**Appeal No. 2023-2153**

# United States Court of Appeals for the Federal Circuit

COLIBRI HEART VALVE LLC,

*Plaintiff-Appellee*,

*v.*

MEDTRONIC COREVALVE, LLC,

*Defendant-Appellant.*

Appeal from the District Court for the Central District of California, Case No. 8:20-cv-00847-DOC-JDE, Judge David O. Carter

**CORRECTED NONCONFIDENTIAL BRIEF OF APPELLANT MEDTRONIC COREVALVE, LLC**

Mark D. Fowler
DLA PIPER LLP (US)
3203 Hanover Street
Suite 100
Palo Alto, CA 94304
(650) 833-2000
mark.fowler@us.dlapiper.com

Stanley J. Panikowski
DLA PIPER LLP (US)
4365 Executive Drive
Suite 1100
San Diego, CA 92121

Gregory A. Castanias
Jennifer L. Swize
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
(202) 879-3939
gcastanias@jonesday.com

Joseph D. Farley
JONES DAY
325 John H. McConnell Blvd.
Suite 600
Columbus, OH 43125

Kelly Holt
JONES DAY
250 Vesey Street
New York, NY 10281-1047

*Counsel for Appellant Medtronic CoreValve, LLC*

**CLAIMS AT ISSUE**

Three claims of U.S. Patent No. 8,900,294, one independent and two dependent, are at issue on appeal. All three claims at issue are set forth below.

1. A method of controlled release of a percutaneous replacement heart valve at a location of a native heart valve in a patient, the method comprising:

obtaining a replacement heart valve device and a delivery and implantation system:

the replacement heart valve device including:

a stent member that is collapsible, expandable and configured for percutaneous delivery; and

a valve residing entirely within an inner channel of the stent member and attached to a proximal portion of the stent member, the valve including two to four individual leaflets made of fixed pericardial tissue;

the delivery and implantation system including:

a pusher member and a moveable sheath, wherein the pusher member includes a guide wire lumen, and wherein the moveable sheath includes a lumen configured for receiving the pusher member;

after the obtaining step, loading the replacement heart valve device into the lumen of the moveable sheath such that the replacement heart valve device is collapsed onto the pusher member to reside in a collapsed configuration on the pusher member and is restrained in the collapsed configuration by the moveable sheath;

after the loading step, advancing the delivery and implantation system transluminally over a guide wire within the patient to position the replacement heart valve device for deployment within the patient at the location of the native heart valve;

after the advancing step, partially deploying a distal portion of the replacement heart valve device within the patient by pushing out the pusher member from the moveable sheath to expose the distal portion of the replacement heart valve device;

after the partially deploying step, restraining the replacement heart valve device so that it does not pop out and is held for controlled release, with a potential that the replacement heart valve device can be recovered if there is a problem with positioning; and

after the restraining step, recovering the distal portion of the replacement heart valve device within the moveable sheath that was exposed in order to address a problem with the position of the replacement heart valve device within the patient.

2. The method of claim 1, wherein the stent member is self-expanding.

3. The method of claim 2, wherein the stent member comprises nitinol.

# CERTIFICATE OF INTEREST

Case No. 2023-2153

*Colibri Heart Valve LLC v. Medtronic CoreValve, LLC*

Filing Party/Entity: Medtronic CoreValve, LLC

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: November 13, 2023 Signature: */s/ Gregory A. Castanias*

Name: Gregory A. Castanias

**1. Represented Entities** (Fed. Cir. R. 47.4(a)(1)) – Provide the full names of all entities represented by undersigned counsel in this case.

Medtronic CoreValve, LLC

**2. Real Party in Interest** (Fed. Cir. R. 47.4(a)(2)) – Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.

Not Applicable

**3. Parent Corporations and Stockholders** (Fed. Cir. R. 47.4(a)(3)) – Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

Medtronic plc

**4. Legal Representatives** – List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

- **DLA Piper LLP (US):**
  - Martin M. Ellison

- Kathryn Riley Grasso
- Safraz Ishmael
- James M. Heintz
- Catherine Huang
- Matthew Ganas

**5. Related Cases** – Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5); *see also* Fed. Cir. R. 47.5(b).

Not Applicable

**6. Organizational Victims and Bankruptcy Cases** – Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

Not Applicable

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ..... i
TABLE OF ABBREVIATIONS ..... x
STATEMENT OF RELATED CASES ..... xi
STATEMENT OF JURISDICTION ..... 1
INTRODUCTION ..... 2
STATEMENT OF THE ISSUES ..... 4
STATEMENT OF THE CASE ..... 6
A. The Paniagua Application, The ’294 Patent, And Their Shared Disclosure Of Leaflets Formed By Folding A Single, Uncut Piece Of Material ..... 6
B. Colibri’s Cancellation Of Claims Reciting Partial Deployment By “Retracting” ..... 11
C. Colibri’s Business Proposition To Medtronic And Its Lawsuit, Years Later, Accusing Medtronic’s Evolut Products Of Infringement ..... 16
D. Pretrial Rulings ..... 21
E. Trial ..... 24
F. Medtronic’s Post-Trial Motions ..... 26
SUMMARY OF THE ARGUMENT ..... 27
STANDARD OF REVIEW ..... 29
ARGUMENT ..... 30
I. THE DISTRICT COURT ERRED BY FAILING TO GRANT JUDGMENT OF INVALIDITY ..... 30
A. The Paniagua Application Fails To Provide Written-Description Support For Colibri’s Claims That Broadly Cover Multi-Piece Valve Leaflets ..... 32
B. A Non-Analogous, Unpublished Decision Cannot Save Colibri’s Claims ..... 37

**TABLE OF CONTENTS**
(continued)

**Page**

II. THE DISTRICT COURT ERRED BY FAILING TO GRANT JUDGMENT OF NONINFRINGEMENT ........ 41

A. No Reasonable Jury Could Find Evolut Users Practice The "Pushing Out" Limitation ........ 41

B. No Reasonable Jury Could Find Evolut Contains A "Valve Residing Entirely Within" An Inner Channel Of The Stent ........ 51

III. THE DISTRICT COURT ERRED BY FAILING TO GRANT JUDGMENT OF NO ACTIVE INDUCEMENT ........ 53

IV. THE DISTRICT COURT ERRED BY PERMITTING COLIBRI'S DAMAGES THEORY AT TRIAL ........ 59

A. Dr. Vellturo Impermissibly Relied On The Edwards-Medtronic Agreement And Failed To Reliably Account For Crucial Differences ........ 60

B. Dr. Vellturo's Royalty Base Impermissibly Includes Products Used Only For Non-Infringing Activity ........ 66

CONCLUSION ........ 71

*CONFIDENTIAL MATERIAL OMITTED*

The material omitted on pages 5, 23, 29, 60, 62, and 63 describes details of a previous agreement between Medtronic and Edwards Lifesciences Corporation.

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Anascape, Ltd. v. Nintendo of Am. Inc.*,
601 F.3d 1333 (Fed. Cir. 2010) ....................32, 36, 37

*Apple Inc. v. Wi-LAN Inc.*,
25 F.4th 960 (Fed. Cir. 2022) ....................65

*AstraZeneca AB v. Apotex Corp.*,
782 F.3d 1324 (Fed. Cir. 2015) ....................68, 69

*Asyst Techs., Inc. v. Emtrak, Inc.*,
402 F.3d 1188 (Fed. Cir. 2005) ....................42

*Bamberg v. Dalvey*,
815 F.3d 793 (Fed. Cir. 2016) ....................32, 36

*Commil USA, LLC v. Cisco Sys., Inc.*,
575 U.S. 632 (2015)....................54, 57

*Cordis Corp. v. Boston Scientific Corp.*,
188 F. App'x 984 (Fed. Cir. 2006) ....................37, 38, 39

*Cyntec Co., Ltd. v. Chilisin Elecs. Corp.*,
84 F.4th 979 (Fed. Cir. 2023) ....................30, 68

*Deere & Co. v. Bush Hog, LLC*,
703 F.3d 1349 (Fed. Cir. 2012) ....................41

*Duramed Pharms., Inc. v. Paddock Labs., Inc.*,
644 F.3d 1376 (Fed. Cir. 2011) ....................46, 48

*Energy Transp. Grp., Inc. v. William Demant Holding A/S*,
697 F.3d 1342 (Fed. Cir. 2012) ....................48

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Enplas Display Device Corp. v. Seoul Semiconductor Co., Ltd.*,
909 F.3d 398 (Fed. Cir. 2018) ....................68, 69

*Ericsson, Inc. v. D-Link Sys., Inc.*,
773 F.3d 1201 (Fed. Cir. 2014) ....................63

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
535 U.S. 722 (2002)....................41, 54

*Finjan, Inc. v. Secure Computing Corp.*,
626 F.3d 1197 (Fed. Cir. 2010) ....................61, 64

*Gaylord v. United States*,
777 F.3d 1363 (Fed. Cir. 2015) ....................61

*Global-Tech Appliances, Inc. v. S.E.B. S.A.*,
563 U.S. 754 (2011)....................29, 54

*Gustafson, Inc. v. Intersystems Indus. Prods., Inc.*,
897 F.2d 508 (Fed. Cir. 1990) ....................65

*Hanson v. Alpine Valley Ski Area, Inc.*,
718 F.2d 1075 (Fed. Cir. 1983) ....................69, 70

*Honeywell International, Inc. v. ITT Industries, Inc.*,
452 F.3d 1312 (Fed. Cir. 2006) ....................34

*HZNP Medicines LLC v. Actavis Labs. UT, Inc.*,
940 F.3d 680 (Fed. Cir. 2019) ....................53, 54, 56

*InTouch Techs., Inc. v. VGO Commc'ns, Inc.*,
751 F.3d 1327 (Fed. Cir. 2014) ....................30

*J&M Corp. v. Harley-Davidson, Inc.*,
269 F.3d 1360 (Fed. Cir. 2001) ....................48

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Krippelz v. Ford Motor Co.*,
667 F.3d 1261 (Fed. Cir. 2012) ....................65

*LaserDynamics, Inc. v. Quanta Comput., Inc.*,
694 F.3d 51 (Fed. Cir. 2012) ....................60, 64

*Lockwood v. Am. Airlines, Inc.*,
107 F.3d 1565 (Fed. Cir. 1997) ....................32

*Lucent Techs., Inc. v. Gateway, Inc.*,
580 F.3d 1301 (Fed. Cir. 2009) ....................64

*Maxwell v. J. Baker, Inc.*,
86 F.3d 1098 (Fed. Cir. 1996) ....................48

*Moore U.S.A., Inc. v. Standard Register Co.*,
229 F.3d 1091 (Fed. Cir. 2000) ....................42

*Mycogen Plant Sci., Inc. v. Monsanto Co*.,
91 F. App'x 666 (Fed. Cir. 2004) ....................49, 50

*Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*,
30 F.4th 1339 (Fed. Cir. 2022) ....................67, 68, 70

*Omega Patents, LLC v. CalAmp Corp.*,
13 F.4th 1361 (Fed. Cir. 2021) ....................60

*Pacific Coast Marine Windshields Ltd. v. Malibu Boats, LLC*,
739 F.3d 694 (Fed. Cir. 2014) ....................49

*Planet Bingo, LLC v. GameTech Int'l, Inc.*,
472 F.3d 1338 (Fed. Cir. 2006) ....................42

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
904 F.3d 965 (Fed. Cir. 2018) ....................71

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Promega Corp. v. Life Techs. Corp.*,
875 F.3d 651 (Fed. Cir. 2017) ....................60, 65, 70

*Purdue Pharma L.P. v. Faulding Inc.*,
230 F.3d 1320 (Fed. Cir. 2000) ....................32, 34

*ResQNet.com, Inc. v. Lansa, Inc.*,
594 F.3d 860 (Fed. Cir. 2010) ....................61

*Roche Diagnostics Corp. v. Meso Scale Diagnostics, LLC*,
30 F.4th 1109 (Fed. Cir. 2022) ....................57, 58

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
242 F.3d 1337 (Fed. Cir. 2001) ....................42

*Silver Sage Partners, Ltd. v. City of Desert Hot Springs*,
251 F.3d 814 (9th Cir. 2001) ....................58

*Sjolund v. Musland*,
847 F.2d 1573 (Fed. Cir. 1988) ....................51

*TecSec, Inc. v. Adobe Inc.*,
978 F.3d 1278 (Fed. Cir. 2020) ....................65

*TEK Global, S.R.L. v. Sealant Sys. Int'l, Inc.*,
920 F.3d 777 (Fed. Cir. 2019) ....................29

*TQ Delta, LLC v. CISCO Sys., Inc.*,
942 F.3d 1352 (Fed. Cir. 2019) ....................65

*Tronzo v. Biomet, Inc.*,
156 F.3d 1154 (Fed. Cir. 1998) .................... 4, 27, 31, 32, 34, 35, 36, 39

*TVIIM, LLC v. McAfee, Inc.*,
851 F.3d 1356 (Fed. Cir. 2017) ....................29, 30

**TABLE OF AUTHORITIES**
(continued)


**Page(s)**

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*,
520 U.S. 17 (1997) .......... 42, 46

*Whitserve, LLC v. Computer Packages, Inc.*,
694 F.3d 10 (Fed. Cir. 2012) .......... 65, 66, 71

**STATUTES**

28 U.S.C.
§ 1295(a)(1) .......... 1
§ 1331 .......... 1
§ 1338(a) .......... 1

35 U.S.C.
§ 284 .......... 68, 69, 70

# TABLE OF ABBREVIATIONS

***Parties***

| Abbreviation | Term |
|---|---|
| Medtronic | Medtronic CoreValve, LLC |
| Colibri | Colibri Heart Valve LLC |

***Terms***

| Abbreviation | Term |
|---|---|
| ’294 patent | U.S. Patent No. 8,900,294 (Appx134-159) |
| asserted claims | claims 1-3 of the ’294 patent |
| Bessler | U.S. Patent No. 5,855,601 (Appx22580-22595) |
| court or district court | United States District Court for the Central District of California |
| JMOL | judgment as a matter of law |
| the Paniagua application | U.S. Patent Pub. No. 2005/0113910 (Appx22673-22695) |
| POSA | person of ordinary skill in the art at the time of the invention |
| PTO | U.S. Patent and Trademark Office |
| TAVR | transcatheter aortic valve replacement |

All emphasis is added throughout this brief, and all internal citations omitted, unless otherwise indicated.

## STATEMENT OF RELATED CASES

Medtronic is not aware of any case pending in this or any court or agency within the meaning of Rule 47.5 that will directly affect this Court's decision in this case or that could be affected by this Court's decision.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1338(a), entered judgment on the verdict on March 16, 2023, resolved all post-trial motions on June 8, 2023, and entered final judgment on June 20, 2023. This appeal, noticed July 7, 2023, is timely. This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## INTRODUCTION

In 2004, Dr. David Paniagua and others filed a continuation-in-part application for a "percutaneously implantable replacement heart valve device and method of making [the] same." That application—the grandparent of what became the '294 patent asserted here—has a specification identical to the '294 patent. The shared specification explains that one reason prior-art valves made of animal tissue had "a significant failure rate" was because of "the presence of extensive suturing," which "prevents the artificial tissue valve from being anatomically accurate in comparison to a normal heart valve."

The Paniagua application emphasized that it overcame this "shortcoming" by folding the leaflet portion of the valve "without cutting of slits to form leaflets or suturing or otherwise affixing of separate leaflet portions." This construction from a single, uncut, unsutured piece of tissue "greatly reduces the risk of tearing of the cusps or leaflets, since they are formed by folding a single uncut portion of material … rather than being attached by suturing." The Paniagua application's specification concluded with a series of proposed-but-never-issued claims, each of which contained the negative requirements of being "uncut" or "without affixing of separate cusps or leaflets or cutting slits into said sheet to form said cusps or leaflets."

Colibri filed the ’294 patent application in April 2014, claiming priority to the Paniagua application. The ’294 patent issued in December 2014. As noted, its specification is identical to the Paniagua application’s. But the claims are not: The ’294 patent broadly claimed a “valve including two to four individual leaflets made of fixed pericardial tissue,” with no limitation to “a single uncut portion of material forming the valve.”

What happened between 2004 and 2014 to cause Colibri’s change of heart? The answer: Colibri had been trying, without success, to sell itself to Medtronic or another company. And so, when Colibri became aware of Medtronic’s Evolut products—with its sutured leaflets—Colibri dusted off its old Paniagua application and filed for a new, broadened set of claims without any “uncut” limitation.

Colibri also tried to obtain claims to a method of deploying the valve by retracting and recovering, which is how Medtronic’s Evolut works. The examiner rejected those proposed claims as lacking written description, so Colibri abandoned them—but then, in this case, asserted infringement by equivalents of that same method.

In the end, the story of this case is a tale as old as time: The ’294 patent was twisted like the proverbial nose of wax, incentivized by the exigencies of commercial needs and financial desires. But the simple fact is this: What Paniagua and his cohorts invented in 2004 and described in that application is not

what the ’294 patent claims, nor what Medtronic has been providing to surgeons since 2013 with Evolut. Basic principles of anticipation, written description, equivalents, and claim meaning stand in the way. The judgment awarding Colibri $106,489,000 should be reversed.

## STATEMENT OF THE ISSUES

This case should have been decided for Medtronic at summary judgment. But the district court misunderstood the claims and the technology, and allowed the case to go to trial. Once before a jury, Colibri offered a timeline and theory of infringement detached from reality. The court then should have granted JMOL for Medtronic, but instead retreated to its prior determinations.

The following legal issues are definitive and compel reversal:

1. The 2004 Paniagua application, to which the ’294 patent claims priority, discloses only a replacement heart valve having leaflets “formed by folding a single uncut portion of material” as the invention, and disparages leaflets made of multiple, sutured parts. Should the district court have granted JMOL of anticipation, invalidating the ’294 patent’s claims, because the Paniagua application did not provide written-description support for those later, broader claims under *Tronzo v. Biomet, Inc.*, 156 F.3d 1154 (Fed. Cir. 1998), and its progeny?

2. Should the court have granted JMOL of noninfringement for Medtronic, where—

(a) the asserted claims require deploying the valve by "pushing out" a "pusher member," but the accused device, which was found equivalent, is capable of deploying the valve only by the opposite motion, pulling back a sheath, which the examiner rejected and Colibri abandoned during prosecution; and

(b) Colibri's expert witness admitted that portions of the accused device which meet the district court's construction of "valve" do not "resid[e] entirely within an inner channel of the stent member," as the claims require?

3. Should the court have granted JMOL of no active inducement for Medtronic, where Colibri abandoned its willfulness claim, alleged only infringement by equivalents, never showed that Medtronic knew Colibri's equivalents theory before trial, and provided no evidence that Medtronic acted with knowing, specific intent to cause infringement?

4. Should the court have granted Medtronic's JMOL or new-trial motions on damages, where Colibri's expert based his theory on a non-comparable type of agreement and failed to reliably account for differences in the hypothetical negotiation, and where it was undisputed that the vast majority of the claimed damages were predicated on non-infringing uses?

## STATEMENT OF THE CASE

### A. The Paniagua Application, The '294 Patent, And Their Shared Disclosure Of Leaflets Formed By Folding A Single, Uncut Piece Of Material

The '294 patent, generally "directed to a method of making a percutaneously implantable replacement heart valve," Appx153 (1:20-23), entered an old, crowded field. In the early 2000s, doctors began replacing weak or faulty heart valves endovascularly (through blood vessels), using a small, flexible catheter to insert the valve into the patient's heart—a procedure commonly called TAVR (**t**ranscatheter **a**ortic **v**alve **r**eplacement). Appx21080-21081 (318:19-319:6); Appx22036-22039 (1203:9-1206:6). The '294 patent, which expired in January 2022, is in this field, as are the earlier-filed applications to which it claims priority. Appx134.

The '294 patent's purported advancement—according to its written description, though not its claims—was to improve on prior-art replacement heart valves by forming leaflets using a "single uncut" piece of tissue. Appx155 (5:64-67). The patent states that it disclosed "a completely newly designed artificial biological tissue valve" that "is formed by folding" the material used to create the leaflets "without cutting of slits … or suturing or otherwise affixing of separate leaflet portions." Appx154-155 (4:64-5:5). The 2004 Paniagua application is the first application in the '294 patent's priority chain to disclose this purported contribution of folding a single piece of material to form the leaflets. Appx22673-

22695. That application and the ’294 patent claim different scopes of valves (*see* p. 11, below), but their written descriptions and figures are identical. *Compare* Appx134-159 *with* Appx22673-22695. (This brief cites only the Paniagua application when discussing the shared specification’s disclosures regarding leaflet formation.)

When describing the “present invention,” the shared specification repeatedly invokes its purported advance of a folding technique—forming the leaflets by folding “a single, continuous, uncut layer” of tissue—and distinguishes this approach from prior-art suturing techniques “that have involved suturing of three separate leaflet/cusp portions.” Appx22691 (¶[0047]); *see also* Appx22674 (“Abstract,” describing “the present invention” as “a novel method of making a replacement heart valve … by folding, thereby eliminating the extent of suturing required, [and] providing improved durability and function”); Appx22689 (¶¶[0024], [0026]) (“Summary of the Invention,” describing “[t]he present invention” as leaflets “formed by folding of the pericardium material … without cutting of slits to form leaflets or suturing or otherwise affixing of separate leaflet portions” and that “[t]he method of the present invention” involves “leaflets … formed by folding a single uncut portion of material … rather than being attached by suturing”); Appx22691 (¶[0049]) (describing “[t]he present invention” as having leaflets “formed by taking a flat sheet of the material and folding it,” which

"reduces the extent of suturing otherwise required, and resembles the natural form and function of the valve leaflets. It also greatly reduces the risk of tearing of the cusps or leaflets, since they are integral to the valve rather than being attached by suturing").

The specification describes the single-piece construction of the leaflets as critical: "the inventors have discovered that as long as the leaflet portion of the valve itself is formed from a single piece of biocompatible valve material, the other portions of the valve can be formed by suturing of one or more separate pieces of material without losing the novel and improved qualities of the present invention." Appx22691 (¶[0047]). The specification provides step-by-step instructions and figures showing how to fold this "single, continuous, uncut" tissue to create the leaflets. Appx22691 (¶¶[0045], [0047]); Appx22684-22686 (Figs. 9A-9C).

Figure 5 (reproduced below) depicts the replacement valve. It constitutes a "self-expanding" stent member (100) made of metal wire (110), and a valve (200). Appx22690 (¶¶[0037], [0040]).




Fig. 5

Appx22680 (Fig. 5). As further shown in Figures 1 and 2 (reproduced below), the valve includes a tubular portion (210) and a leaflet portion (220) containing three "leaflets" (also called "cusps") (221, 222, 223) that "open in response to blood flow in one direction and close in response to blood flow in the opposite direction." Appx22691 (¶[0047]).




Fig. 1




Fig. 2

Appx22675 (Fig. 1); Appx22676 (Fig. 2).

Every disclosed embodiment includes leaflets formed by folding a single uncut piece of tissue, Appx22674 (Abstract); Appx22689 ("Summary of the Invention") (¶¶[0024], [0026]); Appx22690 ("Description of a Preferred Embodiment") (¶[0037]); Appx22691 (¶[0047]). Even "alternate" embodiments—those having "other portions of the valve … formed by suturing"—have "a leaflet forming layer made of a single piece of valve material." Appx22691 (¶[0047]).

The specification's only reference to other methods of forming valve leaflets comes in disparaging discussions of prior-art methods of suturing—described as prone to "failure," inferior, and "disadvantage[d]" compared to the new method of folding "single uncut" leaflets: "The major disadvantage of [prior-art] tissue valves is that they lack the long-term durability of mechanical valves. Tissue valves have a significant failure rate" because of "the presence of extensive suturing." Appx22688 (¶[0022]). It goes on to teach that "the leaflets of most [prior-art] tissue valves are constructed by cutting or suturing the tissue material, resulting in leaflets that do not duplicate the form and function of a real valve and are more susceptible to failure." Appx22688-22689 (¶[0023]). The specification touts its method of folding "single uncut" tissue as "provid[ing] a number of advantages over prior designs, including improved resistance to tearing at suture

lines" and that it "greatly reduces the risk" of failure. Appx22689 (¶¶[0024], [0026]).

But unlike the claims of the Paniagua application (Appx22693-22695), the claims of the '294 patent are not limited to forming leaflets from a single piece of material. In fact, the '294 patent's claims recite that the valve "includ[es] *two to four individual leaflets* made of fixed pericardial tissue," Appx159 (13:38-14:4), and it is undisputed that this covers leaflets formed by suturing separate pieces of tissue together. Appx7514 ("Medtronic and Colibri agree that 'the claims of the '294 patent are not limited to valves with leaflets made from one sheet of material'" and instead "recite a 'valve including two to four leaflets,' irrespective of how that valve is made." (quoting Appx7804 (¶[160]))).

### B. Colibri's Cancellation Of Claims Reciting Partial Deployment By "Retracting"

The '294 patent's claims recite a method of deploying the claimed valve using a "delivery and implantation system" that has a flexible catheter (400) that may be guided through a patient's blood vessel and which uses a "pusher member" disposed within the catheter to deploy a replacement heart valve by pushing the pusher member and the valve from the end of the catheter. Appx158 (11:40-62). During prosecution, Colibri narrowed the scope of its pending claims to this

"pushing" method, after cancelling claims that recited a method of deploying by a pulling (or retracting).

Cancelled claim 39 recited, in relevant part:

> A method of controlled release of a percutaneous replacement heart valve in a patient where a bioprosthetic heart valve is indicated, comprising:
>
> …
>
> partially deploying the replacement heart valve device within the patient by retracting the moveable sheath to expose a portion of the replacement heart valve device; and
>
> after the partially deploying step, recovering the portion of the replacement heart valve device within the moveable sheath that was exposed in order to address a problem with the position of the replacement heart valve device within the patient.

Appx23140-23141.

The examiner rejected claim 39 and others depending from it for inadequate written description. Appx26116-26117; *see also* Appx26114-26123. The specification disclosed "two alternate methods of deployment." Appx26116-26117. One was deployment by pushing and recovering the valve (*see* pp. 15-16 below), which the examiner described as "pushing the pusher member … out of the moveable sheath to *partially* deploy the valve, with the option of recovery." Appx26116 (emphasis in original) (citing Appx23197-23198 (¶[0052])). The other was "pulling/retracting the moveable sheath, allowing full expansion of the

valve"—i.e., fully deploying by "pulling/retracting"—and which did not contemplate the ability to recover the valve. Appx26116-26117 (emphasis in original) (citing Appx23198-23199 (¶[0053])). The disclosure the examiner cited provided that "[t]he stented-valve device is released by pulling the cover sheath … of the delivery system allowing the self-expanding stent to achieve its full expansion." Appx23198.

The examiner explained that, "where the moveable sheath is retracted to expand the valve, the sheath is retracted fully and *no recovering is disclosed*. Recovery is only disclosed with respect to the first method, where the pusher member is pushed out partially." Appx26117 (emphasis in original). But claim 39 and its dependent claims were claiming a method of partially deploying by pulling and recovering—in the examiner's words, a method of "retracting the moveable sheath to expose a portion of the valve device AND recovering the portion of the valve within the moveable sheath." Appx26116-26117. The examiner rejected those claims for lack of written-description support. Appx26116-26117.

Colibri then cancelled the rejected claims and pursued only claims reciting the "pushing out" method, including then-pending claim 34 (issued claim 1). Appx26225. The "pushing out" method occupies the majority of the text of claim 1, and requires the replacement heart valve to be (i) loaded onto the "pusher member" in a "collapsed configuration" within a "moveable sheath," (ii) advanced

within the patient over a guide wire so that it is positioned at the location of the original heart valve, (iii) partially deployed "by pushing out the pusher member from the moveable sheath" so that the far end ("distal portion") of the replacement valve is exposed, (iv) restrained "so that it does not pop out and is held for controlled release," and (v) recovered at the distal end to address a positioning problem. Appx159 (14:10-37).

In describing this method, the specification states that a pusher member (420) is "disposed within the catheter." Appx158 (11:48-49). As shown in Figure 8 (right), the valve (which is inside "stent member 100") is "carrie[d]" in a "collapsed configuration" inside the catheter lumen "to a site where it is desired to implant the replacement heart valve." Appx158 (11:44-48). "Once the … catheter is positioned as desired," the pusher member is pushed out of the moveable sheath so that "the distal portion of the replacement heart valve … is pushed out of the catheter" and it "partially expands." Appx158 (11:51-55). In this partially-deployed position, the stent member "is restrained so that it doesn't pop out and is held for controlled release, with the potential that the replacement heart valve … can be recovered if there is a problem with the positioning." Appx158 (11:55-59). Once repositioned, "the replacement heart valve … is completely pushed out of the



FIG.8

catheter … and released from the catheter to allow the [replacement valve] to fully expand." Appx158 (11:59-62).

### C. Colibri's Business Proposition To Medtronic And Its Lawsuit, Years Later, Accusing Medtronic's Evolut Products Of Infringement

In May 2014, just a month after filing the '294 patent application, Colibri met with Medtronic and proposed that Medtronic acquire Colibri and its technology. Appx21455-21457 (677:24-679:16). During regular discussions, sometimes "multiple times per day," and many concerning the '294 application, Colibri never mentioned potential infringement. Appx21455-21456 (677:24-678:2); Appx21477 (699:10-22). Medtronic made no offer, and discussions ceased early in 2015. Appx21476 (698:17-23).

Years later, in May 2020, Colibri sued Medtronic, alleging direct and induced infringement of the '294 patent based on Medtronic's Evolut sales. Appx164. Medtronic's Evolut products had been successfully used in heart-valve-replacement surgeries since 2013. Appx21791-21793 (991:18-993:9).

Throughout the case, Colibri's allegations narrowed until, by trial, Colibri was pursuing only induced infringement, and only for claims 1-3. Appx648-649. And by the middle of trial, its case relied solely on an equivalents theory for the "pushing out" limitation. Appx22323 (1431:4-9).

The Evolut products undisputedly have valves formed by suturing together three pieces of material to form the "leaflets," and three other pieces to form the "inner skirt." Appx28875 ("The three leaflet … segments … are sewn to each other using … sutures … to form a tri-leaflet configuration."). The following images from a Medtronic customer pamphlet, Appx26672-26684, a supplement to its FDA premarket approval, Appx28837-28890, and an assembly guide (Appx22696-22723), depict an assembled Evolut valve, the pieces used to form it, and a sutured Evolut valve:




Appx26676.



Figure 2-8: Representative Image of Three Laser Cut Leaflets



Figure 2-9: Representative Image of Three Laser-Cut Skirts Segments

Appx28875.




Appx22703.

As for its deployment method, Evolut includes an inner member and a moveable sheath (also called a "capsule"). Colibri alleges that these components correspond to the asserted "pusher member" and "moveable sheath," respectively. Evolut's inner member is positioned within its moveable sheath and holds the replacement valve within a distal end of that sheath.




Appx27612.

Evolut deploys its replacement valve by pulling (or retracting) a moveable sheath. Medtronic's "Instructions For Use," provided with Evolut, instruct surgeons to deploy the replacement heart valve by "retract[ing]" the moveable sheath. Appx22867 ("To deploy the bioprosthesis, rotate the deployment knob .... The capsule retracts and exposes the bioprosthesis."). As depicted in the sequential images to the right, the inner member holds the replacement heart valve stationary and, as the moveable sheath is pulled back (indicated by yellow arrows), the valve is exposed and expands in place. There, the inner skirt forms a seal against the natural anatomy of the aorta and channels blood through the leaflets away from the heart.







Medtronic's instructions give users the option to recover (or "recapture") a partially deployed replacement valve (like that shown in the middle image above). To do so, the moveable sheath is moved back over the inner member, thereby

recapturing the replacement valve. Appx22867-22868 ("Rotate the deployment knob in the opposite direction … to recapture the bioprosthesis" by "advancing the capsule."). Once repositioned, the instructions provide that the replacement valve may be redeployed using the same method of deploying by retracting. Appx22867-22868.

### D. Pretrial Rulings

Early in the case, the district court engaged a special master and frequently adopted the special master's rulings in full, with little (or no) elaboration. *E.g.*, Appx82-86; Appx2318-2321.

***Claim construction.*** The court construed two terms relevant on appeal: (1) "a valve residing entirely within an inner channel of the stent member," and (2) "pushing out the pusher member from the moveable sheath." Appx159 (14:1-2, 14:22-26).

*The "valve residing entirely within" limitation.* The court defined "valve" to mean "portions of the replacement heart valve device that allow the one-way flow of blood." Appx2320.

*The "pushing out" limitation.* The court construed this limitation to mean "pressing against the pusher member with a force that moves the pusher member outward from the moveable sheath." Appx2140-2152; Appx1082. Colibri proposed a construction that focused on a "pushing force" being applied to the

pusher member, without defining what the “pushing force” does or whether the pusher member actually moves. Appx1339 (Colibri’s proposal: a “pushing force is applied to the pushing member in a direction outwards from the moveable sheath”); Appx2150-2151 (special master explaining that, under Colibri’s proposal, “the ‘pushing out’ limitation can be met by a movement in which the pusher member remains stationary while a retraction occurs (that is, wherein only the sheath moves while the pusher member merely prevents the replacement heart valve from being retracted together with the sheath)”).

The court held that Colibri’s proposed construction failed to reflect the claimed limitation. Appx2144-2152. As the special master explained, claim 1 “does not recite merely ‘pushing the pusher member,’ which might be understood as merely applying a force; instead, the claim requires ‘pushing *out* the pusher member *from* the moveable sheath,’” which means that the claimed “‘pushing out’ requires movement of the pusher member such that the replacement heart valve moves outward from the sheath to at least some degree.” Appx2152 (emphases in original). This “distinction” between merely applying force and causing “actual movement” of the pusher member is “apparent in the specification,” Appx2146; Appx2148-2149; *see also* Appx158 (11:51-62), and was confirmed during prosecution. Appx2146-2147.

***Medtronic's summary-judgment motions for non-infringement and invalidity.*** Medtronic moved for summary judgment of (1) anticipation by the Paniagua application; (2) no direct infringement of the "pushing out" limitation because Evolut does not move "outward from the moveable sheath" as required by the asserted claims; (3) no direct infringement of the "valve residing entirely within" limitation because Evolut's inner skirt is part of the "valve" and has parts that are undisputedly outside the stent; and (4) no active inducement because Medtronic does not instruct doctors "to press against" Evolut's inner member (the alleged "pusher member") "with a force that moves [it] outward from the moveable sheath" as required by the claims. Appx3145-3175.

The special master recommended that the district court deny summary judgment as to all of these grounds, which the court did. Appx11486-11582; Appx73-90.

***Medtronic's* Daubert *motions to exclude Colibri's damages expert.*** Colibri submitted a damages report from Christopher Vellturo, who opined that a 6% royalty rate should apply to all Medtronic's Evolut sales based on a 2014 type of [redacted] and type of [redacted] agreement between Medtronic and Edwards Lifesciences Corporation (Edwards). Appx7992-8022. After Medtronic moved to exclude this and other opinions, Appx7921-7950, the court granted the

motion in part but did not exclude Dr. Vellturo's Edwards-Medtronic opinion. Appx91-116.

Dr. Vellturo submitted a supplemental report that repeated the prior flaws and offered an alternative damages theory based on the opinion of another Colibri expert, Dr. Robert Gallegos, that the alleged infringing method is used in only 30-40% of procedures. Appx13223 (¶145 n.196); *see also* Appx10289 (¶321). Medtronic renewed its motion to exclude Dr. Vellturo's opinions. Appx16464-16494. The court granted the motion in part, excluding Dr. Vellturo's alternative theory as too conclusory, but again denied Medtronic's motion to exclude his Edwards-Medtronic opinion. Appx117-133.

### E. Trial

A seven-day jury trial took place in early 2023. Colibri sought $212,978,000 in damages. The jury found the claims infringed and not invalid, and awarded $106,489,000, exactly half of Colibri's request. Appx18-23.

Colibri's case was presented largely through the testimony of Dr. David Fish (a named inventor on the Paniagua application and the '294 patent), and experts Drs. Gallegos (infringement) and Vellturo (damages).

***The Paniagua application disclosed only leaflets made from a single piece of tissue.*** Dr. Fish testified that the challenge with "getting an aortic valve through a catheter" is that it has "to be small enough to … get … all the way up to the

aortic valve." Appx21067-21068 (305:16-306:6). According to Dr. Fish, prior-art devices were "too big." Appx21068 (306:6). Dr. Fish testified that "the lightbulb went off" when Dr. Paniagua showed him "a little folded piece that … looked like origami." Appx21068-21069 (306:24-307:7). He "became really excited with that idea" and determined "to develop [it] as quickly as possible." Appx21069 (307:2-11).

With respect to the claim limitations reciting a transcatheter method of deploying and recovering the valve, Dr. Fish did not point to anything new that his patents or applications contributed. Instead, he admitted the "only thing [the '294] patent [says] about recovering a valve for purposes of then later repositioning it" "was literally copied word for word from … Bessler," a prior-art patent. Appx21172-21175 (410:8-413:12); *see also* Appx21160 (398:1-8); Appx22051 (1218:6-12); Appx21157 (395:14-17) ("There are columns and columns of [the '294] patent that are copied virtually word for word" from Bessler.); Appx21155-21157 (393:7-395:21); Appx22580-22595 (Bessler).

***The "valve residing entirely within" limitation***. Dr. Gallegos acknowledged that Evolut's inner skirt "allows one-way flow of blood" Appx21367 (589:15-19)—rendering the inner skirt a part of the "valve" that does not reside entirely within the stent member.

***The "pushing out" limitation.*** Dr. Gallegos also agreed that Evolut's inner member is "anchored to the handle" of the device, which prevents movement of the inner member "outward from the handle." Appx21398 (620:20-24). Similarly, he testified that the inner member "can't move out of the end [of the moveable sheath] because it's glued" to the handle. Appx21402 (624:5-11); *see also* Appx21404-21405 (626:12-627:1) ("They couldn't move out of the handle because they're all affixed together.").

***Dr. Vellturo's testimony.*** Colibri and Dr. Vellturo offered only a theory that included all Evolut sales, asking the jury to award $212,978,000 based on a 6% royalty rate for every Evolut sold. Appx21548 (770:13-17). (As noted, Colibri and Dr. Vellturo had asserted alternative damages theories pre-trial, including one based on the 30-40% rate of allegedly infringing use, Appx13223 (¶145 n.196), which the court excluded as unreliable. Appx91-133.)

Meanwhile, Colibri abandoned claims that Evolut users literally infringe the "pushing out" limitation, which narrowed its case to infringement-by-equivalents for that limitation. Appx22323 (1431:4-9). Colibri also surrendered its willful-infringement claim. Appx22323 (1431:10-20).

### F. Medtronic's Post-Trial Motions

The district court did not rule on Medtronic's Rule 50(a) motion; Medtronic renewed it under Rule 50(b) after the verdict and moved, alternatively, for a new

trial. Appx19222-19260; *see also* Appx18716-18740; Appx18790-18807 (Medtronic's Rule 50(a) motion). Medtronic requested argument and the district court scheduled a hearing, but cancelled it less than 24 hours before it was to occur. Appx204. Instead, the next day, it issued a short decision denying all of Medtronic's post-trial motions. Appx1-14. The court's reasoning was brief, largely referring back to its prior decisions, with scarcely more explanation. Appx4-14.

## SUMMARY OF THE ARGUMENT

**I.** The Paniagua application anticipates the claims of the '294 patent as a matter of law. That earlier application cannot provide written-description support for the '294 patent—instead, it anticipates—because it discloses only replacement heart valves with leaflets formed from a "single uncut" piece of tissue, whereas the claims of the '294 patent seek to claim leaflets made by any method, including suturing multiple cut pieces of tissue (as Evolut's leaflets are constructed). This broadening of the later claims runs afoul of *Tronzo* and its progeny, and, as in that case, renders the asserted claims invalid.

**II.** The district court should have granted JMOL of no direct infringement. *First*, no reasonable jury could have found that Evolut users practice the "pushing out" limitation under the doctrine of equivalents, because Evolut deploys by *pulling*, not pushing—and opposites cannot be equivalents. *Second*,

that same equivalents theory was barred by prosecution-history estoppel, because Colibri drafted and prosecuted claims to partially deploying a replacement valve by "pulling/retracting" the moveable sheath with the option of recovering the valve—again, precisely how Evolut operates—but cancelled that claim when the examiner rejected it for lack of written-description support. Colibri should not have been allowed to recapture that subject matter by asserting equivalents. *Third*, no reasonable jury could have found that Evolut possesses a "valve residing entirely within an inner channel of the stent member," especially in view of Colibri's own expert's testimony that a portion of the Evolut valve (the inner skirt) resides outside of the stent member.

**III.** The district court should also have granted JMOL for Medtronic on Colibri's ultimate theory of liability—inducement. The Supreme Court has been crystal-clear that a plaintiff must present evidence that the defendant knew the acts it was allegedly inducing constitute infringement. Here, Colibri's direct-infringement theory was an equivalents theory that Medtronic had no knowledge of before this case. Colibri also engaged Medtronic for months about a potential acquisition, discussed the '294 patent, yet studiously avoided asserting infringement under *any* theory. In these circumstances, the record is bereft of the required evidence of Medtronic's actual knowledge "that the induced acts

constitute patent infringement." *Global-Tech Appliances, Inc. v. S.E.B. S.A.*, 563 U.S. 754, 766 (2011).

**IV.** Finally, were the Court to reach the damages issues, it should also reverse and order JMOL of no damages or a new trial. Colibri's only evidence of a reasonable royalty was the testimony of its expert, Dr. Vellturo, who relied on a wildly inapposite type of agreement between the only two TAVR-industry competitors, Edwards and Medtronic, that licensed # U.S. patents across # patent families and nearly # type of patents and pending applications, including apparatus patents. Dr. Vellturo failed to establish comparability between this massive type of license between competitors and the hypothetical negotiation here. Even had comparability been established, Dr. Vellturo failed to reliably account for the vast economic and technological differences between the two situations. In addition, Dr. Vellturo's royalty base impermissibly included all of Medtronic's Evolut sales, despite uncontroverted testimony that the *method claims* accused of *induced* infringement are practiced in at most 30-40% of procedures. JMOL, or a new trial, is warranted.

## STANDARD OF REVIEW

This Court applies Ninth Circuit law in reviewing the JMOL and new-trial decisions. *See TEK Global, S.R.L. v. Sealant Sys. Int'l, Inc.*, 920 F.3d 777, 783 (Fed. Cir. 2019). "The Ninth Circuit reviews denials of JMOL de novo." *TVIIM,*

*LLC v. McAfee, Inc.*, 851 F.3d 1356, 1362 (Fed. Cir. 2017). JMOL is appropriate when "the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Id*. "The Ninth Circuit reviews the denial of a new trial motion for abuse of discretion. A new trial is required if … the verdict is contrary to the great weight of the evidence." *InTouch Techs., Inc. v. VGO Commc'ns, Inc.*, 751 F.3d 1327, 1339 (Fed. Cir. 2014).

Regarding damages, this Court applies Ninth Circuit law to the district court's procedural rulings "and Federal Circuit law to substantive and procedural issues pertaining to patent law." *Cyntec Co., Ltd. v. Chilisin Elecs. Corp.*, 84 F.4th 979, 987 (Fed. Cir. 2023). "The Ninth Circuit reviews evidentiary rulings, such as decisions on *Daubert* motions, for abuse of discretion and reverses if the exercise of discretion is both erroneous and prejudicial." *Id.*

## ARGUMENT

### I. THE DISTRICT COURT ERRED BY FAILING TO GRANT JUDGMENT OF INVALIDITY

At every turn, the Paniagua application emphasizes that the leaflets of its invention must be formed by a "single uncut" piece of tissue. Yet the asserted claims of the '294 patent do not require its leaflets to be formed of a single uncut piece of tissue. Instead, the '294 patent's claims encompass leaflets formed by *any*

method, including by folding "single uncut" tissue as disclosed in the Paniagua application, and also by suturing multiple pieces of tissue, which the Paniagua application disparaged and made clear was not part of its invention. Because the Paniagua application does not provide written-description support for these later, broader claims, the Paniagua application cannot serve as a priority document for the '294 patent. Rather, because the Paniagua application undisputedly discloses the asserted claim's "method of controlled release" using "single uncut" leaflets, which the asserted claims cover, it is anticipating prior art under *Tronzo* and its progeny.

The court erred as a matter of law in finding support in the Paniagua application for the asserted claims—specifically, the broad limitation allowing leaflets to be formed by *any* method, including by suturing separate tissue pieces together. *See* Appx159 (14:3-4); Appx7514 (quoting Appx7804 (¶[160])). And because Colibri does not dispute that Paniagua anticipates the '294 patent claims unless those claims are entitled to the 2004 priority date, the only question here is written description. Appx20180; *see also* Appx2339-2340; *Tronzo*, 156 F.3d at 1158. This Court should reverse.

### A. The Paniagua Application Fails To Provide Written-Description Support For Colibri's Claims That Broadly Cover Multi-Piece Valve Leaflets

"To obtain the benefit of the filing date of a parent application, the claims of the later-filed application must be supported by the written description in the parent 'in sufficient detail that one skilled in the art can clearly conclude that the inventor invented the claimed invention as of the filing date sought.'" *Anascape, Ltd. v. Nintendo of Am. Inc.*, 601 F.3d 1333, 1335 (Fed. Cir. 2010) (quoting *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997)); *see also Bamberg v. Dalvey*, 815 F.3d 793, 797 (Fed. Cir. 2016) (same); *Tronzo*, 156 F.3d at 1158 (same). "A disclosure in a parent application that merely renders the later-claimed invention obvious is not sufficient to meet the written description requirement; the disclosure must describe the claimed invention with all its limitations." *Tronzo*, 156 F.3d at 1158. Where, as here, the patentee seeks to broaden its claim to include a particular feature, the parent must "clearly disclose to the skilled artisan that the inventors … considered [that feature] to be part of their invention." *Purdue Pharma L.P. v. Faulding Inc.*, 230 F.3d 1320, 1328 (Fed. Cir. 2000).

Multi-part leaflets formed by suturing were not part of the Paniagua application's invention. The Paniagua application repeatedly describes its "invention" as a method of forming leaflets by folding a "single uncut" piece of

tissue. Appx22674; Appx22689 (¶¶[0024], [0026]); Appx22691 (¶[0049]). Every embodiment disclosed there, including those recited in the application claims, requires this. Appx22674; Appx22689 (¶¶[0024], [0026]); Appx22690 (¶[0037]); Appx22691 (¶[0047]); Appx22693-22695. More than that, all embodiments and claims explicitly *exclude* leaflets formed by "suturing" or "cutting," repeatedly disclosing leaflets formed only "without cutting of slits to form leaflets or suturing or otherwise affixing of separate leaflet portions," Appx22689 (¶[0024]); *see also* Appx22693-22695, or by folding "rather than being attached by suturing." Appx22689 (¶[0026]); Appx22691 (¶[0049]).

The critical importance of "single uncut" leaflets to the Paniagua application's invention is made abundantly clear in this passage: "the inventors have discovered that *as long as* the leaflet portion of the valve itself is formed from a single piece of biocompatible valve material, the other portions of the valve can be formed by suturing of one or more separate pieces of material without losing the novel and improved qualities of the present invention." Appx22691 (¶[0047]). That is, *according to the inventors*, the leaflets must be "formed from a single piece of biocompatible valve material"; otherwise, one "los[es] the novel and improved qualities of the … invention." Appx22691 (¶[0047]).

The Paniagua application's only references to leaflets formed by any other method are disparaging references to prior-art methods, which the Paniagua

application dismisses as inferior to its “single uncut” leaflets. *See* pp. 10-11 (quoting Appx22688-22689 (¶¶[0022]-[0024])). Indeed, what the Paniagua application disparages is the exact method Colibri later sought to cover with the asserted claims—it even distinguishes its “invention” as being “unlike” Evolut’s method of “suturing of three separate leaflet/cusp portions,” Appx22691 (¶[0047]), that were prone to failure. Appx22688-22689 (¶¶[0022]-[0024], [0026]). This is critical, as Dr. Fish testified, because such failure can “kill the patient.” Appx21163-21164 (401:3-402:8).

The Paniagua application leads to the inescapable conclusion that leaflets formed by suturing are not “part of the[] invention.” *Purdue*, 230 F.3d at 1328. Here, “[i]f the written description could talk, it would say,” “Do not use sutured leaflets,” just like the one in *Honeywell International, Inc. v. ITT Industries, Inc.* metaphorically said, “Do not use carbon fibers.” 452 F.3d 1312, 1320 (Fed. Cir. 2006) (holding that the written description “demeaned the properties of carbon fibers” “beyond expressing the patentee’s preference for one material over another”).

*Tronzo* is squarely on point. There, this Court considered whether the asserted claims had written-description support in the patent’s parent application to benefit from the earlier priority date. 156 F.3d at 1154. If not, it was undisputed that a counterpart application, with an identical specification, anticipated the

asserted claims. *Id.* at 1156-57. The defendant argued that the parent failed to provide written-description support because it "describes only one cup—a conical cup," and the asserted claims were "generic as to the shape of the cup." *Id.* at 1158.

This Court agreed. It held that the parent application described the "invention" in limited terms "as a 'trapezoid,' a 'truncated cone,' or a cup of 'conical shape,'" not broadly to include various permutations. *Id.* at 1159. The parent application also distinguished prior-art cups with "different shapes … as inferior and tout[ed] the advantages of the conical shape." *Id.* But the asserted claims were not limited to cups of a "conical shape," and instead recited claims that "are generic as to the shape of the cup," *id.* at 1158, and thus ran headlong into the parent application's limited, disparaging disclosure. This Court concluded that because the specification of the patent application "fails to meet the written description necessary to support [the asserted] claims," they were "not entitled to the filing date of the parent application and [were] invalid as anticipated by the intervening prior art." *Id.* at 1160.

So too here. The Paniagua application describes its "invention" in limited terms and disparages other methods of forming leaflets, particularly ones requiring suturing separate pieces of tissue. But the asserted claims are not limited, and they sweep so broadly that they include any methods of forming leaflets, including

suturing separate tissue leaflets together to form the leaflet portion of a valve. The Paniagua application thus fails to provide written-description support for the broad claims and anticipates them.

Numerous other decisions likewise compel lack of written description here. In *Bamberg*, the claims covered "a method for the transfer of printed images" using "transfer paper" having "a white layer that melts above and below 220°C." 815 F.3d at 795, 797. This Court held that the "specification must … support a white layer that melts above and below 220°C to satisfy the written description requirement." *Id.* at 797. It did not; this Court concluded that, "like in *Tronzo*, we find that Bamberg does not possess a white layer that melts below 220°C because it specifically distinguished white layers that melt below 220°C as producing an 'undesired' result," and the only disclosure vis-à-vis the claimed invention was white layers that melted above 220°C. *Id.* at 798.

In *Anascape*, too, the asserted claims were not entitled to the priority date of an earlier-filed application and, thus, were anticipated. 601 F.3d at 1341. The earlier application "consistently describe[d]" the "invention [a]s directed to a single input member that is operable in six degrees of freedom," not the later-claimed "controller with input members limited to fewer than six degrees of freedom." *Id.* at 1336-37. Although the earlier application mentioned controllers with less than six degrees of freedom, that was "a description of prior art

joysticks," "not a description of the … invention." *Id.* Finally, the earlier application "stresse[d] the advantages of using a single input member operable in six degrees of freedom, and describe[d] the use of multiple input members as having 'significant disadvantages.'" *Id.* at 1337. On the basis of these features—the same types of disclosures present in the Paniagua application—this Court "conclude[d] that the only reasonable reading of the … specification is that it is directed to and describes only a controller having a single input member operable in six degrees of freedom." *Id.* at 1340.

The Paniagua application makes clear that its "invention" is "single uncut" leaflets, not leaflets formed by any other method. It fails to provide written-description support for the full scope of the asserted claims. Thus, the Paniagua application anticipates as a matter of law.

### B. A Non-Analogous, Unpublished Decision Cannot Save Colibri's Claims

Faced with this Court's numerous precedential decisions compelling a holding of inadequate written description, Colibri defended the asserted claims on the basis of a factually distinct, unpublished decision, *Cordis Corp. v. Boston Scientific Corp.*, 188 F. App'x 984 (Fed. Cir. 2006). The district court and the special master accepted Colibri's argument. But *Cordis* is inapposite.

In *Cordis*, the patent disclosed "two inventive components" for its general subject matter of improving arterial stents, each having distinct benefits: (1) "undulating longitudinal sections (touted for their ability to enhance stent flexibility)," and (2) "ring shaped stent structures (touted for their ability to enhance stent strength)." *Id.* at 990. Each provided a distinct improvement over the prior art, and "nothing in the [*Cordis*] patent suggest[ed] that the benefits of [one were] tied in any way to [the other]." *Id.* Moreover, there was undisputed testimony by the patentee's expert that undulating longitudinal sections taught in the patent could be used in conjunction with stents lacking a ring structure. *Id.* at 990-91. In those circumstances, this Court held that there was adequate written description for an asserted claim that was "broadly directed to using undulating longitudinal structures without reference to any particular type of stent." *Id.* at 989-90.

By contrast, the Paniagua application is not directed to "two inventive components," with single uncut leaflets only an optional one. Paniagua's specification discloses only one (arguably) inventive concept—single uncut leaflets—and the entirety of the Paniagua application's purported inventive contribution depends on that form of leaflets. That is what Paniagua's specification repeatedly states—its invention's "novel and improved qualities" can be realized only with "single uncut" leaflets. Appx22691 (¶[0047]); *see also*

Appx82; Appx158 (11:40-12:2); Appx22692-22693 (¶[0058]). Dr. Fish even testified that the "leaflet-folding technique" was the "lightbulb" idea that allowed him to make a valve device "small enough" to perform his surgeries. Appx21067-21069 (305:16-307:7). And, unlike *Cordis*, here there was inventor testimony indicating that leaflets formed without suturing were anything but optional—Dr. Fish said it was literally a matter of life and death. Appx21163-21164 (401:3-402:8).

Significantly, the *Cordis* patent touted the advantages of both of the allegedly "inventive component[s]" encompassed by its claims (the "undulating longitudinal sections" and the "ring shaped stent structures"). Further, nothing in the *Cordis* specification disparaged stents having undulating longitudinal sections but lacking ring-shaped stent structures or indicated such configurations were outside the patent's scope. But here, the shared specification disparaged valves formed from multiple sheets of material, thereby making clear that such valves were not part of the "invention," even if used in the claimed delivery method. This is one of the grounds on which *Cordis* itself distinguished *Tronzo*. *Id.*

The special master and the court nevertheless embraced Colibri's argument that the '294 patent contained a second, distinct "invention"—"transcatheter techniques for replacing human heart valves." Appx82. That was no distinct "invention" at all. Dr. Fish himself testified that two decades before the Paniagua

application was filed, scientists were researching "the idea of putting a valve somehow mounted on a catheter that could be put into the body without surgery." Appx21067 (305:7-13). He agreed numerous doctors had performed TAVR procedures before him and that he did not invent the use of "self-expanding stents," "catheters," or "a moveable sheath" in TAVR procedures, which "ha[d] been used for many years." Appx21150-21152 (388:22-390:9). Most significantly, he testified that the description contained in the Paniagua application—"columns and columns" of it—including the *only* discussion in the Paniagua application of recovering a partially deployed heart valvewas copied "virtually word for word" from a prior-art patent, Bessler. Appx21156-21157 (394:5-395:21); Appx21172-21173 (410:8-413:12). *Compare* Appx22591-22592 (4:53-5:14) (Bessler) *with* Appx22692-22693 (¶[0058]) (Paniagua application).

In sum, the asserted claims lack the written-description support necessary to entitle them to an earlier priority date. The court therefore erred by denying JMOL of anticipation. This Court need go no further. It should hold the claims invalid and reverse the judgment on this basis alone.

## II. THE DISTRICT COURT ERRED BY FAILING TO GRANT JUDGMENT OF NONINFRINGEMENT

Even were the Court to reach the infringement verdict, here too it should reverse. For at least two independent reasons, no reasonable jury could find direct infringement—a necessary prerequisite to the jury's induced-infringement finding.

### A. No Reasonable Jury Could Find Evolut Users Practice The "Pushing Out" Limitation

Undisputedly, the Evolut valve is deployed by retracting—*pulling*—the moveable sheath, not by pushing the inner member out from the moveable sheath. Appx22867. Mid-trial, Colibri finally recognized it could not prove literal infringement of the "pushing out" limitation for this reason, so Colibri limited its case to infringement by equivalents. Appx22323 (1431:4-9).

But Colibri's doctrine-of-equivalents theory was legally flawed. Under the doctrine of equivalents, a patentee may only "claim those insubstantial alterations that were not captured in drafting the original patent claim but which could be created through trivial changes." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 733 (2002); *see also Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1356 (Fed. Cir. 2012) ("[A]n 'insubstantial difference' from the claimed element" may be an equivalent.). For two independent reasons, there can be no "equivalence" between the "pushing out" required by the claims and Evolut's retracting operation: (1) the doctrine of equivalents cannot be used to

expand the claimed pushing method for deployment to include its opposite, a pulling deployment method; and (2) prosecution-history estoppel bars Colibri's doctrine-of-equivalents theory. Either is sufficient for JMOL of noninfringement.

***Opposites Cannot Be Equivalents.*** This Court has long recognized that equating a claim limitation and its "antithesis" "defies logic." *Moore U.S.A., Inc. v. Standard Register Co.*, 229 F.3d 1091, 1106 (Fed. Cir. 2000). *Moore* thus held that "the term 'majority' is not entitled to a scope of equivalents covering a minority"; a minority—"the very antithesis of a majority"—is not "insubstantially different from a claim limitation requiring a majority." *Id.* Similarly, "after" cannot be the equivalent of "before," *Planet Bingo, LLC v. GameTech Int'l, Inc.*, 472 F.3d 1338, 1345 (Fed. Cir. 2006), nor "non-metallic" and "metallic," *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1346-47 (Fed. Cir. 2001), nor "mounted on" and "unmounted." *Asyst Techs., Inc. v. Emtrak, Inc.*, 402 F.3d 1188, 1195 (Fed. Cir. 2005). To equate opposites would "vitiat[e]" what was claimed, *id.*, in violation of the Supreme Court's command that equivalents "cannot be employed in a manner that wholly vitiates a claim limitation." *SciMed*, 242 F.3d at 1346-47; *see also Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997) (equivalents may not "effectively eliminate [an] element in its entirety").

Two opposing methods of partial deployment are at issue here: (1) partially deploying by "*pushing out*"; and (2) partially deploying by *pulling back*. The asserted claims cover only deploying by "pushing out." Appx159 (14:22-26). But Evolut can deploy a replacement heart valve "only" by retracting—pulling back—the moveable sheath. Appx21780 (980:8-11); Appx21940 (1140:11-18); *see also* Appx21134-21135 (372:2-373:7); Appx21747 (947:16-23). No other method of deployment is even "physically possible." Appx21758 (958:16-24). Colibri's witnesses repeatedly agreed. *E.g.*, Appx21139-21140 (377:25-378:8) (Dr. Fish); Appx21400-21402 (622:9-624-11) (Dr. Gallegos). They testified this is because Evolut's inner member, which Colibri equates with the recited "pusher member," is "rigidly connected" (or "anchored") to the handle of the device, so if the inner member moves, the entire device moves with it—there can never be movement of the inner member "outward from the moveable sheath." Appx21398 (620:5-11); Appx21144-21145 (382:13-383:3). As a result, users "cannot push out" the inner member, "[i]t's just physically impossible for [Evolut] to have that happen without breaking it." Appx21926-21927 (1126:24-1127:5), *see also* Appx21802-21803 (1002:17-1003:3). (Colibri did not accuse broken devices.)

Colibri's doctrine-of-equivalents theory is "that applying a pushing force on the Evolut devices' [inner] member while simultaneously retracting the sheath is equivalent to the pushing limitation." Appx19562. But, as just discussed, the

inability of the inner member to "move[] … outward from the moveable sheath" is fatal to Colibri's doctrine-of-equivalents theory. Colibri's "pushing force" cannot "move[]" Evolut's accused "pusher member outward from the moveable sheath," Appx21758 (958:16-24); rather, any such force merely maintains the position of the replacement heart valve as the sheath is retracted. As Dr. Gallegos explained, without this maintaining force "to restrain" the replacement valve, it "would simply move right along" with the moveable sheath as the sheath is retracted. Appx21281-21282 (519:17-520:8); *see also* Appx21386 (608:8-18).

The special master, whose reasoning the district court adopted, recognized the material difference between a force that "*moves* the pusher member outward from the moveable sheath," as required by the asserted claims, and one that merely *maintains* the position of the pusher member as the sheath is retracted, as with Evolut. Appx2146-2147; Appx2152; *see also* Appx11184 (special master explaining that the court expressly rejected Colibri's argument that the "pushing out" limitation could be met by a pressing force that merely maintains the position of the replacement heart valve as the moveable sheath is retracted). The examiner appreciated this distinction too, "underst[anding] … that 'pushing out' refers *not just to an application of force* but rather to *actual movement*." Appx2146-2147. As the special master understood, the "pushing out" limitation cannot "be met by a movement in which *the pusher member remains stationary while a retraction*

*occurs* (that is, *wherein only the sheath moves while the pusher member merely prevents the replacement heart valve from being retracted together with the sheath*)." Appx2150-2151. Dr. Gallegos described Evolut as operating in precisely this way. *E.g.*, Appx21281-21282 (519:17-520:8) (testifying that Evolut's inner member "restrains the heart valve device" against moving with the moveable sheath as it is retracted); Appx21386 (608:1-18) (testifying that the inner member "applies a force [to the replacement valve] that maintains it in position" as the moveable sheath is retracted).

The distinction between pushing and pulling is not merely theoretical—it directly impacts how Evolut operates. Medtronic's witnesses testified that the Evolut valve was never designed to be pushed out because it would "get tangled up and get blocked by [the patient's] diseased leaflets" without the moveable sheath to hold them back. Appx21708-21709 (908:8-909:4). Pushing out the Evolut valve "would be a bad design," surgeons would have less control over positioning and could even puncture the patient's vessel, "which could be fatal." Appx21768-21769 (968:7-969:2). This is why Evolut was designed to, and can only be operated to, deploy the valve by retracting back the sheath. Appx21735 (935:6-9); Appx21758 (958:6-24); Appx21766-21767 (966:5-967:22).

By necessarily equating pushing out and pulling back, the jury verdict vitiated the "pushing out" limitation. This is legally improper. *Warner-Jenkinson*, 520 U.S. at 29. The Court should order judgment for Medtronic.

***Prosecution-History Estoppel Bars Colibri's Doctrine-Of-Equivalents Theory.*** Prosecution-history estoppel is another independent basis for noninfringement. That rule "prevents a patent owner from recapturing through the doctrine of equivalents subject matter surrendered to acquire the patent." *Duramed Pharms., Inc. v. Paddock Labs., Inc.*, 644 F.3d 1376, 1380 (Fed. Cir. 2011). The district court rejected Medtronic's prosecution-history-estoppel argument for the same reasons it had during summary judgment. Appx4; *see* Appx84-85. This determination was erroneous.

During prosecution, the examiner rejected claim 39 (among others) for lack of written description. Appx26116-26117. As quoted at p. 12, *supra*, claim 39 recited a method of partially deploying by "retracting the moveable sheath" with the option of recovering the valve. Appx23140-23141. The examiner found this "retracting" partial-deployment method to be patentably distinct from the method of partially deploying by pushing out recited in Colibri's other pending claims. *See* Appx26116-26117. Instead of traversing the written-description rejection, Colibri cancelled the rejected claims, thereby accepting the examiner's distinction and withdrawing methods of partially deploying by retracting a moveable sheath

from further scrutiny before the PTO. Appx26225. Colibri thus forfeited all claims reciting methods of partial deployment by retracting a moveable sheath, including (because the preamble of claim 39 recited the open-ended "comprising" transition) methods where a force is applied to hold the pusher member stationary during the retraction. Appx23140-23141; Appx26116. Substantial, undisputed trial evidence establishes this is exactly how Evolut operates. *E.g.*, Appx21096 (334:4-7); Appx21100 (338:6-12); Appx21134 (372:21-25); Appx21246-21249 (484:10-487:3); Appx21407 (629:9-22); Appx21747 (947:16-23). The jury's verdict impermissibly allowed Colibri to recapture this same method under the doctrine of equivalents.

The district court (and special master) gave three reasons for rejecting prosecution-history estoppel: *first*, Colibri's asserted equivalent differs from what was recited in cancelled claim 39, *second*, Colibri did not cancel "claim 39 in favor of pursing a limitation that already appeared in … claim 34" or add or amend "any claims directed to [any such] limitation," and *third*, cancelled claim 39 was not in independent/dependent relationship with claim 34. Appx11522-11523. All these reasons were factually and legally flawed.

*First*, Colibri's asserted equivalent is "applying a pushing force on the Evolut devices' [inner] member while simultaneously retracting the sheath." Appx19562. This is precisely what was recited in claim 39: "deploying the

replacement heart valve device … by retracting the moveable sheath." Appx23140-23141. As noted above, Colibri's asserted "pushing force" is covered by claim 39's open-ended "comprising" language. In fact, Dr. Gallegos testified that without such a force, the valve would move with the moveable sheath as it is retracted, and there would be no deployment. Appx21281-21282 (519:17-520:8).

*Second,* by cancelling claim 39, Colibri narrowed the scope of its then-pending claims to exclude partially-deploying-by-retracting. Colibri's actions "deprived [the examiner] of the opportunity to consider whether [claim 39's method] w[as] patentable," *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1108 (Fed. Cir. 1996), and it cannot now "recaptur[e] through the doctrine of equivalents" the same method it "surrendered to acquire the patent." *Duramed*, 644 F.3d at 1380.

*Third*, this Court's precedent does not require any particular claim relationship to trigger prosecution-history estoppel; it is enough that Colibri cancelled claim 39 to narrow the scope of its then-pending claims. In fact, this Court's prosecution-history estoppel cases often arise when the narrower claims are altogether new ones. *See, e.g.*, *Energy Transp. Grp., Inc. v. William Demant Holding A/S*, 697 F.3d 1342, 1359 (Fed. Cir. 2012) (prosecution-history estoppel barred patentee from recapturing subject matter where patentee cancelled claims rejected for lack of written-description support in order to pursue new, narrower claims); *J&M Corp. v. Harley-Davidson, Inc.*, 269 F.3d 1360, 1368 (Fed. Cir.

2001) (same); *Mycogen Plant Sci., Inc. v. Monsanto Co*., 91 F. App'x 666, 668 (Fed. Cir. 2004) (same; examiner rejected claims for lack of enablement).

*Pacific Coast Marine Windshields Ltd. v. Malibu Boats, LLC*, 739 F.3d 694 (Fed. Cir. 2014), is particularly instructive. This Court held that prosecution-history estoppel restricted the patentee from asserting infringement against a windshield with three holes, where the patentee during prosecution had selected as its invention a windshield with four holes and cancelled all other embodiments. *Id.* at 699-702. On appeal, the patentee argued that cancelling its claims was not a narrowing amendment. This Court disagreed: "By cancelling figures … the applicant surrendered such designs and conceded that the claim was limited to what the remaining figure showed—a windshield with four holes in the corner post." *Id.* at 703. "*It does not matter that the surrender involved the cancellation of claims rather than amendment*." *Id.* "By removing broad claim language referring to alternate configurations and cancelling the individual figures showing the unelected embodiments, the applicant narrowed the scope of his original application, and surrendered subject matter." *Id.* This is exactly what Colibri did here.

*Mycogen Plant Science* is similarly instructive. There, the patentee, Mycogen, cancelled claims that "were rejected for lack of enablement." 91 F. App'x at 667. The accused infringer, Monsanto, argued that because Mycogen

cancelled these claims, it "was barred by prosecution history estoppel from asserting" equivalents. *Id.* Mycogen insisted that "it did not mean to surrender any subject matter by canceling [the] claims …, since it continued to prosecute other claims … which were not the subject of narrowing amendments." *Id.* This Court disagreed: "[C]ancellation of claims for reasons related to patentability in favor of claims with a narrower literal scope *has the same presumptive effect on claim limitations as amending the claims directly*." *Id.* at 668; *see also id.* ("[A] voluntary amendment (or cancellation)" can "give rise to a prosecution history estoppel."). Thus, it was "immaterial that the claims at issue … were not themselves amended to avoid patentability rejections, because [the] broader claims … were canceled in response to a rejection for unpatentability." *Id.* Accordingly, "the cancellation of [the broader] claims … created a rebuttable presumption that all subject matter between the pertinent limitations of the original claims and those of the final, issued claims was surrendered." *Id.*

So too here. It is "immaterial" that Colibri cancelled claims covering Evolut's method of deploying-by-pulling and recovering instead of amending them. Colibri cancelled those claims "in response to a rejection for unpatentability" and did so "in favor of claims with a narrower literal scope." *Id.* The district court erred by concluding that prosecution-history estoppel did not apply to bar Colibri's doctrine-of-equivalents theory.

* * * *

As a matter of law, equivalents cannot be used to cover the opposite of the asserted claims' "pushing out" limitation. And prosecution-history estoppel bars Colibri from recapturing claim scope it abandoned during prosecution. For either reason, this Court should reverse the judgment.

### B. No Reasonable Jury Could Find Evolut Contains A "Valve Residing Entirely Within" An Inner Channel Of The Stent

A second limitation precludes infringement: the requirement that the "valve resid[e] entirely within an inner channel of the stent member." It is undisputed that portions of Evolut's inner skirt reside "outside of the stent member." Appx21353 (575:1-4). The district court defined "valve" to mean "portions of the replacement heart valve device that allow the one-way flow of blood," Appx2109, and Colibri's Dr. Gallegos testified that Evolut's inner skirt "allows one-way flow of blood." Appx21367 (589:19). The evidence thus "permits only one reasonable conclusion": the inner skirt is part of the "valve," and does not reside entirely within an inner channel of the stent member. *See Sjolund v. Musland*, 847 F.2d 1573, 1579 (Fed. Cir. 1988). "The jury was not at liberty to disbelieve [this] evidence." *Id.*

Dr. Gallegos testified, as he had in his pretrial expert report, that "one-way" blood flow requires two "corresponding states": one allowing blood to flow from

the heart to the aorta, and another preventing back flow. Appx21361 (583:3-18); Appx5484 (¶151). On the basis of this definition, he admitted that the inner skirt "allows one-way flow of blood." Appx21367 (589:19). Indeed, in the lengthy colloquy leading up to it, he walked through his definition and testified that the inner skirt directly contributes to achieving both "states." First, by acting as a seal to "channel … blood through the leaflets." Appx21361-21363 (583:19-585:1). And second, "to prevent … blood from flowing backwards" into the heart. Appx21363-21364 (585:2-586:1). Dr. Gallegos even said that without a functioning inner skirt, blood would flow in "multiple directions." Appx21366-21367 (588:14-589:14); *see also* Appx5493 (¶167 n.16). So the inner skirt is part of the valve—it allows "one-way" blood flow. Medtronic's witnesses testified to the same effect, so there is no conflict in the evidence on this point. Appx21689-21690 (889:4-890:13); Appx22018-22023 (1185:22-1190:13). And, since the skirt resides outside of the stent member, the "valve" does not "*resid[e]* entirely within an inner channel of the stent member."

In denying JMOL, the court said that Dr. Gallegos's admission that the inner skirt "allows one-way flow of blood," Appx21367 (589:19), was taken out of context. Appx4. But the court did not explain what the proper context was. Indeed, it is unclear in what context his admission could mean anything different. Nor did the court explain its conclusion that sufficient evidence supports the jury's

finding that the inner skirt is not part of the "valve." Appx4. The evidence, including Dr. Gallegos's testimony, establishes without contradiction that the inner skirt "allows one-way flow of blood" and is, by definition, part of the "valve." There is no other way to view the evidence. Dr. Gallegos's attempts to recant his admissions by emphasizing the inner skirt's function as a seal that "by definition … stops flow," Appx2111 (501:10-16), only confirms that the inner skirt meets his definition of "one way" blood flow by preventing flow in "multiple directions."

For this independent reason, the court erred by upholding the verdict of infringement; no reasonable jury could find that the accused products meet the "valve residing entirely within" limitation.

## III. THE DISTRICT COURT ERRED BY FAILING TO GRANT JUDGMENT OF NO ACTIVE INDUCEMENT

The verdict had yet another basic legal flaw: Colibri failed to prove induced infringement. Even accepting *arguendo* that the jury reasonably found direct infringement by doctors using Evolut, Colibri had to prove Medtronic acted with knowing, specific intent to induce that infringement. It failed to do that.

"To prove inducement, a plaintiff must present evidence of active steps taken to encourage direct infringement." *HZNP Medicines LLC v. Actavis Labs. UT, Inc.*, 940 F.3d 680, 701 (Fed. Cir. 2019). "[S]pecific intent and action to

induce infringement must be shown." *Id.* at 702. As the Supreme Court held in 2011, and underscored again in 2015, this specific-intent requirement is laser-focused not on mere awareness of the patent, but on actual "knowledge that the induced acts constitute patent infringement." *Global-Tech*, 563 U.S. at 766. It is not enough that "the defendant knew of the patent" or encouraged acts that were later found to be infringing; the patentee must "pro[ve] the defendant knew the acts [at issue] were infringing." *Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 640, 642 (2015). It is thus impossible for a defendant to intentionally induce infringement if it "reads the patent's claims differently from the plaintiff, and that reading is reasonable," even if the defendant "knew the acts *might* infringe." *Id.* at 642. That Court has been "clear in rejecting any lesser mental state as the standard." *Id.*

Medtronic's products do not literally infringe any claim—by the middle of trial, Colibri acknowledged it could not show literal infringement of the "pushing out" limitation, retreating to equivalents as its infringement theory. That precludes Colibri's induced-infringement case. To know of the infringement, Medtronic would have had to not only interpret the patent itself, but also accurately predict Colibri's equivalents theory—a complicated doctrine that "renders the scope of patents less certain," because "[i]t may be difficult to determine what is, or is not, an equivalent to a particular element of an invention." *Festo*, 535 U.S. at 732.

This task would have been especially difficult here, as the claims require deploying by "pushing," and Medtronic has only ever instructed its users to deploy by pulling. Medtronic's belief that pulling is materially different from "pushing" is well-founded, as even the examiner found the two methods patentably distinct. Appx26116-26117.

Colibri presented no evidence that anyone at Medtronic knew, or even believed, doctors were using the products in an infringing manner under Colibri's doctrine-of-equivalents theory. All the evidence shows that Medtronic only instructs users in methods of deploying by retracting—never pushing. Appx22867 (Step 22); Appx21762-21763 (962:23-963:5) (testifying that "the only instruction that Medtronic gives in its instructions for use" is Step 22). Step 22 of Medtronic's "Instructions For Use," which are "provided to physicians who use [Evolut]," Appx21224 (462:4-7), says so explicitly.

> 22. To deploy the bioprosthesis, rotate the deployment knob in the direction of the arrows. The capsule retracts and exposes the bioprosthesis. Continue deploying the bioprosthesis in a controlled manner, adjusting valve position as necessary and noting the position of the radiopaque capsule marker band and paddle attachment.

Appx22867. There is no evidence that Medtronic thought—let alone knew—that its instruction to "retract[]" was equivalent to the claimed "pushing." Quite the opposite. The evidence shows that, in Medtronic's reasonable view, it is "physically impossible" to use Evolut to push out the inner member. Appx21721

(921:19-21); Appx21794 (994:15-17). Even if Medtronic had thought it possible to use Evolut in an infringing manner, that is still not enough. *See HZNP*, 940 F.3d at 701 ("[M]ere knowledge about a product's characteristics or that it may be put to infringing uses is not enough" to show inducement.). Colibri would also need to show that Medtronic took "active steps … to encourage direct infringement"—i.e., "specific intent and action to induce infringement." *Id.* at 701-02. No such evidence exists.

The court never addressed Medtronic's inducement arguments in any detail, instead summarily concluding that Medtronic's mere knowledge of the '294 patent and the jury's infringement verdict was enough to sustain the verdict. Appx5. But the court failed to engage at all with the specific-intent requirement or hold Colibri to its burden on that issue.

Years before filing suit, Colibri had begun a "formal sales process" seeking to sell the company and its technology to one of "the large companies … in the transcatheter heart valve space." Appx21457 (679:6-16). Colibri engaged Medtronic in these discussions, and between May 2014 and early 2015, representatives from each company were in contact "multiple times per day." Appx21455-21457 (677:24-679:3). A "vast majority" of these interactions concerned Colibri's patent portfolio, including "detailed conversation[s]" about

the ’294 patent application, which was then pending. Appx21477 (699:2-9); Appx21462 (684:17-23); Appx134.

Colibri strategically chose not to mention to Medtronic that it “believed Medtronic was infringing the ’294 patent,” Appx21477 (699:10-13), because Colibri was “trying to partner with Medtronic” and “wanted … to engage” Medtronic, so “the last thing that [Colibri] wanted to do was to be aggressive and scare [Medtronic] away.” Appx21477 (699:14-22).

These discussions, which the court relied on as supporting the jury’s verdict, show only that Medtronic knew of the ’294 patent, nothing more. Indeed, Colibri’s intentional silence only reinforced Medtronic’s belief of non-infringement. Appx21721 (921:15-21); Appx21794 (994:9-17). Those discussions certainly do not establish that Medtronic “knew” it was “induc[ing] … patent infringement” literally—let alone under Colibri’s doctrine-of-equivalents theory, which appeared for the first time in its expert’s report. *Commil*, 575 U.S. at 639. Only Colibri could have believed Medtronic was inducing infringement and, despite vaguely asserting at trial that it somehow “insinuated” infringement, Colibri actively worked to make sure Medtronic had no inkling of Colibri’s belief. Appx21477 (699:10-22).

Finally, Colibri’s abandonment of its willfulness claim cements the absence of evidence of specific intent. *See Roche Diagnostics Corp. v. Meso Scale*

*Diagnostics, LLC*, 30 F.4th 1109, 1119 (Fed. Cir. 2022). The court found this irrelevant. Appx6. But *Roche* suggests it is quite relevant, for "the intent standard for inducement is akin to the one for willfulness, as both rest on the subjective intent of the accused infringer." 30 F.4th at 1119. There, this Court held that "the district court's findings regarding willfulness and enhancement compel the conclusion in this particular case that Roche lacked the requisite intent for inducement under the proper standard." *Id.* at 1118. Colibri bore the burden of proving both willfulness and inducement, and both require a showing of Medtronic's subjective intent to infringe (or induce infringement). Colibri's abandonment of its willfulness claim underscores its lack of evidence of subjective intent for alleged inducement.

No reasonable jury could find Medtronic actively induced infringement of the '294 patent. This Court should reverse the judgment for this independent reason as well.

* * * *

Were the Court to decline to reverse on liability, it should at least order a new trial. For much the same reasons no reasonable jury could find infringement, the verdict is at least "contrary to the clear weight of the evidence." *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 819 (9th Cir. 2001).

## IV. THE DISTRICT COURT ERRED BY PERMITTING COLIBRI'S DAMAGES THEORY AT TRIAL

Were this Court to uphold the liability verdict, it should at minimum reverse the damages award. Colibri presented its damages case through its expert, Dr. Vellturo. Before trial, Medtronic twice moved to exclude Dr. Vellturo's unreliable damages opinions for his reliance on the Edwards-Medtronic agreement for his royalty rate and incorporation of admittedly non-infringing uses into his damages base. Appx7928-7931; Appx7941-7946; Appx16471-16472; Appx16481-16492. Yet the court allowed Dr. Vellturo's theory to be presented to the jury. The court denied Medtronic's post-trial motion for the same reasons it rejected Medtronic's *Daubert* arguments. Appx7-8.

The court erred by ruling Dr. Vellturo's reliance on the Edwards-Medtronic agreement was permissible, and that Medtronic's arguments went to weight, not admissibility. Appx96-103; Appx124-131. And despite acknowledging that Dr. Vellturo's damages opinion compensated Colibri for predominantly non-infringing uses, the court authorized such compensation based on evidence that having the claimed method available is valuable even if it is never used. Appx130. This, too, was legal error. Because Colibri did not pursue any reliable "theories of recovery in a singular pursuit of an ultimately invalid damages theory," it "is not

entitled to any damages." *Promega Corp. v. Life Techs. Corp.*, 875 F.3d 651, 666 (Fed. Cir. 2017).

### A. Dr. Vellturo Impermissibly Relied On The Edwards-Medtronic Agreement And Failed To Reliably Account For Crucial Differences

The sole license on which Dr. Vellturo's damages opinion was based was the Edwards-Medtronic agreement. It was Colibri's burden to prove that agreement "sufficiently comparable" to the hypothetical Medtronic-Colibri negotiation. *Omega Patents, LLC v. CalAmp Corp.*, 13 F.4th 1361, 1377 (Fed. Cir. 2021). It came nowhere close. Dr. Vellturo offered only the most superficial reasons for using the Edwards-Medtronic agreement, none of which show sufficient comparability. The court erred by allowing Dr. Vellturo's damages opinion to come before the jury.

To start, the Edwards-Medtronic agreement is a type of [redacted]—and this Court has expressed "longstanding disapproval of relying on settlement agreements to establish reasonable royalty damages." *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 77 (Fed. Cir. 2012). Such agreements can be relied on only in "certain limited circumstances." *Id.* An expert relying on such an agreement bears the burden to demonstrate its comparability to the hypothetical license at issue, including by ensuring that it is possible to "account[] for the technological and economic differences between those licenses" and the

hypothetical negotiation. *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 873 (Fed. Cir. 2010). Here, that was a bridge too far, and there was no evidence to guide the jury to any proper conclusions based on the Edwards-Medtronic agreement. In multiple respects, that agreement is not comparable to the hypothetical negotiation, and Dr. Vellturo often failed to even attempt to account for the differences.

*First*, the Edwards-Medtronic agreement involved "head-to-head competitors in the U.S. TAVR market," Appx21601 (833:7-10), whereas Colibri is not even a market participant. Indeed, Edwards and Medtronic "have the only FDA-approved commercial TAVR devices." Appx21601 (833:14-16). Thus, "[i]f someone in the U.S. wants to use a[n] FDA-approved TAVR device, there are two options …. There's Medtronic and Edwards." Appx21602 (834:9-13). The only other alternative would be to "not do a TAVR procedure" at all. Appx21602 (834:14-15). All Medtronic sales thus directly reduce the potential market for Edwards sales—a key factor that would be reflected in any Medtronic-Edwards agreement, but not in a Medtronic-Colibri agreement. After all, Colibri "is a startup that does not have any products on the market." Appx21595 (825:19-21); *see also Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1211 (Fed. Cir. 2010) (holding that "use of past … licenses … must account for differences in … economic circumstances of the contracting parties"); *cf. Gaylord v. United States*,

**CONFIDENTIAL MATERIAL OMITTED ON THIS PAGE**

777 F.3d 1363, 1368 (Fed. Cir. 2015) ("[T]he use of past licenses as evidence must always take account of economically relevant differences between the circumstances of those licenses and the circumstances of the matter in litigation.").

*Second,* the Edwards-Medtronic agreement concerned # U.S. patents—none belonging to Colibri—spread across # patent families, all of which were based on the work of inventors foundational to TAVR, Appx21596-21597 (826:19-827:17), as well as rights to nearly # type of patents and patent applications. Appx21598-21600 (828:20-830:4); Appx8189-8194. Here, the hypothetical negotiation would have been for a single U.S. patent and no foreign rights.

*Third*, many of the patents licensed under the Edwards-Medtronic agreement were apparatus patents, meaning the patent would be infringed, absent a license, by every product sold. Appx21589 (811:12-24). Here, by contrast, the asserted claims are method claims being practiced by—at most—30-40% of the devices sold. Appx21299 (537:12-17); Appx21564-21565 (786:24-787:2); Appx21600 (830:5-8).

Dr. Vellturo claimed to have considered the differences between the Edwards-Medtronic agreement and the hypothetical negotiation, but in fact he acknowledged only one difference: the parties' competitive relationship. Appx21646 (821:13-16). Dr. Vellturo testified this is why he focused on the lower end of the royalty range from the Edwards-Medtronic agreement. Appx21646

(821:13-16). But merely focusing on the lower end of a cumulative royalty range for [redacted] different Edwards patent families consisting of [redacted] total U.S. patents did not adequately account for the significant difference in the relationship of the parties, much less all the relevant economic and technological differences.

The Edwards-Medtronic agreement contemplated different royalty rates based on the number of U.S. patents being licensed at any particular time: [redacted]% for [redacted] patents, [redacted]% for [redacted] patents, and [redacted]% for [redacted] patents. Dr. Vellturo repeatedly testified that he chose a rate from the bottom of the range because Edwards and Medtronic were direct competitors, whereas Colibri was only a competitor to some degree. Appx21644 (819:7-21); *see also* Appx21591 (821:8-25); Appx21603 (835:4-12); Appx21646 (821:13-16). He offered no other reason for this choice. But the [redacted]% rate Dr. Vellturo selected licensed rights to [redacted] patents owned by Medtronic's only direct competitor and "[redacted] patent applications and patents as well." Appx21599-21600 (829:24-830:4). Dr. Vellturo never explained how this is "sufficiently comparable" to the hypothetical negotiation for *one* U.S. patent owned by a non-competitor. *See Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014) ("[A]llegedly comparable licenses may cover more patents than are at issue in the action, include cross-licensing terms, [or] cover foreign intellectual property rights …. Testimony relying on licenses *must account for such distinguishing facts* when invoking them to value the patented invention.");

*Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1331 (Fed. Cir. 2009) ("Lucent did not explain how the fact that the Acer agreement involved eight patents affects how probative it is of the Microsoft–Lucent hypothetical negotiation over one patent.").

Nor did he explain how he accounted for the testimony of Colibri's "comparability" expert, Lakshmi Prasad Dasi, that only half of the Edwards patents were technically comparable to the '294 patent. Appx21603-21604 (835:23-836:22); *see also* Appx21508 (730:9-11). *See Finjan*, 626 F.3d at 1211 (holding that "use of past licenses … must account for differences in the technologies"). And neither Dr. Vellturo nor Dr. Dasi gave the jury any guidance about the relative contributions of the different patents in the Edwards-Medtronic agreement for evaluating royalty rates. Dr. Vellturo instead focused broadly on "the ability to recapture and reposition," *e.g.*, Appx21560 (782:14-20); Appx21561 (783:12-15); Appx21565 (787:12-16)—which he admitted were not Colibri's inventions, Appx21611 (843:18-25) (agreeing that "Colibri did not invent TAVR procedures" or "recapturability"), and which Dr. Fish said were copied "word for word" from prior art. Appx21175 (413:4-12).

Dr. Vellturo thus only "alleg[ed] a loose or vague comparability," which "does not suffice." *LaserDynamics*, 694 F.3d at 79. His failure to adequately account for significant differences between the Edwards-Medtronic agreement and

the hypothetical Colibri license yielded a damages opinion "untethered to the facts of this case." *Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960, 973-74 (Fed. Cir. 2022). The court found Dr. Vellturo's other damages theories too unreliable and excluded them, Appx91-133, so Colibri's only damages theory was based on the Edwards-Medtronic agreement. Thus, because Colibri offered no other reliable measure of damages, it is entitled to none. *See Promega*, 875 F.3d at 666 (plaintiff "not entitled to any damages" where it "deliberately [took] a risk by relying at trial exclusively on a damages theory that ultimately proves unsuccessful, and, when challenged, does not dispute that it failed to present an alternative case for damages"); *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1291 (Fed. Cir. 2020) ("[W]e have observed that there can be an award of no damages where 'none were proven.'" (quoting *Gustafson, Inc. v. Intersystems Indus. Prods., Inc.*, 897 F.2d 508, 509-10 (Fed. Cir. 1990))).

Even if Dr. Vellturo's damages opinion could have survived *Daubert*, his "[c]onclusory expert testimony does not qualify as substantial evidence." *TQ Delta, LLC v. CISCO Sys., Inc.*, 942 F.3d 1352, 1358 (Fed. Cir. 2019). Such "generic statements" of an expert are "too conclusory to sustain the jury's verdict." *Krippelz v. Ford Motor Co.*, 667 F.3d 1261, 1269 (Fed. Cir. 2012). "'[S]uperficial testimony' and the simple recitation of royalty numbers that happen to be in the ballpark of the jury's award will not support the jury's award." *Whitserve, LLC v.*

*Computer Packages, Inc.*, 694 F.3d 10, 32 (Fed. Cir. 2012). As this Court holds, "reciting each factor and making a conclusory remark about its impact on the damages calculation before moving on does no more than tell the jury what factors a damages analysis could take into consideration." *Id.* at 31. This kind of testimony "encourage[s] the jury to reach a purely speculative judgment." *Id.* at 32. So it was here.

### B. Dr. Vellturo's Royalty Base Impermissibly Includes Products Used Only For Non-Infringing Activity

The asserted claims recite the step of "recovering the distal portion of the replacement heart valve device within the moveable sheath that was exposed in order to address a problem with the position of the replacement heart valve device within the patient." Appx159 (14:32-37). The asserted claims do not recite mere "capability" of such recovery, nor do they recite it as an optional step. Rather, the claims require the actual performance of the step.

It is undisputed that, at most, the accused method is used in 30-40% of procedures, meaning that 60-70% of the time Evolut is used, there can be no infringement. Appx21299 (537:12-17); Appx21564-21565 (786:24-787:2); Appx15801. Because each Evolut is used only once, 60-70% of the accused devices were *never used in an infringing manner*. Yet Dr. Vellturo presented a damages number that included *100%* of Medtronic's Evolut sales. Appx21548

(770:4-11); Appx21610 (842:15-18). Dr. Vellturo told the jury that "the value of the invention is inherent in every sale whether or not that invention ultimately get[s] used … in the procedure." Appx21567 (789:12-20). Thus, Dr. Vellturo's theory was that Medtronic would have paid a royalty on every sale for the mere "option" of "recapturing and repositioning," *even if surgeons never used that option*. Appx21565 (787:12-16). Indeed, Dr. Vellturo called this "capability"—which he admitted Colibri "didn't invent"—the "key competitive advantage." Appx21560 (782:14-20); Appx21611 (843:18-25).

Dr. Vellturo told the jury that Medtronic and Colibri would *not* "have only agreed to a royalty for those 30 to 40 percent of the procedures that involve recapturing and repositioning." Appx21565 (787:3-16). The court credited this reasoning in denying Medtronic's post-trial motion, just as it had in denying Medtronic's pre-trial *Daubert* motion. Appx130 ("Colibri presents evidence that having the claimed method available is valuable even when the claimed method is not used."); Appx15764 ("As Colibri's experts explain, that the claimed method is needed 30-40% of the time does not lessen its value.").

The court's reasoning went directly against controlling precedent. Where, as here, "the only asserted claim is a method claim, the damages base should be limited to products that were *actually used to perform the claimed method*." *Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1357 (Fed. Cir. 2022).

"The royalty base for reasonable royalty damages cannot include activities that do not constitute patent infringement, as patent damages are limited to those 'adequate to compensate for the infringement.'" *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1343 (Fed. Cir. 2015) (quoting 35 U.S.C. § 284); *see also Cyntec*, 84 F.4th at 989 (citing *Niazi* to hold that the district court abused its discretion by not excluding an expert damages opinion that "included sales of irrelevant products and services, and … failed to account for these irrelevant products and services"). This is so even if a broader royalty base "reflects what a [licensor] would have agreed to in a real licensing negotiation." *AstraZeneca*, 782 F.3d at 1343; *see also Enplas Display Device Corp. v. Seoul Semiconductor Co., Ltd.*, 909 F.3d 398, 411 (Fed. Cir. 2018).

Even if Dr. Vellturo had been correct that the parties might have agreed to a royalty payment on every sale, Colibri still would not have been entitled to that full amount in damages. In *Enplas*, for example, this Court did not dispute that the parties in the real world would most likely have agreed to a "freedom-to-operate license" that extended beyond the products and patents at issue in the litigation. 909 F.3d at 411. Similarly, in *AstraZeneca*, this Court did not doubt that a real-world licensor and licensee for the pharmaceutical patent at issue would have agreed to a license—and thus royalty payments—during the period of statutory pediatric exclusivity, which extended past the patent's expiration. 782 F.3d at

1343. Nonetheless, in each case, the Court rejected the damages awards based on these theories because, regardless of what parties in the real world would have agreed to, a "'royalty base for reasonable royalty damages cannot include activities that do not constitute patent infringement, as patent damages are limited to those "adequate to compensate for the infringement."'" 909 F.3d at 411 (quoting A*straZeneca*, 782 F.3d at 1343 (quoting 35 U.S.C. § 284)).

The district court relied on *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075 (Fed. Cir. 1983), as "persuasive that the availability of an invention can be valuable even if under good conditions the invention is not actually used." Appx7. But in *Hanson*, the three snowmaking machines practicing the patented method had *actually been used* in an infringing manner. 718 F.2d at 1077. The question was how to calculate the damages the defendant was required to pay. *Id.* at 1080. The plaintiff did not seek damages for machines that never infringed; the only question was whether the defendant was entitled to pay less for machines that it used less often. *Id.* This Court held it was not error to apply a uniform royalty rate across all three machines. *Id.*

As important, *Hanson* concerned an entirely different damages theory: cost savings resulting from use of the infringing snow-making machines instead of noninfringing, prior-art devices. *Id.* The plaintiff's expert "based his [damages] calculations on … an average season's use of snowmaking systems." *Id.* at 1081.

Under this average-annual-cost-savings approach, a per-use royalty calculation was simply irrelevant. Here, Dr. Vellturo did not perform any such cost-savings analysis. Instead, he offered a calculation based on the total revenue for all Evolut products, including the 60-70% undisputedly *never* used to infringe. This Court's "narrow" decision in *Hanson* does not apply to this approach. *Id.* at 1083 ("Our decision is a narrow one," limited to "the record in this case."). And *Niazi* and other cases are clear that, under that approach, all that can be counted are devices actually used to infringe.

Even accepting the district court's premise that "having the claimed method available is valuable even when the claimed method is not used," Appx130, that "valu[e]" cannot be the basis for damages, because no infringement occurs "when the claimed method is not used." And § 284 and this Court's precedent prohibit Colibri from recovering damages not "attributable to infringement." *Promega*, 875 F.3d at 656, 662 n.11.

The jury improperly relied on "sales of products with the mere capability" to infringe, even where the product was never actually used to infringe. *Niazi*, 30 F.4th at 1357. The court should not have upheld the damages verdict. Its decision should be reversed.

* * * *

At minimum, this Court should order a new trial on damages. *See, e.g.*, *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 980 (Fed. Cir. 2018) (remanding for new trial where "the evidence presented … was insufficient as a matter of law" to support damages verdict); *Whitserve*, 694 F.3d at 33-34 (remanding for new trial where damages verdict was "the result of sheer surmise and conjecture").

## CONCLUSION

This Court should reverse the judgment of infringement and no invalidity. Alternatively, this Court should reverse the damages award. At minimum, a new trial should be ordered.

Dated: November 13, 2023

Respectfully submitted,

/s/ Gregory A. Castanias
Gregory A. Castanias
Jennifer L. Swize
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
(202) 879-3939
gcastanias@jonesday.com

Joseph D. Farley
JONES DAY
325 John H. McConnell Blvd.
Suite 600
Columbus, OH 43125

Mark D. Fowler
DLA PIPER LLP (US)
3203 Hanover Street
Suite 100
Palo Alto, CA 94304
(650) 833-2000
mark.fowler@us.dlapiper.com

Stanley J. Panikowski
DLA PIPER LLP (US)
4365 Executive Drive
Suite 1100
San Diego, CA 92121

Kelly Holt
JONES DAY
250 Vesey Street
New York, NY 10281-1047

*Counsel for Appellant Medtronic CoreValve, LLC*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) and Federal Circuit Rule 32(b)(1) because it contains 13,983 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in Times New Roman 14-point font.

Dated: November 13, 2023

*/s/ Gregory A. Castanias*
Gregory A. Castanias
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
(202) 879-3939
gcastanias@jonesday.com

*Counsel for Appellant Medtronic CoreValve, LLC*

## CERTIFICATE OF COMPLIANCE WITH RULE 25.1(e)(2)

I certify that the foregoing brief complies with the limitations set forth in Federal Circuit Rule 25.1(d)(1)(A) and contains 12 unique words (including numbers) marked as confidential.

Dated: November 13, 2023

*/s/ Gregory A. Castanias*
Gregory A. Castanias
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
(202) 879-3939
gcastanias@jonesday.com

*Counsel for Appellant Medtronic CoreValve, LLC*

# ADDENDUM

## Addendum Table of Contents


| Date | Description | Appx Pages |
|---|---|---|
| 6/8/2023 | Sealed Order Denying Medtronic's Renewed Motions for Judgment as a Matter of Law Under FRCP 50(b) and for a New Trial Under FRCP 59, and Granting (as Modified) Colibri's Motion for Pre- and Post-Judgment Interest | Appx1-14 |
| 6/16/2023 | Final Judgment | Appx15-17 |
| 2/8/2023 | Jury Verdict | Appx18-23 |
| 11/15/2021 | Sealed Order Adopting the Technical Special Master's Report and Recommendations on Motions for Summary Judgment | Appx73-90 |
| 11/16/2021 | Sealed Order Granting in Part Medtronic's Motion to Exclude Certain Damages Opinions of Christopher Vellturo | Appx91-116 |
| 8/17/2022 | Sealed Order Granting in Part Medtronic's Motion to Exclude Certain Supplemental Damages Opinions of Chrstopher Vellturo | Appx117-133 |
| | U.S. Patent No. 8,900,294 | Appx134-159 |

# Appx1-14

# SEALED DOCUMENT OMITTED IN ITS ENTIRETY

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SOUTHERN DIVISION – SANTA ANA**

| | |
|---|---|
| COLIBRI HEART VALVE LLC,<br><br>Plaintiff,<br><br>v.<br><br>MEDTRONIC COREVALVE LLC,<br><br>Defendant. | Case No.: 8:20-cv-00847-DOC-JDE<br><br>**FINAL JUDGMENT**<br><br>**Complaint Filed: May 4, 2020**<br><br>**Trial Date: January 31, 2023** |

//
//
//

This action was tried to a jury beginning on January 31, 2023, in Courtroom 10A of the above-entitled Court, before the Honorable District Court Judge David O. Carter, with respect to claims 1-3 of U.S. Patent No. 8,900,294. On February 8, 2023, the jury returned a verdict in favor of Plaintiff Colibri Heart Valve LLC and against Defendant Medtronic CoreValve LLC on all questions. Dkt. 442. The Court previously had granted summary judgment of non-infringement in favor of Medtronic and against Colibri on claims 1, 2, 3, and 5 of U.S. Patent No. 9,125,739 and claim 4 of U.S. Patent No. 8,900,294. Dkt. 258 (entered November 17, 2021).

**NOW THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED THAT JUDGMENT IS HEREBY ENTERED IN THIS MATTER AS FOLLOWS:**

1. Medtronic has induced infringement of claims 1-3 of U.S. Patent No. 8,900,294 ("the '294 patent").

2. Claims 1-3 of the '294 patent are not invalid.

3. Final judgment of non-infringement is entered in Medtronic's favor on claims 1, 2, 3, and 5 of U.S. Patent No. 9,125,739 and claim 4 of the '294 patent.

4. Colibri shall recover $106,489,000 from Medtronic on the jury verdict, and Medtronic shall be liable for that amount.

5. Colibri shall recover $19,120,000 from Medtronic in prejudgment interest under 35 U.S.C. § 284.

6. As provided in 28 U.S.C. § 1961, Colibri shall also recover post-judgment interest, running from the date of this Judgment until the Judgment is paid, on all amounts listed in paragraphs 4 and 5 above at a rate equal to the weekly average one-year constant maturity Treasury yield for the calendar week preceding the date of this Judgment, compounded annually.

7. Per D.I. 496, Colibri shall receive and Medtronic shall pay costs in the amount of $155,045.39.

//

//

IT IS SO ORDERED.

DATED: June 16, 2023

HON. DAVID O. CARTER
UNITED STATES DISTRICT JUDGE

FILED
CLERK, U.S. DISTRICT COURT
2/8/2023
CENTRAL DISTRICT OF CALIFORNIA
BY: kdu DEPUTY

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SOUTHERN DIVISION**

| | |
|---|---|
| COLIBRI HEART VALVE LLC,<br>Plaintiff,<br>v.<br>MEDTRONIC COREVALVE LLC,<br>Defendant. | Case No. 8:20-cv-00847-DOC-JDE<br><br>**VERDICT FORM**<br>REDACTED<br>**Hon. David O. Carter** |

**VERDICT FORM**

When answering the following questions (which begin on the next page) and filling out this Verdict Form, please follow the directions provided throughout the form. Your answer to each question must be unanimous. Some of the questions contain legal terms that are defined and explained in detail in the Jury Instructions. Please refer to the Jury Instructions if you are unsure about the meaning or usage of any legal term that appears in the questions below.

We, the jury, unanimously agree to the answers to the following questions and return them under the instructions of the Court as the verdict in our case.

**JURY QUESTION NO. 1**

**INFRINGEMENT**

Did Colibri prove by a preponderance of the evidence that Medtronic CoreValve actively induced infringement of the following claims of U.S. Patent No. 8,900,294?

A "yes" answer is a finding for Colibri.

A "no" answer is a finding for Medtronic CoreValve.

Claim 1: Yes ✓ No ______

Claim 2: Yes ✓ No ______

Claim 3: Yes ✓ No ______

## JURY QUESTION NO. 2
## INVALIDITY

Did Medtronic CoreValve prove by clear and convincing evidence that the following claims of U.S. Patent No. 8,900,294 are invalid?

A "yes" answer is a finding for Medtronic CoreValve.

A "no" answer is a finding for Colibri.

Claim 1: Yes ______ No ✓

Claim 2: Yes ______ No ✓

Claim 3: Yes ______ No ✓

**JURY QUESTION NO. 3**

**DAMAGES**

**Answer this question on damages only if you found one or more claims infringed by Medtronic CoreValve and not invalid (that is, if you answered "yes" for one or more claims in Question #1 and, for all such claims, you answered "no" in Question #2).**

**Otherwise, skip Jury Question No. 3 and proceed to the final page of this Verdict Form.**

What amount of damages do you award to compensate Colibri for Medtronic CoreValve's inducement of infringement? (Answer in dollars and cents.)

$ 106,489,000.00

You have now reached the end of the Verdict Form and should review it to ensure it accurately reflects your unanimous determinations. The Presiding Juror should sign and date the Verdict Form in the spaces below and notify the Bailiff that you have reached a verdict.

The Presiding Juror should retain possession of the Verdict Form and bring it when the jury is brought back into the courtroom.

Date: 2/08/2023

Presiding Juror: [redacted]

# Appx73-90

# SEALED DOCUMENT OMITTED IN ITS ENTIRETY

# Appx91-116

# SEALED DOCUMENT OMITTED IN ITS ENTIRETY

# Appx117-133

# SEALED DOCUMENT OMITTED IN ITS ENTIRETY

US008900294B2

(12) **United States Patent**
**Paniagua et al.**

(10) **Patent No.: US 8,900,294 B2**
(45) **Date of Patent: Dec. 2, 2014**

(54) **METHOD OF CONTROLLED RELEASE OF A PERCUTANEOUS REPLACEMENT HEART VALVE**

(71) Applicant: **Colibri Heart Valve LLC**, Broomfield, CO (US)

(72) Inventors: **David Paniagua**, Houston, TX (US); **R. David Fish**, Houston, TX (US)

(73) Assignee: **Colibri Heart Valve LLC**, Broomfield, CO (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **14/253,656**

(22) Filed: **Apr. 15, 2014**

(65) **Prior Publication Data**

US 2014/0243955 A1 Aug. 28, 2014

**Related U.S. Application Data**

(63) Continuation of application No. 13/675,665, filed on Nov. 13, 2012, which is a continuation of application No. 10/887,688, filed on Jul. 10, 2004, now Pat. No. 8,308,797, which is a continuation-in-part of application No. 10/037,266, filed on Jan. 4, 2002, now abandoned.

(51) **Int. Cl.**
***A61F 2/24*** (2006.01)
***A61B 8/12*** (2006.01)
*A61F 2/95* (2013.01)

(52) **U.S. Cl.**
CPC ............ ***A61F 2/2427*** (2013.01); ***A61F 2/2412*** (2013.01); ***A61F 2/2415*** (2013.01); ***A61F 2/2418*** (2013.01); ***A61F 2/2436*** (2013.01); ***A61F 2/24*** (2013.01); ***A61F 2/2475*** (2013.01); ***A61B 8/12*** (2013.01); ***A61F 2/2433*** (2013.01); *A61F 2002/9534* (2013.01); *A61F 2/2439* (2013.01); *Y10S 623/917* (2013.01); *A61F 2250/0039* (2013.01)
USPC .......................... **623/2.11**; 623/2.14; 623/917

(58) **Field of Classification Search**
CPC ........... A61F 2/2436; A61F 2002/9534; A61F 2/2439; A61F 2/2433; A61F 2/2427
USPC ....................................... 623/1.24, 1.26, 900
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,014,024 A 12/1961 Lieberman et al.
3,029,819 A 4/1962 Edward
(Continued)

FOREIGN PATENT DOCUMENTS

EP 1603493 12/2005
EP 2000115 5/2011
(Continued)

OTHER PUBLICATIONS

Office Action issued Jun. 9, 2014, in U.S. Appl. No. 14/253,650.
(Continued)

*Primary Examiner* — Thomas J Sweet
*Assistant Examiner* — Cheryl Miller
(74) *Attorney, Agent, or Firm* — Fox Rothschild LLP

(57) **ABSTRACT**

A method of making a replacement heart valve device whereby a fragment of biocompatible tissue material is treated and soaked in one or more alcohol solutions and a solution of glutaraldehyde. The dried biocompatible tissue material is folded and rehydrated in such a way that forms a two- or three-leaflet/cusp valve without affixing of separate cusps or leaflets or cutting slits into the biocompatible tissue material to form the cusps or leaflets. After the biocompatible tissue material is folded, it is affixed at one or more points on the outer surface to the inner cavity or a stent.

**4 Claims, 12 Drawing Sheets**




U.S.D.C. CENTRAL DISTRICT OF CALIFORNIA
CASE NO. 20-847-DOC
Colibri Heart Valve LLC
VS. Medtronic CoreValve LLC
PLAINTIFF'S EXHIBIT **PX1**
DATE ______ IDEN.
DATE ______ EVID.
BY ______
Deputy Clerk

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,105,492 A 10/1963 Jeckel
3,320,972 A 5/1967 High et al.
3,409,914 A 11/1968 Jones
3,548,417 A 12/1970 Kischer et al.
3,562,820 A 2/1971 Braun
3,588,920 A 6/1971 Wesolowski
3,671,979 A 6/1972 Moulopoulos
3,709,175 A 1/1973 Edwards et al.
3,878,565 A 4/1975 Sauvage
3,945,052 A 3/1976 Liebig
3,966,401 A 6/1976 Hancock et al.
3,983,581 A 10/1976 Angell et al.
3,986,828 A 10/1976 Hoffman, Jr. et al.
4,011,947 A 3/1977 Sawyer
4,035,849 A 7/1977 Angell et al.
4,055,861 A 11/1977 Carpentier et al.
4,056,854 A * 11/1977 Boretos et al. ............... 623/2.18
4,060,081 A 11/1977 Yannas et al.
4,082,507 A 4/1978 Sawyer
4,084,268 A 4/1978 Ionescu et al.
4,106,129 A 8/1978 Carpentier et al.
4,164,045 A 8/1979 Bokros et al.
4,172,295 A 10/1979 Batten
4,218,782 A 8/1980 Rygg
4,222,126 A 9/1980 Boretos et al.
4,233,493 A 11/1980 Nath
4,265,694 A 5/1981 Boretos et al.
4,291,420 A 9/1981 Reul
4,340,977 A 7/1982 Brownlee et al.
4,350,492 A 9/1982 Wright et al.
4,364,127 A 12/1982 Pierce et al.
4,388,735 A 6/1983 Ionescu et al.
4,423,525 A 1/1984 Vallana et al.
4,441,216 A 4/1984 Ionescu et al.
4,456,589 A 6/1984 Holman et al.
4,473,423 A 9/1984 Kolff
4,477,930 A 10/1984 Totten et al.
4,490,859 A 1/1985 Black et al.
4,517,687 A 5/1985 Liebig et al.
4,545,082 A 10/1985 Hood
4,597,762 A 7/1986 Walter et al.
4,600,533 A 7/1986 Chu
4,631,052 A 12/1986 Kensey
4,657,133 A 4/1987 Komatsu et al.
4,666,442 A 5/1987 Arru et al.
4,728,328 A 3/1988 Hughes et al.
4,743,231 A 5/1988 Kay et al.
4,759,758 A 7/1988 Gabbay
4,759,759 A 7/1988 Walker et al.
4,798,611 A 1/1989 Freeman, Jr.
4,801,299 A 1/1989 Brendel et al.
4,870,966 A 10/1989 Dellon et al.
4,883,458 A 11/1989 Shiber
4,892,539 A 1/1990 Koch
4,966,604 A 10/1990 Reiss
4,976,733 A 12/1990 Girardot
4,979,939 A 12/1990 Shiber
5,006,104 A 4/1991 Smith et al.
5,007,896 A 4/1991 Shiber
5,011,488 A 4/1991 Ginsburg
5,026,366 A 6/1991 Leckrone
5,032,128 A 7/1991 Alonso
5,047,041 A 9/1991 Samuels
5,047,050 A 9/1991 Arpesani
5,052,771 A 10/1991 Williams et al.
5,061,277 A 10/1991 Carpentier et al.
5,080,660 A 1/1992 Buelna
5,139,515 A 8/1992 Robicsek
5,163,955 A 11/1992 Love et al.
5,171,273 A 12/1992 Silver et al.
5,226,889 A 7/1993 Sheiban
5,261,878 A 11/1993 Galindo
5,282,847 A 2/1994 Trescony et al.
5,326,370 A 7/1994 Love et al.
5,326,371 A 7/1994 Love et al.
5,332,402 A * 7/1994 Teitelbaum .................. 623/2.42
5,336,616 A 8/1994 Livesey et al.
5,360,443 A 11/1994 Barone et al.
5,374,539 A 12/1994 Nimni et al.
5,376,110 A 12/1994 Tu et al.
5,383,927 A 1/1995 De Goicoechea et al.
5,411,552 A 5/1995 Andersen et al.
5,413,601 A 5/1995 Keshelava
5,449,384 A 9/1995 Johnson
5,476,506 A 12/1995 Lunn
5,480,424 A 1/1996 Cox
5,484,444 A * 1/1996 Braunschweiler et al. .. 623/1.11
5,489,297 A 2/1996 Duran
5,500,015 A 3/1996 Deac
5,509,930 A 4/1996 Love
5,522,879 A 6/1996 Scopelianos
5,522,881 A 6/1996 Lentz
5,545,215 A 8/1996 Duran
5,549,664 A 8/1996 Hirata et al.
5,549,666 A 8/1996 Hata et al.
5,571,170 A 11/1996 Palmaz et al.
5,571,173 A 11/1996 Parodi
5,571,174 A 11/1996 Love et al.
5,578,071 A 11/1996 Parodi
5,578,072 A 11/1996 Barone et al.
5,582,168 A 12/1996 Samuels et al.
5,591,229 A 1/1997 Parodi
5,634,928 A 6/1997 Fischell et al.
5,645,559 A * 7/1997 Hachtman et al. ............. 623/1.2
5,653,749 A 8/1997 Love et al.
5,683,451 A * 11/1997 Lenker et al. ................ 623/1.11
5,713,953 A 2/1998 Vallana et al.
5,728,152 A 3/1998 Mirsch, II et al.
5,733,299 A 3/1998 Sheiban et al.
5,741,333 A 4/1998 Frid
5,746,775 A 5/1998 Levy et al.
5,769,780 A 6/1998 Hata et al.
5,782,914 A 7/1998 Schankereli
5,787,887 A 8/1998 Klingenbeck-Regn
5,840,081 A 11/1998 Andersen et al.
5,855,601 A * 1/1999 Bessler et al. ............... 623/2.38
5,861,028 A 1/1999 Angell
5,862,806 A 1/1999 Cheung
5,876,448 A * 3/1999 Thompson et al. .......... 623/1.13
5,895,420 A 4/1999 Mirsch, II et al.
5,931,969 A 8/1999 Carpentier et al.
5,957,949 A * 9/1999 Leonhardt et al. ........... 623/1.24
5,961,539 A 10/1999 Northrup et al.
5,961,549 A 10/1999 Nguyen et al.
5,972,030 A 10/1999 Garrison et al.
5,976,179 A 11/1999 Inoue
6,004,328 A 12/1999 Solar
6,004,330 A 12/1999 Middleman et al.
6,010,531 A 1/2000 Donlon et al.
6,029,671 A 2/2000 Stevens et al.
6,045,576 A 4/2000 Starr et al.
6,053,938 A 4/2000 Goldmann et al.
6,091,984 A 7/2000 Perelman et al.
6,102,944 A 8/2000 Huynh et al.
6,117,169 A 9/2000 Moe
6,124,523 A 9/2000 Banas et al.
6,125,852 A 10/2000 Stevens et al.
6,126,686 A 10/2000 Badylak et al.
6,129,756 A 10/2000 Kugler
6,162,245 A 12/2000 Jayaraman
6,168,614 B1 * 1/2001 Andersen et al. ............ 623/1.26
6,168,619 B1 1/2001 Dinh et al.
6,171,335 B1 1/2001 Wheatley et al.
6,174,327 B1 1/2001 Mertens et al.
6,186,999 B1 2/2001 Chen
6,197,143 B1 3/2001 Bodnar
6,214,055 B1 4/2001 Simionescu et al.
6,221,091 B1 4/2001 Khosravi
6,231,602 B1 5/2001 Carpentier et al.
6,245,102 B1 6/2001 Jayaraman
6,254,629 B1 7/2001 Inoue
6,254,630 B1 7/2001 Inoue
6,254,636 B1 7/2001 Peredo
6,264,691 B1 7/2001 Gabbay

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 6,269,819 | B1 | 8/2001 | Oz et al. | |
| 6,270,526 | B1 | 8/2001 | Cox | |
| 6,277,397 | B1 | 8/2001 | Shimizu | |
| 6,277,555 | B1 | 8/2001 | Duran et al. | |
| 6,287,335 | B1 | 9/2001 | Drasler et al. | |
| 6,293,970 | B1 | 9/2001 | Wolfinbarger, Jr. et al. | |
| 6,312,462 | B1 | 11/2001 | McDermott et al. | |
| 6,312,474 | B1 | 11/2001 | Francis et al. | |
| 6,334,873 | B1 | 1/2002 | Lane et al. | |
| 6,342,069 | B1 | 1/2002 | Deac et al. | |
| 6,350,278 | B1 * | 2/2002 | Lenker et al. | 623/1.12 |
| 6,350,282 | B1 | 2/2002 | Eberhardt | |
| 6,352,554 | B2 | 3/2002 | De Paulis | |
| 6,352,708 | B1 | 3/2002 | Duran et al. | |
| 6,358,275 | B1 | 3/2002 | McIlroy et al. | |
| 6,358,284 | B1 | 3/2002 | Fearnot et al. | |
| 6,371,980 | B1 | 4/2002 | Rudakov et al. | |
| 6,376,244 | B1 | 4/2002 | Atala et al. | |
| 6,378,221 | B1 | 4/2002 | Ekholm, Jr. et al. | |
| 6,383,171 | B1 | 5/2002 | Gifford et al. | |
| 6,391,333 | B1 | 5/2002 | Li et al. | |
| 6,409,755 | B1 | 6/2002 | Vrba | |
| 6,418,339 | B1 | 7/2002 | Essenpreis et al. | |
| 6,425,916 | B1 * | 7/2002 | Garrison et al. | 623/2.11 |
| 6,432,712 | B1 | 8/2002 | Wolfinbarger, Jr. et al. | |
| 6,440,167 | B2 | 8/2002 | Shimizu | |
| 6,458,153 | B1 | 10/2002 | Bailey et al. | |
| 6,461,382 | B1 | 10/2002 | Cao | |
| 6,468,313 | B1 | 10/2002 | Claeson et al. | |
| 6,471,723 | B1 | 10/2002 | Ashworth et al. | |
| 6,482,227 | B1 | 11/2002 | Solovay | |
| 6,482,228 | B1 | 11/2002 | Norred | |
| 6,482,240 | B1 | 11/2002 | Eckmayer et al. | |
| 6,491,719 | B1 | 12/2002 | Fogarty et al. | |
| 6,494,909 | B2 | 12/2002 | Greenhalgh | |
| 6,503,272 | B2 | 1/2003 | Duerig et al. | |
| 6,530,952 | B2 * | 3/2003 | Vesely | 623/2.18 |
| 6,534,004 | B2 | 3/2003 | Chen et al. | |
| 6,540,782 | B1 | 4/2003 | Snyders | |
| 6,553,681 | B2 | 4/2003 | Ekholm, Jr. et al. | |
| 6,558,418 | B2 | 5/2003 | Carpentier et al. | |
| 6,565,960 | B2 | 5/2003 | Koob et al. | |
| 6,569,200 | B2 | 5/2003 | Wolfinbarger, Jr. et al. | |
| 6,582,458 | B1 | 6/2003 | White et al. | |
| 6,582,462 | B1 | 6/2003 | Andersen et al. | |
| 6,582,464 | B2 | 6/2003 | Gabbay | |
| 6,599,524 | B2 | 7/2003 | Li et al. | |
| 6,610,088 | B1 | 8/2003 | Gabbay | |
| 6,624,890 | B2 | 9/2003 | Backman et al. | |
| 6,626,938 | B1 | 9/2003 | Butaric et al. | |
| 6,652,577 | B2 | 11/2003 | Gianotti | |
| 6,652,578 | B2 | 11/2003 | Bailey et al. | |
| 6,666,886 | B1 | 12/2003 | Tranquillo et al. | |
| 6,676,698 | B2 | 1/2004 | McGuckin, Jr. | |
| 6,682,537 | B2 * | 1/2004 | Ouriel et al. | 606/108 |
| 6,682,559 | B2 | 1/2004 | Myers et al. | |
| 6,685,739 | B2 | 2/2004 | Dimatteo et al. | |
| 6,696,074 | B2 | 2/2004 | Dai et al. | |
| 6,702,826 | B2 | 3/2004 | Liddicoat et al. | |
| 6,719,788 | B2 | 4/2004 | Cox | |
| 6,719,789 | B2 | 4/2004 | Cox | |
| 6,733,525 | B2 | 5/2004 | Yang et al. | |
| 6,736,823 | B2 | 5/2004 | Darois et al. | |
| 6,764,510 | B2 | 7/2004 | Vidlund et al. | |
| 6,773,456 | B1 | 8/2004 | Gordon et al. | |
| 6,773,457 | B2 | 8/2004 | Ivancev | |
| 6,790,229 | B1 | 9/2004 | Berreklouw | |
| 6,792,979 | B2 | 9/2004 | Konya et al. | |
| 6,802,319 | B2 | 10/2004 | Stevens et al. | |
| 6,802,806 | B2 | 10/2004 | McCarthy et al. | |
| 6,821,297 | B2 | 11/2004 | Snyders | |
| 6,821,530 | B2 | 11/2004 | Koob et al. | |
| 6,830,584 | B1 * | 12/2004 | Seguin | 623/2.11 |
| 6,893,460 | B2 * | 5/2005 | Spenser et al. | 623/2.14 |
| 6,896,690 | B1 * | 5/2005 | Lambrecht et al. | 606/200 |
| 6,908,481 | B2 | 6/2005 | Cribier | |
| 6,913,608 | B2 | 7/2005 | Liddicoat et al. | |
| 6,916,338 | B2 | 7/2005 | Speziali | |
| 6,942,694 | B2 | 9/2005 | Liddicoat et al. | |
| 6,951,571 | B1 | 10/2005 | Srivastava | |
| 6,961,123 | B1 | 11/2005 | Wang et al. | |
| 6,977,231 | B1 | 12/2005 | Matsuda | |
| 6,986,735 | B2 | 1/2006 | Abraham et al. | |
| 7,004,925 | B2 | 2/2006 | Navia et al. | |
| 7,008,763 | B2 | 3/2006 | Cheung | |
| 7,011,688 | B2 | 3/2006 | Gryska et al. | |
| 7,018,404 | B2 | 3/2006 | Holmberg et al. | |
| 7,018,406 | B2 | 3/2006 | Seguin et al. | |
| 7,022,348 | B2 | 4/2006 | Ketharanathan | |
| 7,025,780 | B2 | 4/2006 | Gabbay | |
| 7,037,333 | B2 | 5/2006 | Myers et al. | |
| 7,039,446 | B2 | 5/2006 | Ruchti et al. | |
| 7,041,132 | B2 | 5/2006 | Quijano et al. | |
| 7,053,051 | B2 | 5/2006 | Hendriks et al. | |
| 7,060,092 | B2 | 6/2006 | Kuribayashi et al. | |
| 7,070,616 | B2 | 7/2006 | Majercak et al. | |
| 7,077,862 | B2 | 7/2006 | Vidlund et al. | |
| 7,084,082 | B1 | 8/2006 | Shimizu | |
| 7,138,226 | B2 | 11/2006 | Vincek et al. | |
| 7,153,324 | B2 | 12/2006 | Case et al. | |
| 7,160,322 | B2 | 1/2007 | Gabbay | |
| 7,164,145 | B2 | 1/2007 | Shakespeare | |
| 7,166,570 | B2 | 1/2007 | Hunter et al. | |
| 7,189,259 | B2 | 3/2007 | Simionescu et al. | |
| 7,213,601 | B2 | 5/2007 | Stevens et al. | |
| 7,214,242 | B2 | 5/2007 | Abraham et al. | |
| 7,232,461 | B2 | 6/2007 | Ramer | |
| 7,261,732 | B2 | 8/2007 | Justino | |
| 7,289,211 | B1 | 10/2007 | Walsh, Jr. et al. | |
| 7,309,461 | B2 | 12/2007 | Kujawski et al. | |
| 7,311,730 | B2 | 12/2007 | Gabbay | |
| 7,318,998 | B2 | 1/2008 | Goldstein et al. | |
| 7,329,279 | B2 | 2/2008 | Haug et al. | |
| 7,331,993 | B2 | 2/2008 | White | |
| 7,354,702 | B2 | 4/2008 | Dai et al. | |
| RE40,404 | E | 6/2008 | Schmitt et al. | |
| 7,381,218 | B2 | 6/2008 | Schreck | |
| 7,381,219 | B2 | 6/2008 | Salahieh et al. | |
| 7,399,315 | B2 | 7/2008 | Iobbi | |
| 7,427,291 | B2 | 9/2008 | Liddicoat et al. | |
| 7,431,725 | B2 | 10/2008 | Stack et al. | |
| 7,468,073 | B2 | 12/2008 | Johnson et al. | |
| 7,473,237 | B2 | 1/2009 | Navia et al. | |
| 7,481,838 | B2 | 1/2009 | Carpentier et al. | |
| 7,503,929 | B2 | 3/2009 | Johnson et al. | |
| 7,510,571 | B2 | 3/2009 | Spiridigliozzi et al. | |
| 7,510,575 | B2 | 3/2009 | Spenser et al. | |
| 7,524,330 | B2 | 4/2009 | Berreklouw | |
| 7,556,646 | B2 * | 7/2009 | Yang et al. | 623/2.11 |
| 7,566,343 | B2 | 7/2009 | Jenson et al. | |
| 7,585,321 | B2 | 9/2009 | Cribier | |
| 7,604,661 | B2 | 10/2009 | Pavcnik et al. | |
| 7,618,446 | B2 | 11/2009 | Andersen et al. | |
| 7,622,276 | B2 | 11/2009 | Cunanan et al. | |
| 7,628,805 | B2 | 12/2009 | Spenser et al. | |
| 7,648,676 | B2 | 1/2010 | Mills et al. | |
| 7,670,368 | B2 | 3/2010 | Hill et al. | |
| 7,708,775 | B2 | 5/2010 | Rowe et al. | |
| 7,758,632 | B2 | 7/2010 | Hojeibane et al. | |
| 7,780,722 | B2 | 8/2010 | Thielen et al. | |
| 7,789,909 | B2 | 9/2010 | Andersen et al. | |
| 7,846,203 | B2 | 12/2010 | Cribier | |
| 7,846,204 | B2 | 12/2010 | Letac et al. | |
| 7,871,431 | B2 | 1/2011 | Gurm et al. | |
| 7,892,281 | B2 | 2/2011 | Seguin et al. | |
| 7,914,576 | B2 | 3/2011 | Navia et al. | |
| RE42,395 | E | 5/2011 | Wright et al. | |
| 7,967,833 | B2 | 6/2011 | Sterman et al. | |
| 7,981,151 | B2 | 7/2011 | Rowe | |
| 8,002,825 | B2 | 8/2011 | Letac et al. | |
| 8,007,992 | B2 | 8/2011 | Tian et al. | |
| 8,057,540 | B2 | 11/2011 | Letac et al. | |
| 8,080,054 | B2 | 12/2011 | Rowe | |
| 8,105,375 | B2 | 1/2012 | Navia et al. | |

(56) **References Cited**

U.S. PATENT DOCUMENTS


| | | | |
|---|---|---|---|
| 8,512,401 | B2 | 8/2013 | Murray et al. |
| 8,512,403 | B2 | 8/2013 | Navia et al. |
| 2001/0010017 | A1 | 7/2001 | Cribier et al. |
| 2001/0023372 | A1 | 9/2001 | Chen et al. |
| 2001/0049558 | A1 | 12/2001 | Liddicoat et al. |
| 2002/0005073 | A1 | 1/2002 | Tompkins et al. |
| 2002/0028243 | A1 | 3/2002 | Masters |
| 2002/0029783 | A1 | 3/2002 | Stevens et al. |
| 2002/0032481 | A1 | 3/2002 | Gabbay |
| 2002/0037940 | A1 | 3/2002 | Koob et al. |
| 2002/0042621 | A1 | 4/2002 | Liddicoat et al. |
| 2002/0091441 | A1 | 7/2002 | Guzik |
| 2002/0095167 | A1 | 7/2002 | Liddicoat et al. |
| 2002/0095994 | A1 | 7/2002 | Vesely et al. |
| 2002/0123789 | A1 | 9/2002 | Francis et al. |
| 2002/0128708 | A1 | 9/2002 | Northrup et al. |
| 2002/0151970 | A1 | 10/2002 | Garrison et al. |
| 2003/0027332 | A1 | 2/2003 | Lafrance et al. |
| 2003/0078659 | A1 | 4/2003 | Yang |
| 2003/0102000 | A1 | 6/2003 | Stevens et al. |
| 2003/0130727 | A1 | 7/2003 | Drasler et al. |
| 2003/0130729 | A1 | 7/2003 | Paniagua et al. |
| 2003/0130731 | A1 | 7/2003 | Vidlund et al. |
| 2003/0149477 | A1 | 8/2003 | Gabbay |
| 2003/0153974 | A1 | 8/2003 | Spenser et al. |
| 2003/0187362 | A1 | 10/2003 | Murphy et al. |
| 2003/0195620 | A1 | 10/2003 | Huynh et al. |
| 2003/0204023 | A1 | 10/2003 | Koob et al. |
| 2003/0212460 | A1 | 11/2003 | Darois et al. |
| 2003/0212462 | A1 | 11/2003 | Gryska et al. |
| 2003/0217415 | A1 | 11/2003 | Crouch et al. |
| 2004/0024452 | A1 | 2/2004 | Kruse et al. |
| 2004/0039442 | A1 | 2/2004 | St. Goar |
| 2004/0055608 | A1 | 3/2004 | Stevens et al. |
| 2004/0059418 | A1 | 3/2004 | McKay et al. |
| 2004/0098092 | A1 | 5/2004 | Butaric et al. |
| 2004/0158321 | A1 | 8/2004 | Reuter et al. |
| 2004/0193261 | A1 | 9/2004 | Berreklouw |
| 2004/0230285 | A1 | 11/2004 | Gifford, III et al. |
| 2004/0243153 | A1 | 12/2004 | Liddicoat et al. |
| 2004/0243229 | A1 | 12/2004 | Vidlund et al. |
| 2005/0004668 | A1 | 1/2005 | Aklog et al. |
| 2005/0027369 | A1 | 2/2005 | Eldridge et al. |
| 2005/0043819 | A1 | 2/2005 | Schmidt et al. |
| 2005/0096673 | A1 | 5/2005 | Stack et al. |
| 2005/0113910 | A1 | 5/2005 | Paniagua et al. |
| 2005/0137681 | A1 | 6/2005 | Shoemaker et al. |
| 2005/0137682 | A1 | 6/2005 | Justino |
| 2005/0142163 | A1 | 6/2005 | Hunter et al. |
| 2005/0147562 | A1 | 7/2005 | Hunter et al. |
| 2005/0147599 | A1 | 7/2005 | Hunter et al. |
| 2005/0147643 | A1 | 7/2005 | Hunter et al. |
| 2005/0148512 | A1 | 7/2005 | Hunter et al. |
| 2005/0158274 | A1 | 7/2005 | Hunter et al. |
| 2005/0159811 | A1 | 7/2005 | Lane |
| 2005/0169958 | A1 | 8/2005 | Hunter et al. |
| 2005/0169959 | A1 | 8/2005 | Hunter et al. |
| 2005/0175657 | A1 | 8/2005 | Hunter et al. |
| 2005/0187618 | A1 | 8/2005 | Gabbay |
| 2005/0191248 | A1 | 9/2005 | Hunter et al. |
| 2005/0228494 | A1 | 10/2005 | Marquez |
| 2005/0241981 | A1 | 11/2005 | Gupta et al. |
| 2005/0246035 | A1 | 11/2005 | Wolfinbarger et al. |
| 2005/0247320 | A1 | 11/2005 | Stack et al. |
| 2005/0267529 | A1 | 12/2005 | Crockett et al. |
| 2006/0004439 | A1 | 1/2006 | Spenser et al. |
| 2006/0004443 | A1 | 1/2006 | Liddicoat et al. |
| 2006/0020336 | A1 | 1/2006 | Liddicoat |
| 2006/0025800 | A1 | 2/2006 | Suresh |
| 2006/0041306 | A1 | 2/2006 | Vidlund |
| 2006/0074486 | A1 | 4/2006 | Liddicoat et al. |
| 2006/0089708 | A1 | 4/2006 | Osse et al. |
| 2006/0111733 | A1 | 5/2006 | Shriver |
| 2006/0129225 | A1 | 6/2006 | Kopia et al. |
| 2006/0134079 | A1 | 6/2006 | Sih et al. |
| 2006/0140916 | A1 | 6/2006 | Siani-Rose et al. |
| 2006/0173475 | A1 | 8/2006 | Lafontaine et al. |
| 2006/0178740 | A1 | 8/2006 | Stacchino et al. |
| 2006/0190074 | A1 | 8/2006 | Hill et al. |
| 2006/0193885 | A1 | 8/2006 | Neethling et al. |
| 2006/0195010 | A1 | 8/2006 | Arnal et al. |
| 2006/0195183 | A1 | 8/2006 | Navia et al. |
| 2006/0206203 | A1 | 9/2006 | Yang et al. |
| 2006/0229701 | A1 | 10/2006 | Gurm et al. |
| 2006/0240063 | A9 | 10/2006 | Hunter et al. |
| 2006/0240064 | A9 | 10/2006 | Hunter et al. |
| 2006/0259134 | A1 | 11/2006 | Schwammenthal et al. |
| 2006/0259135 | A1 | 11/2006 | Navia et al. |
| 2006/0259137 | A1 | 11/2006 | Artof et al. |
| 2006/0265056 | A1 | 11/2006 | Nguyen et al. |
| 2006/0287571 | A1 | 12/2006 | Gozzi et al. |
| 2006/0292125 | A1 | 12/2006 | Kellar et al. |
| 2007/0010857 | A1 | 1/2007 | Sugimoto et al. |
| 2007/0043431 | A1 | 2/2007 | Melsheimer |
| 2007/0050014 | A1 | 3/2007 | Johnson |
| 2007/0050022 | A1 | 3/2007 | Vidlund et al. |
| 2007/0056346 | A1 | 3/2007 | Spenser et al. |
| 2007/0060932 | A1 | 3/2007 | Stack et al. |
| 2007/0061008 | A1 | 3/2007 | Salahieh et al. |
| 2007/0100426 | A1 | 5/2007 | Rudakov et al. |
| 2007/0104395 | A1 | 5/2007 | Kinigakis et al. |
| 2007/0128174 | A1 | 6/2007 | Kleinsek et al. |
| 2007/0173861 | A1 | 7/2007 | Strommer et al. |
| 2007/0203575 | A1 | 8/2007 | Forster et al. |
| 2007/0213813 | A1 | 9/2007 | Von Segesser et al. |
| 2007/0250154 | A1 | 10/2007 | Greenberg et al. |
| 2007/0263226 | A1 | 11/2007 | Kurtz et al. |
| 2007/0276432 | A1 | 11/2007 | Stack et al. |
| 2007/0276461 | A1 | 11/2007 | Andreas et al. |
| 2008/0004686 | A1 | 1/2008 | Hunt et al. |
| 2008/0009667 | A1 | 1/2008 | Longhini et al. |
| 2008/0009940 | A1 | 1/2008 | Cribier |
| 2008/0029105 | A1 | 2/2008 | Stevens et al. |
| 2008/0039871 | A1 | 2/2008 | Wallace et al. |
| 2008/0039926 | A1 | 2/2008 | Majercak et al. |
| 2008/0058798 | A1 | 3/2008 | Wallace et al. |
| 2008/0082113 | A1 | 4/2008 | Bishop et al. |
| 2008/0102439 | A1 | 5/2008 | Tian et al. |
| 2008/0133004 | A1 | 6/2008 | White |
| 2008/0147182 | A1 | 6/2008 | Righini et al. |
| 2008/0154356 | A1 | 6/2008 | Obermiller et al. |
| 2008/0177381 | A1 | 7/2008 | Navia et al. |
| 2008/0183280 | A1 | 7/2008 | Agnew et al. |
| 2008/0183283 | A1 | 7/2008 | Downing |
| 2008/0190989 | A1 | 8/2008 | Crews et al. |
| 2008/0195200 | A1 | 8/2008 | Vidlund et al. |
| 2008/0199843 | A1 | 8/2008 | Haverich et al. |
| 2008/0200977 | A1 | 8/2008 | Paul et al. |
| 2009/0005857 | A1 | 1/2009 | Ischinger |
| 2009/0030511 | A1 | 1/2009 | Paniagua et al. |
| 2009/0043383 | A1 | 2/2009 | McGregor et al. |
| 2009/0054969 | A1 | 2/2009 | Salahieh |
| 2009/0062907 | A1 | 3/2009 | Quijano et al. |
| 2009/0112309 | A1 | 4/2009 | Jaramillo et al. |
| 2009/0132032 | A9 | 5/2009 | Cribier |
| 2009/0157175 | A1 | 6/2009 | Benichou |
| 2009/0164005 | A1 | 6/2009 | Dove et al. |
| 2009/0187241 | A1 | 7/2009 | Melsheimer |
| 2009/0248149 | A1 | 10/2009 | Gabbay |
| 2009/0254175 | A1 | 10/2009 | Quijano et al. |
| 2009/0281609 | A1 | 11/2009 | Benichou et al. |
| 2010/0030259 | A1 | 2/2010 | Pavcnik et al. |
| 2010/0036479 | A1 | 2/2010 | Hill et al. |
| 2010/0036484 | A1 | 2/2010 | Hariton et al. |
| 2010/0043197 | A1 | 2/2010 | Abbate et al. |
| 2010/0048987 | A1 | 2/2010 | Khairkhahan |
| 2010/0049312 | A1 | 2/2010 | Edoga et al. |
| 2010/0131054 | A1 | 5/2010 | Tuval et al. |
| 2010/0161036 | A1 | 6/2010 | Pintor et al. |
| 2010/0185277 | A1 | 7/2010 | Braido et al. |
| 2010/0217382 | A1 | 8/2010 | Chau et al. |
| 2010/0234878 | A1 | 9/2010 | Hruska |
| 2010/0241069 | A1 | 9/2010 | Hatten |
| 2010/0249918 | A1 | 9/2010 | Zhang |

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2010/0256749 | A1 | 10/2010 | Tran et al. |
| 2010/0256751 | A1 | 10/2010 | Rowe et al. |
| 2010/0312333 | A1 | 12/2010 | Navia et al. |
| 2011/0004299 | A1 | 1/2011 | Navia et al. |
| 2011/0015728 | A1 | 1/2011 | Jimenez et al. |
| 2011/0040375 | A1 | 2/2011 | Letac et al. |
| 2011/0087322 | A1 | 4/2011 | Letac et al. |
| 2011/0137409 | A1 | 6/2011 | Yang et al. |
| 2011/0146361 | A1 | 6/2011 | Davidson et al. |
| 2011/0153009 | A1 | 6/2011 | Navia et al. |
| 2011/0166636 | A1 | 7/2011 | Rowe |
| 2011/0178597 | A9 | 7/2011 | Navia et al. |
| 2011/0218619 | A1 | 9/2011 | Benichou et al. |
| 2011/0224607 | A1 | 9/2011 | Vogelbaum et al. |
| 2011/0240511 | A1 | 10/2011 | Bolton et al. |
| 2011/0300625 | A1 | 12/2011 | Paniagua et al. |
| 2011/0301700 | A1 | 12/2011 | Fish et al. |
| 2012/0078343 | A1 | 3/2012 | Fish |
| 2012/0078356 | A1 | 3/2012 | Fish et al. |
| 2012/0095551 | A1 | 4/2012 | Navia et al. |
| 2012/0158128 | A1 | 6/2012 | Gautam et al. |
| 2012/0185038 | A1 | 7/2012 | Fish et al. |
| 2012/0310041 | A1 | 12/2012 | Paniagua et al. |
| 2014/0039613 | A1 | 2/2013 | Navia et al. |
| 2013/0304201 | A1 | 11/2013 | Navia et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 1441672 | 9/2011 |
| EP | 2055266 | 2/2012 |
| EP | 1621162 | 5/2012 |
| EP | 2260796 | 2/2013 |
| RU | 2355361 C | 5/2009 |
| WO | 91/17720 | 11/1991 |
| WO | 92/17118 | 10/1992 |
| WO | 98/29057 | 7/1998 |
| WO | 99/30646 | 6/1999 |
| WO | 00/12164 | 3/2000 |
| WO | 01/02031 | 1/2001 |
| WO | 03/047468 | 6/2003 |
| WO | 03/092554 | 11/2003 |
| WO | 2004/026124 | 4/2004 |
| WO | 2004/082527 | 9/2004 |
| WO | 2006/095342 | 9/2006 |
| WO | 2007/138572 | 12/2007 |
| WO | 2008/063537 | 8/2008 |
| WO | 2008/106531 | 9/2008 |
| WO | 2009/052188 | 4/2009 |
| WO | 2009/156471 | 12/2009 |
| WO | 2010/024801 | 3/2010 |
| WO | 2010/027363 | 3/2010 |
| WO | 2010/080594 | 7/2010 |
| WO | 2010/117541 | 10/2010 |
| WO | 2011/109433 | 3/2011 |
| WO | 2011/109450 | 9/2011 |
| WO | 2012/006124 | 1/2012 |
| WO | 2012/040643 | 3/2012 |
| WO | 2012/082952 | 6/2012 |

OTHER PUBLICATIONS

Paniagua, David et al., Abstract 4622: "Percutaneous Implantation of a Low Profile, Dry Membrane, Heart Valve in an Integrated Delivery System in the Aortic and Pulmonary Positions: One-month Animal Results," Circulation, American Heart Association, Inc., 2009; vol. 120: pp. 982.

Pathak, CP et al., "Treatment of bioprosthetic heart valve tissue with long chain alcohol solution to lower calcification potential" J Biomed Mater Res A. Apr. 1, 2004;69(1), pp. 140-144.

Pavenik, Susan, M.D., PhD et al., "Development and Initial Experimental Evaluation of a Prosthetic Aortic Valve for Transcatherter Placement" Cardivascular Radiology, Apr. 1992, pp. 151-154.

Pick, Adam, "True or False: An Edwards Lifesciences' Tissue Valve Replacement Requires 1,800 Hand-Sewn Stitches" http://heart-valve-surgery.com/heart-surgery-blog/2008/02/26. printed Aug. 13, 2010.

Pohl, M. et al., "In vitro testing of artificial heart valves; comparison between Newtonian and non-Newtonian fluids" Artif Argns, Jan. 1996; 20(1); pp. 37-46.

Purinya, B. et al., "Biomechanical and Structural Properties of the Explanted Bioprosthetic Valve Leaflets" J. of Biomechanis, vol. 27, Iss 1, Jan. 1994 pp. 1-11 Elsevier Science Ltd, 1993.

Sacks, M S et al., "Bioprosthetic heart valve heterograft biomaterials: structure, mechanical behavior and computational simulation" Expert Rev Med Devices, Nov. 2006; 3(6): pp. 817-834 (Abstract only).

Sacks, M S et al., "Collagen fiber architecture of bovine pericardium" ASAIO J, Jul. 1, 1994, 40(3), pp. 632-637.

Sacks, M S et al., "A small angle light scattering device for planar connective tissue miscrostructural analysis" Ann Biomed Eng, Jul. 1, 1997, 254(4), pp. 678-689.

Sacks, Michael S, "Incorporation of experimentally-derived fiber orientation into a structural constitutive model for planar collagenous tissues" J. Biomech Eng, Apr. 1, 2003, 125(2), pp. 280-287.

Sacks, Michael S. et al., "Quantification of the fiber architecture and biaxial mechanical behavior of porcine intestinal submucosa" J of Biomedical Research, vol. 46, Iss 1, Jul. 1999, pp. 1-10.

Samouillan, V. et al., "Comparison of chemical treatments on the chain dynamics and thermal stability of bovine pericardium collagen" J Biomed Mater Res A. Feb. 1, 2003;64(2), pp. 330-338.

Schmidt, Dorthe et al., "Tissue engineering of heart valves using decellularized xenogeneic of polymeric starter matrices" Philos Trans R Soc Lond B Bio Sci., Aug. 29, 2007, 362(1484); 1505-1512; published online Jun. 22, 2007, doi: 10.1098/rstb.2007.2131.

Schoen, Frederick J., "Tissue heart valves: Current challenges and future research perspectives" J of Biomedical Materials Research, vol. 47, Iss 4, Dec. 15, 1999, pp. 439-465.

Sellaro, Tiffany L., "Effects of Collagen Orientation on the Medium-Term Fatigue Response of Heart Valve Biomaterials" 2003, (published thesis) pp. 40-45.

Sellaro, Tiffany L. et al., "Effects of Collagen Fiber Orientation on the Response of Biologically Derived Soft Tissue Biomaterials to Cyclic Loading" J. Biomed Mater Res A Jan. 1, 2007; 80(1): 194-205); published online Oct. 13, 2006 by Wiley InterScience.

Shandas, Robin PhD et al., "A Method for Determining the Reference Effective Flow Areas for Mechanical Heart Valve Prostheses" Circulation Apr. 25, 2000.

Shen, Ming et al., "Effect of ethanol and ether in the prevention of calcification of bioprostheses" Ann Thorac Surg. May 2001;71(5 Suppl), pp. 413-416.

Shen, Ming et al., "Protein adsorption in glutaraldehyde-preserved bovine pericardium and porcine valve tissues" The Annals of Thoracic Surgery, 2001; 71, pp. 409.

Simionescu, D et al., "Mapping of glutaraldehyde-treated bovine pericardium and tissue selection for bioprosthetic heart valve" J. Biomed Mater Res, Jun. 1, 1993:27(6), pp. 697-704.

Sun, Wei et al., "Response of heterograft heart valve biomaterials to moderate cyclic loading" J Biomed Mater Res A, Jun. 2004, 69(4), pp. 658-669.

Topol, Eric J., "Textbook of Interventional Cardiology", 1990, Chs. 43-44, pp. 831-867.

Vyavahare, Narendra et al., "Mechanisms of bioprosthetic heart valve failure: Fatigue causes collagen denaturation and glycosaminoglysan loss" J of Biomedical Research, vol. 446, Iss 1, Jul. 1999, pp. 44-50.

Vyavahare, NR et al., "Prevention of Glutaraldehyde-Fixed Bioprosthetic Heart Valve Calcification by Alcohol Pretreatment: Further Mechanistic Studies" J Heart Valve Dis. Jul. 2000;9(4), pp. 561-566.

Werner, S. et al., "Testing the Hydrodynamic properties of heart valve prostheses with a new test apparatus", Biomed Tech (Berl) Sep. 1994; 30(9); pp. 204-210 (Abstract only).

Wiegner, A W et al., "Mechanical and structural correlates of canine pericardium" Circ Res, Sep. 1, 1981m 49(3), pp. 807-814.

(56) **References Cited**

OTHER PUBLICATIONS

Yasui, Takeshi et al., "Determination of collagen fiber orientation in human tissue by use of polarization measurement of molecular second-harmonic-generation light", Applied Optics, vol. 42, No. 14, May 10, 2004, pp. 2861-2867.
Zioupos, P. et al., "Anisotropic Elasticity and Strength of Glutaraldehyde Fixed Bovine Pericardium for Use in Pericardial Bioprosthetic Valves" J. Biomed Mater Res., Jan. 1994, 28(1), pp. 49-57.
Zioupos, P. et al., "Mechanical and Optical anisotrophy of bovine pericardium" Med Biol Eng Comput, Jan. 1992; 30 (1); pp. 76-82.
Office Action issued in U.S. Appl. No. 14/136,516, dated Mar. 10, 2014.
Notice of Allowance issued in U.S. Appl. No. 14/136,516, dated Mar. 31, 2014.
Office Action issued in U.S. Appl. No. 10/887,688, dated Nov. 28, 2007.
Final Office Action issued in U.S. Appl. No. 10/887,688, dated Jul. 15, 2008.
Office Action issued in U.S. Appl. No. 10/887,688, dated Mar. 16, 2009.
Examiner Interview Summary issued in U.S. Appl. No. 10/887,688, dated Jun. 12, 2009.
Final Office Action issued in U.S. Appl. No. 10/887,688, dated Mar. 2, 2010.
Supplemental Declaration Under 37 CFR 1.131 by inventors filed in U.S. Appl. No. 10/887,688, filed Sep. 14, 2009.
Supplemental Declaration Under 37 CFR 1.131 by inventors filed in U.S. Appl. No. 10/887,688, filed Feb. 28, 2008.
Supplemental Declaration Under 37 CFR 1.131 by inventors filed in U.S. Appl. No. 10/887,688, filed Dec. 15, 2008.
Examiner Interview Summary issued in U.S. Appl. No. 10/887,688, dated Jul. 26, 2010.
Office Action issued in U.S. Appl. No. 10/887,688, dated Feb. 16, 2012.
Office Action issued Sep. 29, 2010, issued in U.S. Appl. No. 12/228,192.
Examiner Interview Summary, dated Apr. 5, 2011 in U.S. Appl. No. 12/228,192.
Final Office Action issued Jul. 14, 2011, in U.S. Appl. No. 12/228,192.
Office Action issued in U.S. Appl. No. 10/037,266, dated May 8, 2003.
Final Office Action issued in U.S. Appl. No. 10/037,266, dated Mar. 9, 2004.
Cross-reference is made to U.S. Appl. No. 14/253,650, filed Apr. 15, 2014, and its associated Preliminary Amendment.
Cross-reference is made to U.S. Appl. No. 14/268,184, filed May 2, 2014, and its associated Preliminary Amendment.
Cross-reference is made to U.S. Appl. No. 14/268,190, filed May 2, 2014, and its associated Preliminary Amendment.
Cross-reference is made to U.S. Appl. No. 14/284,049, filed May 21, 2014, and its associated Preliminary Amendment.
Cross-reference is made to U.S. Appl. No. 14/284,063, filed May 21, 2014, and its associated Preliminary Amendment.
Office Action issued Sep. 11, 2014, in U.S. Appl. No. 14/268,190.
Office Action issued Sep. 3, 2014, in U.S. Appl. No. 14/284,049.
Office Action issued Sep. 12, 2014, in U.S. Appl. No. 14/268,184.
Office Action issued Aug. 15, 2014, in U.S. Appl. No. 14/284,063.
Hilbert et al., "Biomechanics: Allograft Heart Valves," Cardiac Reconstructions with Allograft Tissues, Springer, New York (2005), pp. 210-212.
Affidavit of Dr. Paolo Angelini, M.D., signed Aug. 25, 2009.
Affidavit of Dr. Gervasio A. Lamas, M.D., signed Sep. 3, 2009.
Andersen, H.R. et al., "Transluminal implantation of artificial heart valve" European Heart Journal, 1992, 13, pp. 704-708.
"Artificial heart valve" http://en.wikipedia.org/Artificial_heart_valve, printed May 13, 2009.
Bonhoeffer, Philipp M.D. et al., "Percutaneous Insertion of the Pulmonary Valve" J of the Amer College of Cardiology, vol. 39, No. 10, Elsevier Science, Inc. 2002, pp. 1664-1669, London, UK, and Paris, FR.
Bonhoeffer, Philipp et al., "Percutaeous replacement of pulmonary valve in a right-centricle to pulmonary-artery prosthetic conduit with valve dysfunction" Early Report, The Lacet, vol. 356, Oct. 21, 2000, pp. 1403-1405.
Bonhoeffer, Philipp et al., "Transcatherter Implantation of a Bovine Valve in Pulmonary Position: A Lamb Study" Circulation J. of the Amer Heart Assoc, 2000; 102; pp. 813-816.
Boudjemline, Younes et al., "Percutaneous pulmonary valve replacement in a large right ventricular outflow tract: An experimental study" J. Am. Coll. Cardiol. 2004; 43; pp. 1082-1087.
Braga-Vilela, A. et al., "Extracellular Matrix of Porcine Pericardium; Biochemistry and Collagen Architecture" J. Membr Biol., 2008.
Breuer, Christopher K. M.D. et al., "Application of Tissue-Engineering Principles toward the Development of a Semilunar Heart Valve Substitute" Tissue Engineering, vol. 10, No. 11/12, 2004, pp. 1725-1736.
Cale, A.R. et al., "Revisited: a descending thorasic aortic valve to treat prosthetic valve insufficiency" Ann Thorac Surg, May 1993, 55(5), pp. 1218-1222.
Cerrolaza, M et al., "A comparison of the hydrodynamical behaviour of three heart aortic prostheses by numerical methods".
Chew, G.G. et al., Abstract for "Simulation of Damage in a Porcine Prosthetic Heart Valve" J. Med. Eng. Technol., Sep.-Oct. 1999; 23(5): 178-89 (Abstract only).
Christie G.W. et al., Abstract for "On Stress Reduction in Bioprosthetic Heart Valve Leaflets by the Use of a Flexible Stent" J. Card Surg, Dec. 1991; 6(4) pp. 476-481 (Abstract only).
"Collagen" http://en.wikipedia.org/wiki/Collagen, printed May 13, 2009.
Collins, J. J., Jr, "The Evolution of artificial heart valve" N. Engl J Med, Feb. 28, 1991; vol. 324(9), pp. 624-626.
Corden, J. et al., "The influence of open leaflet geometry on the haemodynamic flow characteristics of polyrethane trileaflet artificial heart valve" PubMed medline query, p. 1 of 1.
Cribier, Alain et al., "Percutaneious Transcatheter Implantation of an Aoritc Valve Prosthesis for Calcific Aortic Stenosis: First Human Case Description" Circulation J of the Amer Heart Assoc, originally published online Nov. 25, 2002.
Edwards Lifesciences Receives FDA Approval for New Heart Valve, http:www.medicalnewstoday.com/articles/149588.php, May 11, 2009.
Fish, R. David, "Percutaneous Heart Valve Replacement: Enthusiasm Tempered" Circulation J of the Amer Heart Assoc, 2004; vol. 110; pp. 1876-1878.
Fishbein, M.C. et al., "Cardiac pathology after aortic valve replacement using Hufnagel trileaflet prostheses: study of 20 necropsy patients" Ann Heart J., Apr. 1975, 89(4), pp. 443-448.
Gloeckner, D. Claire et al., "Mechanical Evaluation and Design of a Multilayered Collagenous Repair Biomaterial" J. of Biomedical Materials Research Part A, vol. 52 Iss 2, pp. 365-373, Published online Aug. 15, 2000, Wiley Periodicals, Inc.
Grube, et al., "Progress and Current Status of Percutaneous Aortic Valve Replacement: Results of Three Device Generations of the CoreValve Revalving System", Circ. Cardiovasc Intervent. 2008;1:167-175 (Abstract only).
Hanlon, JG et al., "Pre-use intraoperative testing of autologous tissue for valvular surgery: a proof of concept study" J. Heart Valve Dis, Nov. 1999; 8(6); pp. 614-623.
Bech-Hanssen, Odd, M.D. et al., "Aortic Prosthetic Valve Desing and Size: Relation to Doppler Echocardiographic Finding and Pressure Recovery—An In Vitro Study" J. Am Soc Echocardiography 2000; vol. 13, pp. 39-50.
Hasenkam, J.M. et al., "A model for acute haemodynamic studies in the ascending aorta in pigs" Cardiovasc Res, Jul. 1988, 22(7), pp. 464-471.
Hiester,E.D. et al., "Optimal bovine pericardial tissue selection sites. I. Fiber architecture and tissue thickness measurements." J. Biomed Mater Res, Feb. 1, 1998; 39(2), pp. 207-214.

(56) **References Cited**

OTHER PUBLICATIONS

Hufnagel, Charles A., M.D., "Basic Concepts in the Development of Cardiovascular Prosthes" The American Journal of Surgery, vol. 137, Mar. 1979.
Hufnagel, Charles.A., MD et al., "In the beginning. Surgical Correction of Aortic Insufficiency" 1954; Ann Thorac Surg May 1989; 47(3), pp. 475-476.
Hufnagel, Charles.A., MD et al., "Late follow-up of ball-valve prostheses in the descending thoracic aortia", J. Throrac Cardiovasc Surg, Dec. 1976, 72(6), pp. 900-909.
Hufnagel, Charles.A., MD et al., "Surgical Correction of Aortic Insufficiency" Surgery vol. 35, May 1954 No. 5.
Hufnagel, Charles A., "Vessels and Valves", Sec. 1: Development of Cardiac Surgery, Chap 7, pp. 43-55.
Introduction to Stereomicroscopy, http://www.microscopyu.com/articles/stereomicroscopy/stereointro.html, Copyright 2000-2012, printed on Mar. 15, 2012.
IOPATCH(R) Tutoplast(R) Processed Pericardium Directions for Use; http://www.iopinc.com/surgeons_and_medical_professionals/iopatch/directions.asp, printed on Jun. 2, 2009.
Knudsen, LL et al., "Catheter-implanted prosthetic heart valves. Transluminal catheter implantation of a new expandable artificial heart valve in the descending thoracic aorta in isolated vessels and closed chest pigs" Int J. Artif Organs, May 1993, 16(5); pp. 253-262.
Lax, Jorge A., M.D., et al. "Estimation of the Ejection Fraction in Patients with Myocardial Infarction Obtained from the Combined Index of Systolic and Diastolic Left Ventricular Function: A New Method" J of the American Soc of Echocardiography, vol. 13, No. 2.
Liao, Jun et al., "Molecular orientation of collagen in intact planar connective tissues under biaxial stretch" Acta Biomateriala, vol. 1, Iss. 1, Jan. 2005, pp. 45-54.
Liao, K X et al., "Two-dimensional mechanical and ultrastructural correlates of bovine pericardium for prosthetic valves" ASAIO Trans, Jun. 1, 1991, 37(3); pp. 341-351.
Ls, Yu et al., "New Polyurethane valves in new soft artificial heart" ASAIO Trans Jul.-Sep. 1989; 35(3), pp. 301-304.
Mendelson, Karen et al., "Heart Valve Tissue Engineering: Concepts, Approaches, Progress, and Challenges" Ann Biomed Eng, Dec. 2006; 34(12); 1799-1819; published online Oct. 12, 2006 doi:10.1007/s/10439-006-9163-z.
Mirnajafi, A. et al. "The effects of collagen fiber orientation of the flexural properties of pericardial heterograft biomaterials" Biomaterials, Mar. 2005; 26(7): pp. 795-804.
Mirzaie, M. et al., "A new storage solution for porcine aortic valves" Ann Thorac Cardiovasc Surg. Apr. 2007;13(2), pp. 102-109.
Moazami, N. et al., "Transluminal aortic valve placement. A feasibility study with a newly designed collapsible aortic valve" ASAIO J, Sep.-Oct. 1996, 42(5), pp. 381-385.
Nienaber C., M.D. et al., "Nonsurgical Reconstruction of Thoracic Aortic Dissection by Stent-Graft Placement" N. Eng. J. Med, May 20, 1999, col. 340, No. 20.
Noorlander, Maril L. et al., "A Quantitative Method to Determine the Orientation of Collagen Fibers in the Dermis" The J. of Histochemistry & Cytochemistry, vol. 50(11): 2002, pp. 1469-1474.
Nunn, D.B., "Structural Failure of Dacron Arterial Grafts" Seminars in Vascular Surgery, col. 12, No. 1 (Mar. 1999), pp. 88-91.
Optical Microscope, Wikipedia, http://en.wikipedia.org/wiki/Stereomiscroscope, May 13, 2009.
Orthogonality, http://en.wikipedia.org/wiki/Orthogonal, May 13, 2009.
Paniagua, David, et al., Percutaneous Heart Valve in the Chronic In Vitro Testing Model, Circulation, 2002, pp. 51-52, vol. 106, American Heart Association, US.
Paniagua, David et al, First Human Case of Retrograde Transcatheter Implantation of an Aortic Valve Prosthesis, Texas Heart Institute Journal, 2005, pp. 91-96, vol. 32, US.

* cited by examiner




FIG.1




FIG.2



FIG.3A



FIG.3B



FIG.4

Case: 23-2153 Document: 25 Page: 116 Filed: 12/04/2023




FIG.5



FIG.6




FIG. 7




FIG.8




FIG. 9A


UPPER BORDER
(UPPER EDGE OF SHEET
IS FOLDED TO OTHER SIDE)
1 FOLD
(LOWER EDGE OF SHEET)
4 FOLD
3
2 FOLD

FIG. 9B


UPPER BORDER
(UPPER EDGE OF SHEET
IS FOLDED TO OTHER SIDE)
1 FOLD
(LOWER EDGE OF SHEET)
3
4
6 FOLD TO
LEAFLET/CUSP SHAPE
7 FOLD TO
LEAFLET/CUSP SHAPE
8 FOLD TO
LEAFLET/CUSP SHAPE
LOWER BORDER
2 FOLD

FIG. 9C

# METHOD OF CONTROLLED RELEASE OF A PERCUTANEOUS REPLACEMENT HEART VALVE

## CONTINUITY INFORMATION

The present application is a continuation application of U.S. patent application Ser. No. 13/675,665 filed on Nov. 13, 2012, which is a continuation application of U.S. patent application Ser. No. 10/887,688 filed on Jul. 10, 2004, now U.S. Pat. No. 8,308,797, which is a continuation-in-part application of U.S. patent application Ser. No. 10/037,266, filed on Jan. 4, 2002 (now abandoned). All of the foregoing applications are incorporated herein by reference in their entireties.

## BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention is in the field of heart valve replacement. More specifically, the present invention is directed to a method of making a percutaneously implantable replacement heart valve.

2. Description of Related Art

There have been numerous efforts in the field of heart valve replacement to improve both the durability and effectiveness of replacement heart valves as well as the ease of implantation. A brief description of heart valves and heart function follows to provide relevant background for the present invention.

There are four valves in the heart that serve to direct the flow of blood through the two sides of the heart in a forward direction. On the left (systemic) side of the heart are: 1) the mitral valve, located between the left atrium and the left ventricle, and 2) the aortic valve, located between the left ventricle and the aorta. These two valves direct oxygenated blood coming from the lungs through the left side of the heart into the aorta for distribution to the body. On the right (pulmonary) side of the heart are: 1) the tricuspid valve, located between the right atrium and the right ventricle, and 2) the pulmonary valve, located between the right ventricle and the pulmonary artery. These two valves direct de-oxygenated blood coming from the body through the right side of the heart into the pulmonary artery for distribution to the lungs, where it again becomes re-oxygenated to begin the circuit anew.

Heart valves are passive structures that simply open and close in response to differential pressures on either side of the particular valve. They consist of moveable "leaflets" that are designed simply to open and close in response to differential pressures on either side of the valve's leaflets. The mitral valve has two leaflets and the tricuspid valve has three. The aortic and pulmonary valves are referred to as "semilunar valves" because of the unique appearance of their leaflets, which are more aptly termed "cusps" and are shaped somewhat like a half-moon. The aortic and pulmonary valves each have three cusps.

In general, the components of heart valves include the valve annulus, which will remain as a roughly circular open ring after the leaflets of a diseased or damaged valve have been removed; leaflets or cusps; papillary muscles which are attached at their bases to the interior surface of the left or right ventricular wall; and multiple chordae tendineae, which couple the valve leaflets or cusps to the papillary muscles. There is no one-to-one chordal connection between the leaflets and the papillary muscles; instead, numerous chordae are present, and chordae from each papillary muscle attach to both of the valve leaflets.



When the left ventricular wall relaxes so that the ventricular chamber enlarges and draws in blood, the leaflets of the mitral valve separate and the valve opens. Oxygenated blood flows in a downward direction through the valve, to fill the expanding ventricular cavity. Once the left ventricular cavity has filled, the left ventricle contracts, causing a rapid rise in the left ventricular cavitary pressure. This causes the mitral valve to close while the aortic valve opens, allowing the oxygenated blood to be ejected from the left ventricle into the aorta. The chordae tendineae of the mitral valve prevent the mitral leaflets from prolapsing back into the left atrium when the left ventricular chamber contracts.

The three leaflets, chordae tendineae, and papillary muscles of the tricuspid valve function in a similar manner, in response to the filling of the right ventricle and its subsequent contraction. The cusps of the aortic valve also respond passively to pressure differentials between the left ventricle and the aorta. When the left ventricle contracts, the aortic valve cusps open to allow the flow of oxygenated blood from the left ventricle into the aorta. When the left ventricle relaxes, the aortic valve cusps reapproximate to prevent the blood which has entered the aorta from leaking (regurgitating) back into the left ventricle. The pulmonary valve cusps respond passively in the same manner in response to relaxation and contraction of the right ventricle in moving de-oxygenated blood into the pulmonary artery and thence to the lungs for re-oxygenation. Neither of these semilunar valves has associated chordae tendineae or papillary muscles.

Problems that can develop with heart valves consist of stenosis, in which a valve does not open properly, and/or insufficiency, also called regurgitation, in which a valve does not close properly. In addition to stenosis and insufficiency of heart valves, heart valves may need to be surgically repaired or replaced due to certain types of bacterial or fungal infections in which the valve may continue to function normally, but nevertheless harbors an overgrowth of bacteria (vegetation) on the leaflets of the valve that may embolize and lodge downstream in a vital artery. If such vegetations are on the valves of the left side (i.e., the systemic circulation side) of the heart, embolization may occur, resulting in sudden loss of the blood supply to the affected body organ and immediate malfunction of that organ. The organ most commonly affected by such embolization is the brain, in which case the patient suffers a stroke. Thus, surgical replacement of either the mitral or aortic valve (left-sided heart valves) may be necessary for this problem even though neither stenosis nor insufficiency of either valve is present. Likewise, bacterial or fungal vegetations on the tricuspid valve may embolize to the lungs resulting in a lung abscess and therefore, may require replacement of the tricuspid valve even though no tricuspid valve stenosis or insufficiency is present.

These problems are treated by surgical repair of valves, although often the valves are too diseased to repair and must be replaced. If a heart valve must be replaced, there are currently several options available, and the choice of a particular type of artificial valve depends on factors such as the location of the valve, the age and other specifics of the patient, and the surgeon's experiences and preferences. Currently in the United States over 100,000 defective heart valves are replaced annually, at an approximate cost of $30-50,000 per procedure, and thus it would be desirable if heart valves could be replaced using minimally invasive techniques and without having to repeat the procedure within a matter of years due to the lack of durability of the replacement heart valve. It would be especially advantageous if a defective heart valve could be removed via an endovascular procedure, that is, a procedure where the invasion into the body is through a blood vessel

such as the femoral artery. The procedure is then carried out percutaneously and transluminally using the vascular system to convey appropriate devices to the position in the body wherein it is desired to carry out the desired procedure. An example of such a procedure would be angioplasty, wherein a catheter carrying a small balloon at its distal end is manipulated through the body's vessels to a point where there is a blockage in a vessel. The balloon is expanded to create an opening in the blockage, and then the balloon is deflated and the catheter and balloon are removed from the vessel.

Endovascular procedures have substantial benefits both from the standpoint of health and safety as well as cost. Such procedures require minimal invasion of the human body, and there is consequently considerable reduction and in some instances even elimination, of the use of a general anesthesia and much shorter hospital stays.

Replacement heart valves can be categorized as either artificial mechanical valves, transplanted valves and tissue valves. Replacement heart valves are designed to optimize hemodynamic performance, thrombogenicity and durability. Another factor taken into consideration is the relative ease of surgical implantation.

Mechanical valves are typically constructed from nonbiological materials such as plastics, metals and other artificial materials which, while durable, are expensive and prone to blood clotting which increases the risk of an embolism. Anticoagulants taken to help against blood clotting can further complicate the patient's health due to increased risks for hemorrhages.

Transplanted valves are natural valves taken from cadavers. These valves are typically removed and frozen in liquid nitrogen, and are stored for later use. They are typically fixed in glutaraldehyde to eliminate antigenicity and are sutured in place, typically with a stent.

Artificial tissue valves are valves constructed from animal tissue, such as bovine or porcine tissue. Efforts have also been made at using tissue from the patient for which the valve will be constructed.

Most tissue valves are constructed by sewing the leaflets of pig aortic valves to a stent to hold the leaflets in proper position, or by constructing valve leaflets from the pericardial sac of cows or pigs and sewing them to a stent. The porcine or bovine tissue is chemically treated to alleviate any antigenicity. The pericardium is a membrane that surrounds the heart and isolates it from the rest of the chest wall structures. The pericardium is a thin and very slippery, which makes it difficult for suturing in a millimetricly precise way. The method of making the replacement heart valve of the present invention solves this problem through a process that includes drying and compressing the pericardium using photo-mechanical compression in such a way that makes it possible to handle and fold the material more easily.

For example, one prior replacement heart valve requires each sculpted leaflet to be trimmed in a way that forms an extended flap, which becomes a relatively narrow strand of tissue near its tip. The tip of each pericardial tissue strand is sutured directly to a papillary muscle, causing the strand to mimic a chordae tendineae. Each strand extends from the center of a leaflet in the valve, and each strand is sutured directly to either an anterior and posterior papillary muscle. This requires each leaflet to be positioned directly over a papillary muscle. This effectively rotates the leaflets of the valve about 90 degrees as compared to the leaflets of a native valve. The line of commissure between the leaflets, when they are pressed together during systole, will bisect (at a perpendicular angle) an imaginary line that crosses the peaks of the two papillary muscles, instead of lying roughly along that line as occurs in a native valve.

A different approach to creating artificial tissue valves is described in U.S. Pat. No. 5,163,955 to Calvin, et al. and U.S. Pat. Nos. 5,571,174 and 5,653,749 to Love. Using a cutting die, the pericardial tissue is cut into a carefully defined geometric shape, treated with glutaraldehyde, then clamped in a sandwich-fashion between two stent components. This creates a tri-leaflet valve that resembles an aortic or pulmonary valve, having semilunar-type cusps rather than atrioventricular-type leaflets.

U.S. Pat. No. 3,671,979 to Moulopoulos describes an endovascularly inserted conical shaped umbrella-like valve positioned and held in place by an elongated mounting catheter at a supra-annular site to the aortic valve in a nearby arterial vessel. The conical end points toward the malfunctioning aortic valve and the umbrella's distal ends open up against the aorta wall with reverse blood flow, thereby preventing regurgitation.

U.S. Pat. No. 4,056,854 to Boretos describes an endovascularly inserted, catheter mounted, supra-annular valve in which the circular frame abuts the wall of the artery and attached flaps of flexible membrane extend distally in the vasculature. The flaps lie against the artery wall during forward flow, and close inward towards the central catheter to prevent regurgitation during reverse blood flow. The Boretos valve was designed to be positioned against the artery wall during forward flow, as compared to the mid-center position of the Moulopoulos valve, to reduce the stagnation of blood flow and consequent thrombus and embolic formation expected from a valve at mid-center position.

The main advantage of tissue valves is that they do not cause blood clots to form as readily as do the mechanical valves, and therefore, they do not absolutely require systemic anticoagulation. The major disadvantage of tissue valves is that they lack the long-term durability of mechanical valves. Tissue valves have a significant failure rate, usually within ten years following implantation. One cause of these failures is believed to be the chemical treatment of the animal tissue that prevents it from being antigenic to the patient. In addition, the presence of extensive suturing prevents the artificial tissue valve from being anatomically accurate in comparison to a normal heart valve, even in the aortic valve position.

A shortcoming of prior artificial tissue valves has been the inability to effectively simulate the exact anatomy of a native heart valve. Although transplanted human or porcine aortic valves have the gross appearance of native aortic valves, the fixation process (freezing with liquid nitrogen, and chemical treatment, respectively) alters the histologic characteristics of the valve tissue. Porcine and bovine pericardial valves not only require chemical preparation (usually involving fixation with glutaraldehyde), but the leaflets must be sutured to cloth-covered stents in order to hold the leaflets in position for proper opening and closing of the valve. Additionally, the leaflets of most such tissue valves are constructed by cutting or suturing the tissue material, resulting in leaflets that do not duplicate the form and function of a real valve and are more susceptible to failure.

## SUMMARY OF THE INVENTION

The present invention is a replacement heart valve device and method of making same. The replacement heart valve device, in a preferred embodiment, comprises a stent made of stainless steel or self-expanding nitinol and a completely newly designed artificial biological tissue valve disposed

within the inner space of the stent. The cusp or leaflet portion of the valve means is formed by folding of the pericardium material preferably used to create the valve without cutting of slits to form leaflets or suturing or otherwise affixing of separate leaflet portions. Other forms of tissue and suitable synthetic materials can also be used for the valve, formed in a sheet of starting material. The folded design provides a number of advantages over prior designs, including improved resistance to tearing at suture lines. The cusps/leaflets open in response to blood flow in one direction and close in response to blood flow in the opposite direction. Preferably the tubular portion of the valve means contains the same number of cusps as the native valve being replaced, in substantially the same size and configuration. The outer surface of the valve means is attached to the stent member.

The replacement heart valve device is preferably implanted using a delivery system having a central part which consists of a flexible hollow tube catheter that allows a metallic guide wire to be advanced inside it. The stented valve is collapsed over the central tube and it is covered by a movable sheath. The sheath keeps the stented valve in the collapsed position. Once the cover sheath is moved backwards, the stented valve can be deployed. The endovascular stented-valve, in a preferred embodiment, is a glutaraldehyde fixed mammal pericardium or synthetic biocompatible material which has two or three cusps that open distally to permit unidirectional blood flow. The stent can either be self-expanding or the stent can be expandable through use of a balloon catheter.

The present invention also comprises a method of making a replacement heart valve device. In order to make the valve, the pericardium starting material is isolated and all the fat tissue and extra fibers are removed. The biological membrane material is cleaned by mechanical separation of unwanted layers using hydromechanical force means. Once the pericardium is completely clean, the material is dried in order to make it easier to handle and fold. Preferably, this drying is done by exposing the biocompatible membrane material to photomechanical compression to remove all lipids from the pericardium or other biocompatible membrane material and to cause protein denaturalization, transforming the material into a stronger and more homogeneous surface. The valve is formed by taking a flat sheet of the material and folding in such a way that forms a three-leaflet or other number of leaflet valve. Then it is placed in a sequence of solutions, one of isopropyl alcohol of about 70-100%, one of ethanol of about 70-100%, one of glycerol and one of glutaraldehyde, preferably at a concentration of about 0.07-25% for approximately 36 hours. The material is dried in order to make it easier to handle and fold. Preferably this drying is done by exposing the biocompatible membrane material to light and then mechanically compressing the material to cause protein denaturation. This results in material that is stronger and more homogeneous. The valve is formed by taking a flat sheet of bovine or porcine pericardium and folding it in such a way that forms a three-leaflet valve. The valve can also be made in the same manner from fresh, cryopreserved or glutaraldehyde fixed allografts or xenografts or synthetic non-biological, non-thrombogenic material. The folding of the pericardium material to create the cusps or leaflets reduces the extent of suturing otherwise required, and resembles the natural form and function of the valve leaflets. The cleaning, pressing and drying technique used to create the valve material makes the folding more practicable. The valve is rehydrated after being formed. The method of the present invention also greatly reduces the risk of tearing of the cusps or leaflets, since they are formed by folding a single uncut portion of material forming the valve rather than being attached by suturing.



Once the endovascular implantation of the prosthetic valve device is completed in the host, the function of the prosthetic valve device can be monitored by the same methods as used to monitor valve replacements done by open heart surgery. Routine physical examination, periodic echocardiography or angiography can be performed. In contrast to open heart surgery, however, the host requires a short recovery period and can return home within one day of the endovascular procedure. The replacement heart valve device of the present invention can be used in any patient where bioprosthetic valves are indicated, namely elderly patients with cardiac valve diseases, and patients unable to tolerate open heart procedures or life-long anticoagulation medication and treatment. The present invention can be practiced in applications with respect to each of the heart's valves.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** depicts a side perspective view of the replacement heart valve device of the present invention in one embodiment with the valve in the closed position.

FIG. **2** depicts the folds which form the leaflets or cusps of the replacement heart valve of the present invention in one embodiment.

FIGS. **3**A and **3**B depict a preferred procedure for folding the pericardium tissue starting material to create the replacement heart valve of the present invention.

FIG. **4** depicts a side perspective view of the replacement heart valve device of the present invention in one embodiment represented as if implanted within an artery.

FIG. **5** depicts a side view of one embodiment of the replacement heart valve device of the present invention mounted within a self-expanding stent, with the stent in the expanded position.

FIG. **6** depicts a side perspective view of one embodiment of the replacement heart valve device of the present invention mounted within a self-expanding stent in the collapsed position.

FIG. **7** depicts the suture points of one embodiment of the replacement heart valve device of the present invention.

FIG. **8** depicts the implantation/delivery system used with the present invention in a preferred embodiment.

FIGS. **9**A, **9**B and **9**C depict a representation of a sheet of biocompatible valve material showing preferred folds.

## DESCRIPTION OF A PREFERRED EMBODIMENT

The present invention comprises a percutaneously implantable replacement heart valve and a method for making same. The artificial heart valve device of the present invention is capable of exhibiting a variable diameter between a compressed or collapsed position and an expanded position. A preferred embodiment of the replacement heart valve device according to the present invention is set forth in FIG. **5**. The replacement heart valve device comprises a stent member **100** and a flexible valve means **200**. The stent member **100** is preferably self-expanding, although balloon-expandable stents can be used as well, and has a first polygonal shape in its compressed or collapsed configuration and a second, larger polygonal shape in its expanded configuration. Referring to FIG. **1**, the valve means **200** comprises a generally tubular portion **210** and, preferably, a peripheral upstanding cusp or leaflet portion **220**. The valve means **200** is disposed within the cylindrical stent member **100** with the tubular portion **210** transverse of and at some acute angle relative to the stent walls. The diameter of the tubular portion **210** is

substantially the same as the inside diameter of the stent member in its initial expanded configuration. The peripheral upstanding cusp or leaflet portion **220** is disposed on valve means **200** substantially parallel to the walls of the stent member similar to a cuff on a shirt. The cusp or leaflet portion **220** of the valve means **200** is generally tubular in shape and comprises three leaflets **221**, **222** and **223** as shown, although it is understood that there could be from two to four leaflets. The tubular portion of the valve means **200** is attached to the stent member **100** by a plurality of sutures **300**, as depicted in FIG. **7**.

The leaflet portion **220** of the valve means **200** extends across or transverse of the cylindrical stent **100**. The leaflets **221**, **222** and **223** are the actual valve and allow for one-way flow of blood. The leaflet portion **220** as connected to the rest of the valve resembles the cuff of a shirt. FIG. **9** depicts the folds preferred for valve cusp and leaflet formation involving three leaflets. The configuration of the stent member **100** and the flexible, resilient material of construction allows the valve to collapse into a relatively small cylinder as seen in FIG. **6**. The replacement heart valve will not stay in its collapsed configuration without being restrained. Once the restraint is removed, the self-expanding stent member **100** will cause the artificial heart valve to take its expanded configuration, as seen in FIG. **5**.

Stent Member

The stent member **100** preferably comprises a self-expanding nickel-titanium alloy stent, also called "nitinol," in a sine wave-like configuration as shown in FIG. **5**. An enlarged view of a preferred embodiment of the stent member for use in the replacement heart valve of the invention is depicted in FIG. **5**. The stent member **100** includes a length of wire **110** formed in a closed zigzag configuration. The wire can be a single piece, stamped or extruded, or it could be formed by welding the free ends together. The straight sections of the stent member **100** are joined by bends. The stent is readily compressible to a small cylindrical shape as depicted in FIGS. **6** and **8**, and resiliently self-expandable to the shape shown in FIG. **5**.

The stent member **100** of the artificial heart valve device of the present invention may be made from various metal alloys, titanium, titanium alloy, nitinol, stainless steel, or other resilient, flexible non-toxic, non-thrombogenic, physiologically acceptable and biocompatible materials. The configuration may be the zigzag configuration shown or a sine wave configuration, mesh configuration or a similar configuration which will allow the stent to be readily collapsible and self-expandable. When a zigzag or sine wave configured stent member is used, the diameter of the wire from which the stent is made is preferably from about 0.010 to 0.035 inches and still, preferably from about 0.012 to 0.025 inches. The diameter of the stent member will be from about 1.5 to 3.5 cm, preferably from about 1.75 to 3.00 cm, and the length of the stent member will be from about 1.0 to 10 cm, preferably from about 1.1 to 5 cm.

The stent used in a preferred embodiment of the present invention is fabricated from a "shaped memory" alloy, nitinol, which is composed of nickel and titanium. Nitinol wire is first fashioned into the desired shape for the device and then the device is heat annealed. A meshwork of nitinol wire of approximately 0.008 inch gauge is formed into a tubular structure with a minimum central diameter of 20 mm to make the stent. Away from its central portion, the tubular structure flares markedly at both ends in a trumpet-like configuration. The maximum diameter of the flared ends of the stent is approximately 50 mm. The purpose of the stent is to maintain a semi-rigid patent channel through the diseased cardiac valve following its implantation.



When the components of the replacement heart valve device are exposed to cold temperatures, they become very flexible and supple, allowing them to be compressed down and pass easily through the delivery sheath. A cold temperature is maintained within the sheath during delivery to the deployment site by constantly infusing the sheath with an iced saline solution. Once the valve components are exposed to body temperature at the end of the sheath, they instantaneously reassume their predetermined shapes, thus allowing them to function as designed.

Preferably the stent member **100** carries a plurality of barbs extending outwardly from the outside surface of the stent member for fixing the heart valve device in a desired position. More preferably the barbs are disposed in two spaced-apart, circular configurations with the barbs in one circle extending in an upstream direction and the barbs in the other circle extending in a downstream direction. It is especially preferable that the barbs on the inflow side of the valve point in the direction of flow and the barbs on the outflow side point in the direction opposite to flow. It is preferred that the stent be formed of titanium alloy wire or other flexible, relatively rigid, physiologically acceptable material arranged in a closed zigzag configuration so that the stent member will readily collapse and expand as pressure is applied and released, respectively.

Valve Means

The valve means **200** is flexible, compressible, host-compatible, and non-thrombogenic. The valve means **200** can be made from various materials, for example, fresh, cryopreserved or glutaraldehyde fixed allografts or xenografts. Synthetic biocompatible materials such as polytetrafluoroethylene, polyester, polyurethane, nitinol or other alloy/metal foil sheet material and the like may be used. The preferred material for the valve means **200** is mammal pericardium tissue, particularly juvenile-age animal pericardium tissue. The valve means **200** is disposed within the cylindrical stent member **100** with the tubular portion **210** transverse of and at some acute angle relative to the stent walls. The diameter of the tubular portion **210** is substantially the same as the inside diameter of the stent member **100** in its initial expanded configuration. The peripheral upstanding cusp or leaflet portion **220** is disposed substantially parallel to the walls of the stent member **100** similar to a cuff on a shirt.

The cusp or leaflet portion **220** of the valve means **200** is formed by folding of the pericardium material used to create the valve. FIGS. **3**A and **3**B depict the way the sheet of heart valve starting material is folded. The starting material is preferably a flat dry sheet, which can be rectangular or other shaped. The cusps/leaflets **221**, **222** and **223** open in response to blood flow in one direction and close in response to blood flow in the opposite direction. Preferably the cusp or leaflet portion **220** of the valve means **200** contains the same number of cusps as the native valve being replaced, in substantially the same size and configuration. FIGS. **9**A-**9**C depict a preferred configuration for folds to create the leaflets/cusps. The leaflet forming portion is a single, continuous, uncut layer affixed to the interior of the cuff layer to form the leaflets/cusps, unlike prior efforts that have involved suturing of three separate leaflet/cusp portions onto the main valve body portion. The leaflets are formed from the free edge of the material after forming the cuff portion. Referring now to FIGS. **9**-A, **9**B, and **9**C, with flat sheet on a table, a person facing the sheet would create a cuff at the upper border of sheet by folding the horizontal top edge away/downwardly (fold no. 1). The leaflet portion is formed by folding the sheet's lower half towards the folder/upwardly, as shown in FIG. **9**A (fold no. 2). The sheet, now with the upper cuff and bottom inward fold, is folded

inwardly at two preferably equidistant vertical points as shown in FIG. **9**B to create the leaflet/cusp portion (folds nos. 3 and 4). The leaflets/cusps are formed by folding fold nos. 6, 7 and 8 after the two opposite vertical edges of sheet are joined to create a cylindrical valve shape, depicted in FIGS. **1** and **3**B. The inner leaflet layer is preferably attached to the outer cuff layer by curved or straight continuous suturing. Although a preferred embodiment of the invention comprises a single piece of valve material folded to create the valve body and a leaflet-forming portion that has no cuts or sutures, the inventors have discovered that as long as the leaflet portion of the valve itself is formed from a single piece of biocompatible valve material, the other portions of the valve can be formed by suturing of one or more separate pieces of material without losing the novel and improved qualities of the present invention. This allows for the valve to be made even stronger, more durable and easier to make. This alternate embodiment comprises a leaflet forming layer made of a single piece of valve material attached to a separate piece forming the valve body having a folded cuff portion. The single piece leaflet forming layer is preferably cylindrical in shape and can be formed with or without folding. In this embodiment the single piece leaflet layer can itself be attached to the stent with or without a cylindrical cuff portion. Attachment is preferably by suturing, particularly continuous single or double sutures.

Method of Making Replacement Heart Valve Device

The present invention also comprises a method of making a replacement heart valve device. In order to make the valve, the biocompatible tissue material is isolated and all the fat tissue and extra fibers are removed. Cleaning is preferably accomplished by using a hydromechanical force-based cleaning device to separate tissue layers and hydration with distilled water to remove unwanted layers. Once the pericardium is completely clean, it is subjected to photo-mechanical compression, then the valve is formed and placed in sequential solutions of isopropyl alcohol of about 70-100%, ethanol of about 70-100%, glycerol and glutaraldehyde preferably at a concentration of about 0.07-25% for about 36 hours, respectively. The material is preferably photomechanically compressed to remove lipids and produce protein coagulation to make the surface smoother and more compact and biocompatible, decreasing the molecular distance of collagen fibers. The exposure to light and mechanical compression cause protein denaturation making the material stronger and more homogeneous and biocompatible. Gas sterilization can also be used to sterilize the tissue membrane material. The valve is formed by taking a flat sheet of the material and folding it in such a way that forms a three-leaflet or desired number of leaflet valve as shown in FIGS. **3**A and **3**B and/or FIGS. **9**A, **9**B and **9**C. The folding of the pericardium material to create the cusps or leaflets reduces the extent of suturing otherwise required, and resembles the natural form and function of the valve leaflets. It also greatly reduces the risk of tearing of the cusps or leaflets, since they are integral to the valve rather than being attached by suturing.

In a preferred embodiment, the single continuous piece of membrane is folded inward to form an inner leaflet layer within the outer cuff. The single leaflet layer is then attached to the cuff layer to form valve cusps in one of three preferred ways: (i) by curved or straight continuous single or double sutures that affix and form the bases or recesses of the valve cusps; (ii) by lengthwise suture lines attaching the leaflet layer to the cuff layer with the bases or recesses of the valve cusps being thus formed of the folded edge of the membrane; (iii) by further folding of the membrane into lengthwise pleats secured by lengthwise suture attaching the leaflet layer to the cuff layer with the bases or recesses of the valve cusps being thus formed of the folded edge of the membrane, done for the purpose of giving greater strength and durability to the attachment points of the leaflet layer.

In order to make the pericardium material less slippery and easier to fold, the pericardium is dried, preferably with artificial light using a multi-watt lamp with the pericardium or other biocompatible membrane material placed in a flat aluminum surface to dry it homogeneously. A photomechanical drying machine can also be used. The final result is a homogeneous tissue that looks like plastic paper and makes it easy to manipulate to fold and suture the valve. Once the valve is formed, it is re-hydrated by placing it in a solution of water and 70% alcohol. In approximately 3 days the valve is fully rehydrated. The suturing of membrane layers to form the valve is done with single, double, or more continuous suture material. This form of suturing has great advantages for durability and avoidance of damage to the membrane and can be performed by sewing machines. The attachment points of the leaflet layer to the cuff layer may be reinforced by folding an additional layer of membrane over the attachment point before suturing, this layer being formed of a projected tab of the continuous piece of leaflet membrane. The free edge of the leaflet layer may be straight or curved, and this free edge forming the free edges of the individual leaflets may be contoured in parabolic or curved shape.

Attachment of the Valve Means to the Stent Member

The valve means **200** is then attached to the inner channel of the stent member **100** by suturing the outer surface of the valve means' pericardium material to the stent member. FIG. **7** depicts preferred suture points of one embodiment of the present invention: 3-point fixation or 6-point fixation at each border of the stent. Other fixation schemes can be utilized, such as, by way of non-limiting example, fixation on both borders 18 points at each end following a single plane and 36 fixation points following to adjacent vertical planes. The use of only one plane of fixation points helps prevent systolic collapse of the proximal edge of the valve means. A fold on the border of the pericardium material prevents tearing. The attachment position of the valve is preferably closer to the proximal and wider part of the stent.

The sequence of steps can vary. The pericardium material can be fixed in glutaraldehyde before attachment to the stent or the valve can be formed and then fixed with glutaraldehyde after mounting it in the stent. One observation noted is that the material becomes whiter and apparently increases its elasticity. 1 mm vascular clips keep the cusps coapted while fixing them in glutaraldehyde. The use of metallic clips to keep both cusps adjacent to each other after 24 hours of fixation in glutaraldehyde helps to educate the material and make the primary position of the valve cusps adjacent to each other. After the clips are removed, there are no lesions to the valve.

Different suture materials can be used, including, in a preferred embodiment, Prolene 1-0 to 8-0 and Mersilene 1-0 to 8-0 which is a braided suture.

Implantation of Replacement Heart Valve Device

The replacement heart valve device of the present invention is preferably used in surgical procedures involving the percutaneous and transluminal removal of the diseased or defective heart valve and the percutaneous and transluminal implantation of the new heart valve described above. The defective heart valve is removed by a suitable modality, such as, for example, laser, ultrasound, mechanical, or other suitable forms of delivery of energy, or phacoemulsion, including, but not limited to, laser lithotripsy, mechanical lithotripsy, electrohydraulic lithotripsy, and laser or mechanical ablation. To remove the native heart valve that is being replaced, a guidewire is inserted percutaneously and translu-

minally using standard vascular or angiography techniques. The distal end of the guidewire is manipulated to extend through and across the defective heart valve. Then a catheter is advanced distally through the femoral artery to a point proximal to the defective heart valve, between the origin of the coronary artery and the origin of the right subclavian artery. The position of the distal end of catheter can be monitored by observation of radiopaque markers. Collector member is preferably inflated and occludes the aorta at a point between the origin of the coronary artery and the right subclavian artery. Next, a balloon and cutting tool are advanced through the catheter so that the cutting tool and uninflated balloon are distal to the defective heart valve. Optionally an additional step, such as balloon dilatation or atherectomy, may be required to provide a passageway through the heart valve. A catheter is also placed into the coronary sinus via a transjugular puncture. This catheter is used for infusion of blood or cardioplegia solution during the portion of the procedure when the aorta is occluded. The absence of valves in the cardiac venous system allows retrograde flow so that there will be an effluence of fluid from the coronary arteries. This flow of fluid is desired to prevent embolization of material into the coronary arteries during the procedure. Once the cutting tool is in place, the balloon is inflated and flexible shaft is rotated. Once the cutting tool has reached the appropriate rotation speed, the cutting tool is pulled proximally to remove the defective heart valve. The balloon and the cutting tool are spaced apart so that the inflated balloon will be stopped by the perimeter, unremoved portion of the defective heart valve, which will signal the physician that the valve has been removed, as well as protect the heart and aorta from damage from the valve removal device. Once it is determined that the defective heart valve has been removed, the cutting tool is slowed or stopped altogether and the balloon is deflated. The cutting tool and the deflated balloon are pulled proximally through catheter. Then, a catheter containing an artificial heart valve is inserted and the artificial heart valve is placed as described above.

The delivery and implantation system of the replacement artificial heart valve of the present invention percutaneously and transluminally includes a flexible catheter **400** which may be inserted into a vessel of the patient and moved within that vessel as depicted in FIG. **8**. The distal end **410** of the catheter **400**, which is hollow and carries the replacement heart valve device of the present invention in its collapsed configuration, is guided to a site where it is desired to implant the replacement heart valve. The catheter has a pusher member **420** disposed within the catheter lumen **430** and extending from the proximal end **440** of the catheter to the hollow section at the distal end **410** of the catheter. Once the distal end **410** of the catheter is positioned as desired, the pusher mechanism **420** is activated and the distal portion of the replacement heart valve device is pushed out of the catheter and the stent member **100** partially expands. In this position the stent member **100** is restrained so that it doesn't pop out and is held for controlled release, with the potential that the replacement heart valve device can be recovered if there is a problem with the positioning. The catheter **400** is then retracted slightly and the replacement heart valve device is completely pushed out of the catheter **400** and released from the catheter to allow the stent member **100** to fully expand. If the stent member **100** preferably includes two circles of barbs on its outer surface as previously described, the first push and retraction will set one circle of barbs in adjacent tissue and the second push and release of the replacement heart valve device will set the other circle of barbs in adjacent tissue and securely fix the replacement heart valve device in place when the device is released from the catheter.

Alternatively, or in combination with the above, the replacement heart valve device could be positioned over a metallic guidewire that is advanced through the catheter. The replacement heart valve device of the present invention is preferably implanted percutaneously through an aortic passageway to, or near to, the location from which the natural heart valve has been removed. Referring to FIG. **8**, the implantation system comprises a flexible hollow tube catheter **410** with a metallic guide wire **450** disposed within it. The stented valve device is collapsed over the tube and is covered by a moveable sheath **460**. The moveable sheath **460** maintains the stented valve device in the collapsed position. The implantation method comprises the following steps: inserting the replacement heart valve device in the lumen of a central blood vessel via entry through the brachial or femoral artery using a needle or exposing the artery surgically; placing a guide wire **450** through the entry vessel and advancing it to the desired position; advancing dilators over the wire to increase the lumen of the entry site, thereby preparing the artery to receive the heart-valve; and advancing the heart-valve device to the desired place. The stented-valve device is released by pulling the cover sheath **460** of the delivery system allowing the self-expanding stent to achieve its full expansion. A balloon expandable stent can alternately be used to deliver the valve to its desired position. At this point, a pigtail catheter is advanced over the wire and an aortogram is performed to assess the competency of the valve.

Before creation of the valve means and implantation, the patient is studied to determine the architecture of the patient's heart. Useful techniques include fluoroscopy, transesophageal echocardiography, MRI, and angiography. The results of this study will enable the physician to determine the appropriate size for the replacement heart valve.

In one procedure for implantation of the replacement heart valve device of the present invention, the femoral artery of the patient is canulated using a Cook needle and a standard J wire is advanced into the artery either percutaneously or after surgical exposure of the artery. An 8 F introducer is advanced into the femoral artery over the wire. The J wire is then withdrawn and anticoagulation is started using heparin 60 U/Kg intravenously. Once vascular access is obtained an aortogram is performed for anatomical evaluation. A special wire (Lunderquist or Amplatz superstiff) is advanced into the aortic arch and dilators progressively larger are advanced over the wire, starting with 12 F all the way to 18 F. After this the valve introducer device containing the prosthetic valve device is then inserted and used to transport the replacement valve over a guidewire to the desired position. The stented-valve is released by pulling the cover sheath of the delivery system allowing the self-expanding stent to achieve its full expansion. At this point, a pigtail catheter is advanced over the wire and repeat aortogram is performed to assess the competency of the valve.

When the device is used to treat severe leakage of the aortic valve, the native valve is left in place and the prosthetic stented valve is deployed below the subclavian artery. When the device is used to treat aortic stenosis, first the stenotic valve needs to be opened using either aortic valvuloplasty or cutting and if this procedure induces aortic insufficiency the stented valve is placed to prevent the regurgitation.

Intravascular ultrasound or an angioscope passed intravascularly via either the venous system through the intra-atrial septum across the mitral valve and into the left ventricle or retrograde via the femoral artery would provide the added

benefit of allowing constant high definition imaging of the entire procedure and high flow irrigation.

Once the endovascular implantation of the prosthetic valve device is completed in the host, the function of the prosthetic valve device can be monitored by the same methods as used to monitor valve replacements done by open heart surgery. Routine physical examination, periodic echocardiography or angiography can be performed. In contrast to open heart surgery, however, the host requires a short recovery period and can return home within one day of the endovascular procedure. The prosthetic valve device can be used in any patient where bioprosthetic valves are indicated, namely elderly patients with cardiac valve diseases, and patients unable to tolerate open heart procedures or life-long anticoagulation. In addition, with the development of longer-life, flexible, non-thrombogenic synthetic valve alternatives to bioprosthesis, the prosthetic valve device will be indicated in all patients where the relative advantages of the life-span, the non-thrombogenic quality, and the ease of insertion of prosthetic valve devices outweigh the disadvantages of mechanical valves. Anticoagulation may be beneficial in certain clinical situations for either short or long term use.

This method of percutaneous endovascular heart-valve replacement, in contrast to open heart surgical procedures, requires only local anesthesia, partial or no cardiac bypass, one to two days hospitalization, and should result in a reduced mortality rate as compared to open heart procedures.

While the present invention has been shown and described herein in what is considered to be a preferred embodiment thereof, illustrating the results and advantages over the prior art obtained through the present invention, the invention is not limited to the specific embodiments described above. Thus, the forms of the invention shown and described herein are to be taken as illustrative and other embodiments may be selected without departing from the spirit and scope of the present invention.

What is claimed is:

**1**. A method of controlled release of a percutaneous replacement heart valve at a location of a native heart valve in a patient, the method comprising:

obtaining a replacement heart valve device and a delivery and implantation system:

the replacement heart valve device including:

a stent member that is collapsible, expandable and configured for percutaneous delivery; and



a valve residing entirely within an inner channel of the stent member and attached to a proximal portion of the stent member, the valve including two to four individual leaflets made of fixed pericardial tissue;

the delivery and implantation system including:

a pusher member and a moveable sheath, wherein the pusher member includes a guide wire lumen, and wherein the moveable sheath includes a lumen configured for receiving the pusher member;

after the obtaining step, loading the replacement heart valve device into the lumen of the moveable sheath such that the replacement heart valve device is collapsed onto the pusher member to reside in a collapsed configuration on the pusher member and is restrained in the collapsed configuration by the moveable sheath;

after the loading step, advancing the delivery and implantation system transluminally over a guide wire within the patient to position the replacement heart valve device for deployment within the patient at the location of the native heart valve;

after the advancing step, partially deploying a distal portion of the replacement heart valve device within the patient by pushing out the pusher member from the moveable sheath to expose the distal portion of the replacement heart valve device;

after the partially deploying step, restraining the replacement heart valve device so that it does not pop out and is held for controlled release, with a potential that the replacement heart valve device can be recovered if there is a problem with positioning; and

after the restraining step, recovering the distal portion of the replacement heart valve device within the moveable sheath that was exposed in order to address a problem with the position of the replacement heart valve device within the patient.

**2**. The method of claim **1**, wherein the stent member is self-expanding.

**3**. The method of claim **2**, wherein the stent member comprises nitinol.

**4**. The method of claim **1**, wherein the stent member includes a tubular structure away from a central portion that flares at both ends in a trumpet-like configuration.

* * * * *