**No. 23-2153**

**IN THE**

# United States Court of Appeals

**FOR THE FEDERAL CIRCUIT**

COLIBRI HEART VALVE LLC,

*Plaintiff-Appellee*,

v.

MEDTRONIC COREVALVE LLC,

*Defendant-Appellant*.

On Appeal from the United States District Court
for the Central District of California
No. 8:20-cv-00847-DOC-JDE, Judge David O. Carter

**NON-CONFIDENTIAL RESPONSE BRIEF OF APPELLEE COLIBRI HEART VALVE LLC**

John M. Hughes
Meg E. Fasulo
Taylor J. Kelson
BARTLIT BECK LLP
1801 Wewatta Street, Suite 1200
Denver, CO 80202
(303) 592-3100
john.hughes@bartlitbeck.com

Jeffrey A. Lamken
Michael G. Pattillo, Jr.
Walter H Hawes IV
MOLO LAMKEN LLP
The Watergate, Suite 500
600 New Hampshire Avenue, N.W.
Washington, D.C. 20037
(202) 556-2000
jlamken@mololamken.com

*Counsel for Appellee Colibri Heart Valve LLC*
*(Additional Counsel Listed on Inside Cover)*

Steven E. Derringer
Matthew R. Ford
Katherine E. Rhoades
BARTLIT BECK LLP
Courthouse Place
54 West Hubbard Street
Chicago, IL 60654
(312) 494-4400

Catherine Martinez
MOLO LAMKEN LLP
430 Park Avenue
New York, NY 10022
(212) 607-8160

*Counsel for Appellee Colibri Heart Valve LLC*

# PATENT CLAIMS AT ISSUE

Claims 1-3 of U.S. Patent No. 8,900,294 are at issue in this appeal.

Claim 1 is representative:

> A method of controlled release of a percutaneous replacement heart valve at a location of a native heart valve in a patient, the method comprising:
>
> obtaining a replacement heart valve device and a delivery and implantation system:
>
> the replacement heart valve device including:
>
> a stent member that is collapsible, expandable and configured for percutaneous delivery; and
>
> a valve residing entirely within an inner channel of the stent member and attached to a proximal portion of the stent member, the valve including two to four individual leaflets made of fixed pericardial tissue;
>
> the delivery and implantation system including:
>
> a pusher member and a moveable sheath, wherein the pusher member includes a guide wire lumen, and wherein the moveable sheath includes a lumen configured for receiving the pusher member;
>
> after the obtaining step, loading the replacement heart valve device into the lumen of the moveable sheath such that the replacement heart valve device is collapsed onto the pusher member to reside in a collapsed configuration on the pusher member and is restrained in the collapsed configuration by the moveable sheath;
>
> after the loading step, advancing the delivery and implantation system transluminally over a guide wire within the patient to position the replacement heart valve device for deployment within the patient at the location of the native heart valve;

> after the advancing step, partially deploying a distal portion of the replacement heart valve device within the patient by pushing out the pusher member from the moveable sheath to expose the distal portion of the replacement heart valve device;
>
> after the partially deploying step, restraining the replacement heart valve device so that it does not pop out and is held for controlled release, with a potential that the replacement heart valve device can be recovered if there is a problem with positioning; and
>
> after the restraining step, recovering the distal portion of the replacement heart valve device within the moveable sheath that was exposed in order to address a problem with the position of the replacement heart valve device within the patient.

Appx159 (13:38-14:37).

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2023-2153

**Short Case Caption** Colibri Heart Valve LLC v. Medtronic CoreValve, LLC

**Filing Party/Entity** Colibri Heart Valve LLC

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 03/08/2024

Signature: /s/ Jeffrey A. Lamken

Name: Jeffrey A. Lamken

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Colibri Heart Valve LLC | None | None |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Carolyn C. Chang<br>Marton Ribera Schumann Chang | Adam K. Mortara | Mieke K. Malmberg<br>Skiermont Derby LLP |
| Ryan J. Marton<br>Marton Ribera Schumann Chang | John S. Phillips<br>Bartlit Beck LLP | Theodore D. Kwong<br>Hilgers Graben PLLC |
| Hector Julian Ribera<br>Marton Ribera Schumann Chang | Joseph C. Smith, Jr.<br>Bartlit Beck LLP | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☑ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

Page

INTRODUCTION ....... 1

STATEMENT OF THE ISSUES ....... 2

STATEMENT OF THE CASE ....... 2

I. Colibri's Patented Invention ....... 2

A. Drs. Fish and Paniagua's Breakthroughs in Heart Valve Replacement Procedures ....... 3

B. The Paniagua Application and the '294 Patent ....... 6

II. Colibri and Medtronic's Business Discussions Regarding the '294 Patent ....... 9

III. Procedural History ....... 9

A. The Court's *Daubert* Ruling ....... 10

B. Trial ....... 10

1. Direct Infringement ....... 10

2. Active Inducement ....... 14

3. Damages ....... 15

4. The Jury's Verdict for Colibri ....... 16

C. The Court Denies Medtronic's Post-Trial Motions ....... 16

SUMMARY OF ARGUMENT ....... 18

ARGUMENT ....... 22

I. Substantial Evidence Supports the Jury's Verdict that Medtronic Failed To Prove the '294 Patent Invalid ....................22

A. Paniagua Provides Written-Description Support for the '294 Patent's Claims ....................23

B. Paniagua's Additional Disclosure of Folded Valves Does Not Nullify Written-Description Support for the Claimed Partial-Deployment Method ....................25

II. The Infringement Verdict Should Be Sustained ....................33

A. Colibri Proved Direct Infringement Under the Doctrine of Equivalents ....................33

1. Medtronic's Claim-Vitiation Argument Is Forfeited ....................35

2. Medtronic's Claim-Vitiation Argument Fails on the Merits ....................36

3. Medtronic's "Physically Impossible" Theory Is Foreclosed by the Verdict and Record Evidence ....................37

4. Medtronic's Prosecution-History-Estoppel Defense Is Waived and Meritless ....................44

B. Substantial Evidence Supports the Jury's Finding that the Evolut's Valve Is "Entirely Within" the Stent Member ....................49

III. Substantial Evidence Supports the Jury's Finding that Medtronic Actively Induced Infringement ....................52

A. Overwhelming Evidence Showed Inducement ....................53

B. The Jury's Doctrine-of-Equivalents Determination Is Consistent With Inducement ....................57

IV. The Damages Award Is Amply Supported ........ 60

A. The Court Properly Admitted the Medtronic-Edwards Agreement ........ 61

1. The Medtronic-Edwards Agreement Was Sufficiently Comparable ........ 61

2. Medtronic's Quibbles Do Not Establish an Abuse of Discretion ........ 63

B. Colibri's Damages Theory Properly Included the Option Value of the Patented Method ........ 66

CONCLUSION ........ 70

**CONFIDENTIAL MATERIAL OMITTED**

The material omitted on pages 15, 63, 64, and 65 describes details of a previous licensing agreement between Medtronic and Edwards Lifesciences Corporation. The material omitted on pages 35 and 37 quotes language from a special master's report and recommendation that remains under seal.

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Absolute Software, Inc. v. Stealth Signal, Inc.*,
659 F.3d 1121 (Fed. Cir. 2011) ....................................................................35

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
694 F.3d 1312 (Fed. Cir. 2012) ....................................................................61

*Allen Organ Co. v. Kimball Int'l, Inc.*,
839 F.2d 1556 (Fed. Cir. 1988) ....................................................................53

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
314 F.3d 1313 (Fed. Cir. 2003) ....................................................................25

*Amgen Inc. v. Hospira, Inc.*,
944 F.3d 1327 (Fed. Cir. 2019) ....................................................................60

*Applied Med. Res. Corp. v. U.S. Surgical Corp.*,
147 F.3d 1374 (Fed. Cir. 1998) ....................................................................33

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
598 F.3d 1336 (Fed. Cir. 2010) (en banc) ..........................................24, 25, 29

*AstraZeneca AB v. Apotex Corp.*,
782 F.3d 1324 (Fed. Cir. 2015) ....................................................................70

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*,
512 F.3d 1338 (Fed. Cir. 2008) ....................................................................25

*Barry v. Medtronic, Inc.*,
914 F.3d 1310 (Fed. Cir. 2019) ....................................................................55

*Bio-Rad Labs., Inc. v. 10X Genomics Inc.*,
967 F.3d 1353 (Fed. Cir. 2020) ...................................................61, 62, 63

*Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*,
320 F.3d 1339 (Fed. Cir. 2003) ....................................................................23

*Broadcom Corp. v. Qualcomm Inc.*,
543 F.3d 683 (Fed. Cir. 2008) ......................................................................57

*Cadence Pharms. Inc. v. Exela PharmSci Inc.*,
780 F.3d 1364 (Fed. Cir. 2015) ....................36, 37

*Cordis Corp. v. Boston Sci. Corp.*,
188 F. App'x 984 (Fed. Cir. 2006) ....................25, 27, 29, 32

*Crown Packaging Tech., Inc. v. Ball Metal Beverage Container Corp.*,
635 F.3d 1373 (Fed. Cir. 2011) ....................27, 33

*Deere & Co. v. Bush Hog, LLC*,
703 F.3d 1349 (Fed. Cir. 2012) ....................36, 37

*Enplas Display Device Corp. v. Seoul Semiconductor Co., Ltd.*,
909 F.3d 398 (Fed. Cir. 2018) ....................69, 70

*Ericsson, Inc. v. D-Link Sys., Inc.*,
773 F.3d 1201 (Fed. Cir. 2014) ....................61, 63, 65

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co*.,
535 U.S. 722 (2002)....................45

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
493 F.3d 1368 (Fed. Cir. 2007) ....................37

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
344 F.3d 1359 (Fed. Cir. 2003) (en banc) ....................45, 46, 48

*Gillette Co. v. Energizer Holdings, Inc*.,
405 F.3d 1367 (Fed. Cir. 2005) ....................47, 48

*Glaxo Wellcome, Inc. v. Impax Labs., Inc.*,
356 F.3d 1348 (Fed. Cir. 2004) ....................47

*GlaxoSmithKline LLC v. Teva Pharms. USA, Inc.*,
7 F.4th 1320 (Fed. Cir. 2021) ....................33, 53, 57

*Global-Tech Appliances, Inc. v. SEB S.A.*,
563 U.S. 754 (2011)....................53, 57

*Hanson v. Alpine Valley Ski Area, Inc.*,
718 F.2d 1075 (Fed. Cir. 1983) ....................67

*Honeywell Inc. v. Victor Co. of Japan, Ltd.*,
298 F.3d 1317 (Fed. Cir. 2002) ....................26

*i4i Ltd. P'ship v. Microsoft Corp.*,
598 F.3d 831 (Fed. Cir. 2010) ....................61

*Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*,
863 F.2d 867 (Fed. Cir. 1988) ....................1

*Lucent Techs., Inc. v. Gateway, Inc.*,
580 F.3d 1301 (Fed. Cir. 2009) ....................60, 66, 68

*Microsoft Corp. v. DataTern, Inc.*,
755 F.3d 899 (Fed. Cir. 2014) ....................55

*In re MTSG, Inc.*,
675 F.3d 1337 (Fed. Cir. 2012) ....................64

*Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*,
30 F.4th 1339 (Fed. Cir. 2022) ....................68, 69

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
843 F.3d 1315 (Fed. Cir. 2016) ....................52, 53, 57, 58

*Resonate Inc. v. Alteon Websystems, Inc.*,
338 F.3d 1360 (Fed. Cir. 2003) ....................25

*ResQNet.com, Inc. v. Lansa, Inc.*,
594 F.3d 860 (Fed. Cir. 2010) ....................64

*Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*,
563 F.3d 1358 (Fed. Cir. 2009) ....................23, 26, 27

*Roche Diagnostics Corp. v. Meso Scale Diagnostics, LLC*,
30 F.4th 1109 (Fed. Cir. 2022) ....................59

*SEB S.A. v. Montgomery Ward & Co.*,
594 F.3d 1360 (Fed. Cir. 2010) ....................57

*Summit 6, LLC v. Samsung Elecs. Co.*,
802 F.3d 1283 (Fed. Cir. 2015) ....................63, 66

*Smith & Nephew, Inc. v. Ethicon*,
276 F.3d 1304 (Fed. Cir. 2001) ....................................................................49

*Tronzo v. Biomet, Inc.*,
156 F.3d 1154 (Fed. Cir. 1998) ..............................................................27, 29, 32

*Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*,
520 U.S. 17 (1997)..........................................................................................35, 36

*Warsaw Orthopedic, Inc. v. NuVasive, Inc.*,
824 F.3d 1344 (Fed. Cir. 2016) ..............................................................53, 54, 59

*WCM Indus., Inc. v. IPS Corp.*,
721 F. App'x 959 (Fed. Cir. 2018) ..................................................................57

## STATUTES

35 U.S.C. § 271(b)...............................................................................................52

## RULES

Fed. R. Civ. P. 50(b) ............................................................................................16

Fed. R. Civ. P. 53 ...................................................................................................35

Fed. R. Civ. P. 59 ...................................................................................................16

## STATEMENT OF RELATED CASES

Colibri Heart Valve LLC is not aware of any case pending in this or any other tribunal that will directly affect or be directly affected by this Court's decision within the meaning of Federal Circuit Rule 47.5.

## INTRODUCTION

The "story of this case" is indeed "a tale as old as time," Medtronic.Br.3—just not the tale Medtronic spins. Medtronic met with Colibri to discuss licensing Colibri's patented technology, but decided to infringe rather than pay for the right to use that technology. Having been found liable for that infringement, Medtronic now seeks to evade the jury's verdict by throwing a slew of arguments against the wall, hoping something sticks. But Medtronic does not seriously engage with the trial record, which defies its arguments that no reasonable jury could have reached the verdict this one did. Medtronic's efforts to manufacture legal arguments concerning the doctrine of equivalents and inducement are foreclosed by precedent. And Medtronic's complaints about Colibri's damages methodology are, at most, matters for cross-examination, not grounds for exclusion.

Medtronic's "tale"—that, once Medtronic entered the market, Colibri "dusted off" its prior "Paniagua" patent application "and filed for a new, broadened set of claims" that issued as the '294 patent, Medtronic.Br.3—is both incorrect and irrelevant. So long as the requirements of patentability are met, it is not "in any manner improper to amend or insert claims intended to cover a competitor's product." *Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 874 (Fed. Cir. 1988). The jury found the asserted claims for partially deploying a replacement heart valve fully supported by Paniagua. Medtronic ties itself in knots arguing that what

Paniagua "described . . . is not what the '294 patent claims." Medtronic.Br.3-4. But Paniagua disclosed multiple, independent innovations. And it provides written-description support for every limitation of the asserted claims.

## STATEMENT OF THE ISSUES

1. Whether no reasonable juror could find that Medtronic failed to prove, by clear-and-convincing evidence, that Paniagua does not provide written-description support for the '294 patent's claims.

2. Whether substantial evidence supports the jury's infringement verdict.

3. Whether substantial evidence supports the jury's finding that Medtronic actively induced infringement.

4. Whether the district court was within its discretion in admitting Colibri's damages evidence.

## STATEMENT OF THE CASE

### I. COLIBRI'S PATENTED INVENTION

This case concerns a method for safely and effectively replacing the aortic valve of the human heart. Colibri's invention provides cardiologists with a second chance to "stick the landing" during a transcatheter aortic replacement heart valve ("TAVR") procedure if the valve is not positioned in precisely the right spot during the initial deployment attempt.

### A. Drs. Fish and Paniagua's Breakthroughs in Heart Valve Replacement Procedures

The aortic valve directs blood flow from the heart out to the body. Appx21063-64 (301:2-302:2). Over time, the valve can thicken and stiffen, impairing its functionality and causing serious health problems. Appx21064 (302:3-10); Appx21065 (303:4-9).

As late as the 1990s, repairing severe aortic valve disease required open-heart surgery. Appx21065-66 (303:10-304:11). Many patients, however, were not candidates for that invasive procedure. Appx21066-67 (304:22-305:3). Dr. David Fish, a cardiologist at the Texas Heart Institute, sought to develop a technique for replacing the aortic valve that did not require cutting the patient's chest open. Appx21066-67 (305:4-306:17).

Dr. Fish explored the idea of replacing a heart valve through "an endovascular procedure," "where the invasion into the body is through a blood vessel such as the femoral artery." Appx153-54 (2:66-3:1). Experienced with performing endovascular angioplasties to open blockages in coronary arteries, Appx21051 (289:2-12); Appx21052-53 (290:25-291:9), he thought endovascular procedures might be used to replace damaged aortic valves, Appx21068 (306:11-17). He eventually succeeded. With his colleagues, Dr. Fish performed the first TAVR procedure in a human using the femoral artery. Appx21080-81 (318:19-319:2).

Dr. Fish recognized the importance of deploying replacement valves in exactly the right place in the patient's heart—what he called "sticking the landing." Appx21071 (309:15-18); Appx21067-68 (305:16-306:10). He addressed that challenge by developing a method that allows doctors to: (1) partially deploy the replacement valve once it is located in the area of the damaged valve; (2) recapture the valve if it is not in precisely the right spot; and (3) reposition the valve so the doctor has another chance to "stick the landing." Appx21071 (309:15-24).

Dr. Fish's method involves fitting the replacement valve within a self-expanding metal stent—a tubular mesh device. Appx21072 (310:14-16). The stent is compressed and inserted into a tube—called the "moveable sheath"—that can be moved back and forth inside a catheter. Appx21073 (311:3-12). The catheter is inserted through an incision in the femoral artery, routed up the blood vessel into the aorta, and positioned at the "target area" for deployment. Appx21073 (311:20-23). Because the compressed stent is self-expanding, it "push[es] against the inside of the sheath," exerting a radial force that causes it to be "stuck in there." Appx21075-76 (313:17-314:4). Thus, to deploy the stent and valve in the heart, Dr. Fish's method requires applying a pushing "force to move it out of the sheath." Appx21074 (312:1-3).

To enable doctors to stick the landing, the method calls for ***partially*** deploying the stent in the first instance. The doctor applies a pushing force to the self-

expanding metal stent so that one end emerges from the moveable sheath. Free from the sheath, the exposed portion self-expands, allowing doctors to assess whether the valve is positioned correctly. But the other end of the stent remains within, and compressed by, the sheath. Consequently, doctors who have not "stuck the landing" can recapture the entire stent by pulling it back into the sheath, repositioning it, and then deploying the valve more accurately. Appx21073-74 (311:24-312:15); Appx21076-78 (314:19-316:20); Appx158 (11:40-62).

Dr. Fish, with his colleague, Dr. Paniagua, also invented a new method for making replacement heart valves. Valves have "leaflets," which "are like flaps that move passively" as the heart pumps. Appx20164 (302:16-19). Prior-art replacement heart valves were "constructed by sewing the leaflets of pig aortic valves to a stent." Appx22688 (¶ [0017]). Such valves had shortcomings: The "extensive suturing prevents the artificial valve from being anatomically accurate." Appx22688 (¶ [0022]). And they exhibited a "lack of durability" after implantation. Appx22687 (¶ [0011]).

Rather than stitch together different pieces of tissue, their new method involves forming "the leaflet portion" of the "valve . . . by folding" a single piece of pericardial tissue, Appx22689 (¶ [0024]), "like origami," Appx21069 (307:3-5). "[F]olding leaflets out of a single sheath" made for "more durable leaflets." Appx22273(1381:20-24). And the folded valve could be "readily collapsed [o]nto a catheter" for use in TAVR procedures. Appx21068-69 (306:18-307:7).

### B. The Paniagua Application and the '294 Patent

Drs. Fish and Paniagua sought patents for their inventions beginning in 2002. In May 2005, they filed U.S. patent application No. 10/887,688—"Paniagua." Appx22674-95. At that time, they were full-time practicing cardiologists. Appx21082 (320:1-15). In 2010, they founded Colibri and obtained funding to continue developing their TAVR system and begin clinical trials. Appx21081-83 (319:18-321:25). Colibri then filed more than a dozen patents to protect its work, including the patent-in-suit: U.S. Patent No. 8,900,294. Appx134-59. That patent shares a specification with, and claims priority to, Paniagua. The specification discloses Drs. Fish and Paniagua's two inventions.

In describing the partial-deployment method, the specification discloses using "a replacement heart valve device" that has a "stent," with a "valve disposed" inside the stent. Appx154-55 (4:63-5:1). "The stent is readily compressible to a small cylindrical shape as depicted in FIG[.] 6 . . . , and resiliently self-expandable to the shape shown in FIG. 5," Appx156 (7:36-38):



FIG.6




FIG.5

Appx146 (Fig. 5); Appx147 (Fig. 6). The valve is "tubular in shape," and is comprised of "two to four leaflets." Appx156 (7:5-8). The leaflets "allow for one-way flow of blood," Appx156 (7:14-15), "open[ing] in response to blood flow in one direction and clos[ing] in response to blood flow in the opposite direction," Appx156 (8:49-51).

The specification discloses a "delivery and implantation system" for the "replacement artificial heart valve." Appx158 (11:40-41). It has a "central part which consists of a flexible hollow tube catheter [400] that allows a metallic guide wire [450] to be advanced inside it. The stented valve is collapsed over the central tube and covered by a moveable sheath [460]. The sheath keeps the stented valve [100] in the collapsed position." Appx155 (5:16-21). The catheter also "has a pusher member [420] disposed within the catheter lumen." Appx158 (11:48-49).



FIG.8

The specification discloses "implantation of [the] replacement heart valve device," Appx157 (10:55), using the novel partial-deployment method. The "delivery and implantation system" (Figure 8 above) is "inserted into" the patient's "vessel" and "guided to" the site for "implant[ing] the replacement heart valve."

Appx158(11:40-48). "Once the distal end of the catheter is positioned as desired, the pusher mechanism is activated and the distal portion of the replacement heart valve device is pushed out of the catheter and the stent member partially expands." Appx158(11:51-55). Critically, "[i]n this position the stent member is restrained so that it doesn't pop out and is held for controlled release." Appx158(11:51-57). That partial deployment leaves doctors "with the potential that the replacement heart valve can be recovered if there is a problem with the positioning." Appx158(11:57-59). Once correctly repositioned, the catheter is "retracted slightly" and the replacement heart valve device is "completely pushed out of the catheter . . . to allow the stent member to fully expand." Appx158(11:59-62).

Separately, the specification discloses Drs. Fish and Paniagua's "method of making" a valve, Appx157(9:27-28), by "folding . . . the pericardium material to create the . . . leaflets," Appx157(9:50-51). It explains that valves with folded leaflets are "more durable and easier to make" than valves with sutured leaflets. Appx157(9:16-17).

The '294 patent claims only the novel "method of controlled release of a percutaneous replacement heart valve." Appx159(13:38-14:44). The folded valve is claimed in a different patent, U.S. Patent No. 8,109,995.

## II. COLIBRI AND MEDTRONIC'S BUSINESS DISCUSSIONS REGARDING THE '294 PATENT

Medtronic is part of the world's largest medical device company. Appx380. In 2014, Colibri approached Medtronic about partnering with or acquiring Colibri and its patented technology. Appx21455 (677:8-10).

Colibri and Medtronic had "many conversations," Appx21477 (699:5-9), about the '294 patent application's importance "in the transcatheter heart valve space," Appx21458 (680:16-19). The parties discussed the "specific claims regarding recapturing and repositioning a heart valve" asserted in this case. Appx21462 (684:20-23). While Colibri did not want to be "aggressive" given it was "trying to partner with" Medtronic, Colibri clearly "insinuated" that Medtronic was infringing the '294 patent. Appx21477 (699:10-22). Medtronic decided not to partner with Colibri. Appx21476 (698:22-23).

## III. PROCEDURAL HISTORY

Medtronic manufactures and sells devices used in TAVR procedures. In 2020, Colibri sued Medtronic, alleging that it induces doctors to infringe the '294 patent's partial-deployment method when they perform TAVR procedures using Medtronic's "Evolut" products. Appx215. One of those, Medtronic's "Evolut ***R***," is so named to tout its "recapture and reposition" capability. Appx21799-800 (999:25-1000:7).

### A. The Court's *Daubert* Ruling

The district court denied Medtronic's motion to exclude Colibri's damages expert, Dr. Christopher Vellturo. *See* Appx103; Appx8195. It rejected Medtronic's argument that Dr. Vellturo relied on an agreement between Medtronic and Edwards Lifesciences Corporation that "is not comparable." Appx95. The court found the Medtronic-Edwards agreement "to be the most reliable [prior] license in the record." Appx100. And it found that Dr. Vellturo properly "account[ed] for the technological and economic differences" between the Medtronic-Edwards agreement and the hypothetical negotiation between Medtronic and Colibri. Appx100. The court held that "Medtronic's criticisms go to weight rather than admissibility." Appx103.

### B. Trial

#### 1. *Direct Infringement*

Colibri's witnesses—Dr. Richard Fish (an inventor of the '294 patent) and Dr. Robert Gallegos (a cardiologist who has performed hundreds of TAVR procedures)—explained why doctors infringe when using Medtronic's Evolut devices. Medtronic did not offer testimony from a single medical doctor. Most of claim 1's limitations were undisputedly met. Only two remain relevant.

"<u>Pushing out the pusher member</u>." The claim recites "partially deploying a distal portion of the replacement heart valve device . . . by pushing out the pusher member from the moveable sheath to expose the distal portion of the replacement heart valve device." Appx159(14:22-26). The court construed "pushing out the

pusher member from the moveable sheath" to mean "pressing against the pusher member with a force that moves the pusher member outward from the moveable sheath." Appx2321. Colibri alleged that limitation was met under the doctrine of equivalents. "[A]pplying a pushing force on the Evolut devices' pusher member," such that it emerges from the moveable sheath when that sheath "simultaneously retract[s]," Appx19562, is equivalent to "pressing against the pusher member with a force that moves the pusher member outward from the moveable sheath" while the sheath is held stationery, Appx19561-62.

Drs. Fish and Gallegos explained that the equivalence is simple physics. Medtronic's Evolut contains a self-expanding stent placed inside a "hollow tube" called the "moveable sheath." Appx21073 (311:5-12). Dr. Fish testified that the self-expanding stent can "open up on its own after you compress it." Appx21072 (310:21-22). Therefore, Evolut users "collapse [the stent] and then put it inside the moveable sheath." Appx21073 (311:20-22).



Dr. Gallegos testified that, once inside the sheath, the stent "want[s] to expand," exerting a "radial force . . . pushing outward against the . . . moveable sheath." Appx21281 (519:20-25). That force causes the stent to be "stuck" "inside of the sheath." Appx21076 (314:2-3). As a result, Drs. Fish and Gallegos testified, if surgeons only retracted or "pull[ed] back the sheath," the stent would "just . . . move with it" as a unit, Appx21075-76 (313:23-314:5)—the "distal portion of the valve will not come out," Appx21426 (648:16-19).



Dr. Gallegos testified that deploying the valve requires applying "opposing forces" to overcome the radial force exerted by the self-expanding stent against the inside of the moveable sheath. Appx21292 (530:20-24). He explained that users must "both push[ ]" on the pusher member "and retract[ ]" the sheath to get the distal portion of the valve to come out of the sheath. Appx21292 (530:11-17).

Dr. Gallegos explained there was "no substantial difference" between simultaneously "pushing" the pusher member while "retracting" the moveable sheath, as doctors do when using the Evolut, Appx21292-93 (530:3-531:9), and "pushing out the pusher member from the moveable sheath" as recited in claim 1 of the '294 patent, which likewise requires force on the pusher member, Appx159 (14:22-26). He testified that such action "perform[s] substantially the same function" and

"work[s] in substantially the same way to achieve substantially the same result as the element of the claim." Appx21293-96 (531:24-534:7).

"<u>Entirely within</u>." The court construed the term "valve" "residing entirely within an inner channel of the stent member" as requiring that the "portions of the replacement heart valve device that allow the one-way flow of blood" "resid[e] . . . entirely within the inner channel of the stent member." Appx2320.

Dr. Gallegos testified that "allow the one-way flow of blood" means "allow blood to flow through the valve, but not come back." Appx21252 (490:19-21). Dr. Gallegos explained that the ***leaflets*** "are the only portions of the valve that allow the one-way flow of blood" through the body. Appx21255 (493:6-7). He further showed that those leaflets are entirely within the stent's metal frame. Appx21254-55 (492:25-493:2).

Medtronic urged that the stent's "inner skirt," which performs a "sealing function," Appx21263 (501:7-12), "to prevent leak[s] around the valve," Appx21362 (584:14), is what allows the one-way flow of blood and thus is the valve, *see* Appx22456 (1564:14-16).




Medtronic.Br.17. Medtronic argued that this defeated infringement because portions of the inner skirt are outside the stent. Appx22454-55 (1562:21-1563:2).

2. *Active Inducement*

Colibri presented evidence that Medtronic actively induced doctors to infringe. There was no dispute Medtronic knew about the ’294 patent. And there was ample evidence Medtronic knew it was infringing—Colibri had so indicated in discussions. *See* p. 9, *supra*.

Medtronic provided doctors with instructions for the Evolut that, Dr. Gallegos testified, “instruct . . . physicians to use the product as described in the” patent. Appx21243 (481:9-13); Appx21247-49 (485:5-487:3); *see also* Appx21223-25 (461:3-463:15). Medtronic also provided training courses for doctors, including lecture presentations. Appx21120-24 (358:19-362:4); Appx21121 (359:18-22). Medtronic employees also “participate[]” in TAVR procedures, giving “step by step” instructions while “standing next to” the physician. Appx21121-23 (359:23-

361:2); Appx21222 (460:7); Appx21227 (465:5-22). Dr. Gallegos testified that the instructions Medtronic provided in those contexts followed "exactly what the steps in the patent describe," Appx21241 (479:1-14), including "recaptur[ing]" and re-deploying the valve, Appx26433.

3. *Damages*

Medtronic sold more than $3.5 billion worth of accused devices. Appx21547 (769:7-11). Colibri's damages expert, Dr. Vellturo, calculated a reasonable royalty using the "bottom of the range" of royalties—[redacted]%—from a prior agreement in which Medtronic licensed "comparable" patent rights from Edwards for use in the ***exact products*** at issue here. Appx21547 (769:15-19); Appx21591 (821:12-25); Appx21588 (810:8-13); Appx21589 (811:1-7).

Dr. Vellturo "made . . . adjustments" to account for the differences between Edwards and Colibri as market participants. Appx21601-03 (833:7-835:9). He accounted for the differences in technology covered by the Edwards patents and the '294 patent. Appx21589 (811:1-7). He relied on Dr. Dasi, Colibri's technical expert, who testified that the patent rights Medtronic acquired from Edwards were, "from a technical and capability standpoint, . . . comparable in terms of significance to the [infringing] product[s]" when compared with "how the '294 patent is incorporated into the products." Appx21558-59 (810:23-811:7); Appx21504-07 (726:7-729:19).

Dr. Vellturo testified that the royalty should be based on Medtronic's total Evolut sales, even though the patented method was used in 30-40% of TAVR procedures. Evolut's "key competitive advantage" was the stent's "capability to be repositioned and recaptured." Appx21560(782:14-18). Doctors value having the ***option*** to use the patented method, even if it is ultimately not used, because of the "serious ramifications . . . if the device isn't placed properly." Appx21567(789:9-11). Dr. Vellturo testified that the parties would factor that option value into any negotiation to license the '294 patent. Appx21567(789:12-23).

#### 4. *The Jury's Verdict for Colibri*

The jury found Medtronic infringed claims 1-3 under the doctrine of equivalents, Appx20, and rejected Medtronic's invalidity challenges, Appx21. The jury awarded Colibri $106,489,000 in damages—half what Colibri requested. Appx22.

### C. The Court Denies Medtronic's Post-Trial Motions

The district court denied Medtronic's motions for JMOL under Rule 50(b), and for a new trial under Rule 59. Appx1-14.

The court rejected Medtronic's argument that the "pushing out the pusher member" limitation was not met "under the doctrine of equivalents." Appx4. The "opinions of Colibri's experts at trial provided sufficient evidence upon which the jury could find equivalence." Appx4. The court rejected prosecution-history estop-

pel because "[t]he asserted equivalent . . . differs from what was set forth in the" claim Colibri "cancelled" during prosecution. Appx4.

The court rejected Medtronic's non-infringement argument that the "limitation requiring a 'valve residing entirely within the inner channel of the stent member'" was not met. Appx4. Contrary to Medtronic's argument, "sufficient evidence supports the jury's finding that the inner skirt" is "***not*** part of the 'valve.'" Appx4. The court debunked Medtronic's argument that Dr. Gallegos "admitted" the skirt was part of the valve. Appx4-5.

On induced infringement, the court ruled that "Colibri presented sufficient evidence at trial, including evidence that Medtronic instructs doctors to perform infringing acts." Appx5. There was also "sufficient" evidence of intent, including "evidence from which the jury could find that Medtronic, after evaluating . . . Colibri's intellectual property portfolio, decided to use Colibri's patented technology rather than . . . obtain a license to the '294 Patent." Appx5.

The court rejected Medtronic's arguments regarding "anticipation by the 'Paniagua' reference." Appx6. It likewise rejected Medtronic's argument that the claims were obvious in view of "Bessler," a prior-art patent. Appx6.

Finally, the court denied Medtronic's request for a new trial on damages "[f]or the same reasons" that it "rejected Medtronic's *Daubert* arguments." Appx7-8.

## SUMMARY OF ARGUMENT

**I.** The jury found that Medtronic failed to prove that Paniagua does not provide written-description support for the ’294 patent’s claims. Because the ’294 patent is entitled to Paniagua’s priority date, Paniagua cannot anticipate.

**A.** Medtronic urges that Paniagua does not provide written-description support for the “valve including . . . two to four individual leaflets” claim limitation, because Paniagua does not disclose leaflets formed by suturing. But the limitation is not a process limitation; how the valves are made is thus irrelevant. Paniagua, moreover, ***expressly*** discloses valves with sutured leaflets.

**B.** The fact that Paniagua also discloses folded valves does not nullify written-description support for the ’294 patent’s partial-deployment method. The evidence showed that the specification discloses two independent inventions: the claimed partial-deployment method, and a method for making replacement heart valves with folded leaflets. This Court’s precedent holds that, where the specification discloses two inventions, a claim does not lack written description support merely because it recites only one of those inventions.

Medtronic cannot avoid that precedent by arguing that the partial-deployment method disclosed in Paniagua was not truly an “invention”—that attempts to incorporate Medtronic’s failed (and unappealed) obviousness argument into a written-

description challenge. Regardless, the evidence—which Medtronic ignores—shows the described partial-deployment method was inventive.

Medtronic's "disparagement" argument also is baseless. Paniagua criticizes sutured valves for lacking durability after implantation, but Paniagua nowhere suggests sutured valves cannot be used to perform the partial-deployment implantation method. Paniagua supports the claims for partially deploying a replacement valve, whether that valve is formed by folding or by suturing.

**II. A.** Substantial evidence supports the jury's finding that Medtronic directly infringed the '294 patent under the doctrine of equivalents.

Medtronic waived its claim-vitiation argument below. The argument also fails on the merits. Medtronic's argument that the jury verdict vitiated the "pushing out" limitation by equating "pushing out" and "pulling back" mischaracterizes Colibri's doctrine-of-equivalents theory, which does not equate pushing with pulling, but instead involves doctors applying a pushing force on the Evolut's pusher member while simultaneously retracting its moveable sheath. Medtronic fails to show that no reasonable juror could have credited Colibri's expert's testimony that the tests for equivalence were met. And ample evidence—including Medtronic's training materials—refutes Medtronic's argument that it is "physically impossible" to conduct pushing-while-retracting using the Evolut.

Medtronic waived its prosecution-history-estoppel argument, which also fails on the merits. Colibri's cancelled claim 39 did not include a "pushing" limitation; its cancellation therefore could not have surrendered Colibri's pushing-while-retracting equivalents theory.

**B.** Substantial evidence supports the jury's finding that the Evolut's valve is "entirely within" the stent member. Colibri's expert testified that the leaflets are the valve (as that term was construed by the court), and that those leaflets reside entirely within the stent. Medtronic's contrary argument depends on a mischaracterization of Colibri's expert's testimony—as the court recognized below.

**III. A.** Overwhelming evidence supports the jury's finding that Medtronic actively induced infringement. Medtronic does not deny it induced doctors' infringing acts when instructing them to use the Evolut. It challenges only whether it knew or was willfully blind to the fact that using the Evolut as directed constitutes infringement. But there was no dispute Medtronic knew about the '294 patent, and the evidence showed that Colibri conveyed to Medtronic that it was infringing. Colibri also presented evidence that Medtronic's Instructions for Use, training, and operating-room assistance taught doctors to use the Evolut in a manner that tracked Colibri's claimed method to the limitation. Reasonable jurors could have found that Medtronic acted with knowledge that the induced acts constituted infringement (or was willfully blind to that reality).

**B.** Medtronic's attempt to manufacture a novel intent requirement for doctrine-of-equivalents cases lacks any legal basis. This Court has never endorsed Medtronic's view that an accused infringer must have "accurately predicted" the patentee's equivalents theory to possess the required intent. It routinely upholds induced-infringement verdicts involving the doctrine of equivalents without requiring such a finding. Medtronic offers no basis to depart from that precedent. Regardless, ample evidence—including Medtronic's training materials—proved that Medtronic knew that doctors infringe when deploying the Evolut's valve: that they push the pusher member out from the moveable sheath, and forward in the patient, while retracting that sheath.

**IV. A.** The jury's damages award should be upheld. It was the "bottom of the range" from the most-representative license agreement. Medtronic offered no damages case of its own. Its attacks on the district court's admission of a prior Medtronic license agreement fail. It involved the same Evolut products, and licensed comparable technology that brought comparable value to Medtronic. The court did not abuse its discretion in finding that license to be sufficiently comparable such that it was proper to present it to the jury.

**B.** This Court has rejected Medtronic's argument that royalties for method claims must in all cases be limited to only those instances in which the method is used. Colibri's expert opined, and Medtronic's marketing materials attest, that the

Evolut's value derives from giving doctors the option to use Colibri's partial-deployment method, even if it is not needed in every case. A royalty based on each sale is therefore proper.

## ARGUMENT

### I. SUBSTANTIAL EVIDENCE SUPPORTS THE JURY'S VERDICT THAT MEDTRONIC FAILED TO PROVE THE '294 PATENT INVALID

Medtronic's argument that the '294 patent is anticipated by its identical parent application, Paniagua, fails. Medtronic agrees that the '294 patent is entitled to " 'the benefit of the filing date of [its] parent application' "—and thus cannot be anticipated by it—if the '294 patent's claims are " 'supported by the written description in the parent.' " Medtronic.Br.32 (quoting *Anascape, Ltd. v. Nintendo of Am., Inc.*, 601 F.3d 1333, 1335 (Fed. Cir. 2010)). The jury rejected Medtronic's contention that Paniagua does not support the '294 patent's claims. And rightly so—Paniagua describes every limitation. Because the '294 patent is entitled to Paniagua's priority date, Paniagua cannot anticipate.

Medtronic's contrary argument ignores that Paniagua discloses multiple inventions—including the partial-deployment method claimed in the '294 patent and the method of making folded leaflets claimed in another patent. Claim 1 recites "a replacement heart valve device" with a generic "valve including . . . two to four individual leaflets." Appx159(13:43, 14:3-4). Medtronic says that, because Paniagua discloses a novel process for making folded-tissue leaflets, ***as well as*** the novel

method of partially deploying a replacement heart valve, Paniagua ***only*** supports performing the method using folded-leaflet valves. *See* Medtronic.Br.30-40. This Court has rejected that very argument as a "false premise." *Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*, 563 F.3d 1358, 1367 (Fed. Cir. 2009). Where the specification discloses two inventions, it can support separate claims for each.

Medtronic's argument that Paniagua disparages prior-art sutured leaflets, Medtronic.Br.31, fares no better. Paniagua never suggests that a valve's method of manufacture is critical to the partial-deployment method claimed in the '294 patent. Paniagua supports the full range of valves encompassed by the claim language.

Standard of review. Because Medtronic had the burden of "establish[ing]" invalidity by "clear and convincing evidence" below, Medtronic's "burden on appeal is doubly high: it must show that no reasonable jury could have failed to conclude that [Medtronic's] case had been established by clear and convincing evidence." *Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 320 F.3d 1339, 1353 (Fed. Cir. 2003).

### A. Paniagua Provides Written-Description Support for the '294 Patent's Claims

The asserted claims recite a "method of controlled release of a percutaneous replacement heart valve," comprising six steps. Appx159(13:38-39). They recite using a "replacement heart valve device" with a "valve including . . . two to four individual leaflets." Appx159(13:43, 14:3-4). Medtronic does not dispute that Pan-

iagua discloses each ***step*** doctors take to perform the method. *See* Appx22692-93(¶[0058]). Nor does Medtronic dispute that the patent provides figures illustrating the implantation device used in the method. *See* pp. 6-7, *supra*. Instead, Medtronic urges that Paniagua does not support using the method with valves that are not "folded." Medtronic.Br.32. Medtronic misapprehends both written-description law and Paniagua's disclosures.

To provide written-description support, the patent must "reasonably convey[] to those skilled in the art that the inventor had possession of the claimed subject matter." *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc). Paniagua unquestionably does so for the "valve including . . . two to four individual leaflets" limitation: It discloses a valve that "comprises three leaflets," Appx22690(¶[0037]), and explains that skilled artisans would "underst[and] that there could be from two to four leaflets," Appx22690(¶[0037]); *see* Appx22689 (¶[0024]). Paniagua discloses that valves with leaflets were well-known in the prior art. Appx22688(¶[0017]). Paniagua clearly possessed the claimed "valves" with "two to four individual leaflets."

Medtronic urges that Paniagua does not disclose "[m]ulti-part leaflets ***formed by*** suturing." Medtronic.Br.32 (emphasis added). But how valves are "formed" is irrelevant. The claims "have no process limitations" for the valves; they "are therefore not limited to any particular process or method of making the claimed" valves.

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1344 (Fed. Cir. 2008). The "written description requirement" thus "does not demand that the specification describe" any particular way in which the valves might be "made." *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1331-32 (Fed. Cir. 2003).

Regardless, Paniagua ***does*** disclose multi-part leaflets "formed by" suturing. It explains that in the known art, "[m]ost tissue valves are constructed by sewing the leaflets of pig aortic valves to a stent . . . or by constructing the valve leaflets from the pericardial sac of cows or pigs and sewing them to a stent." Appx22688 (¶[0017]); *see* Appx22688(¶[0018]) (similar). Dr. Dasi, Colibri's validity expert, confirmed skilled artisans would "already know[ ]" how to make valves by "sewing [leaflets] on a stent," and would understand from the specification that such valves could be used in the partial-deployment method. Appx22275-76(1383:11-1384:15). Paniagua thus "reasonably conveys to" skilled artisans that it "possess[ed]" sutured leaflets. *Ariad*, 598 F.3d at 1351.

### B. Paniagua's Additional Disclosure of Folded Valves Does Not Nullify Written-Description Support for the Claimed Partial-Deployment Method

The law is clear: "[W]hen a patent includes two inventive components, particular claims may be directed to one of those inventive components and not to the other." *Cordis Corp. v. Boston Sci. Corp.*, 188 F. App'x 984, 990 (Fed. Cir. 2006); *see also Resonate Inc. v. Alteon Websystems, Inc.*, 338 F.3d 1360, 1367 (Fed. Cir.

2003); *Honeywell Inc. v. Victor Co. of Japan, Ltd.*, 298 F.3d 1317, 1326 (Fed. Cir. 2002). That principle controls this case.

1. As Colibri's expert, Dr. Dasi, explained, "[t]here were two fundamental ideas in" the Paniagua/'294 patent specification: "One is the idea of repositionability and recapturability of the delivery device. And two is the idea of folding leaflets out of a single sheath to create more durable leaflets." Appx22273 (1381:20-24); *see* Appx22692-93 (¶ [0058]) (partial-deployment method); Appx22689 (¶ [0024]) (folding method). He testified that skilled artisans would understand those to be "two independent ideas." Appx22273 (1381:24-25). The '294 patent claims the first invention; related patents cover the other. Appx159 (13:38-14:44).

Asking the Court to turn written-description law upside-down, Medtronic urges that Paniagua's disclosure of the novel folding technique for making valves means Paniagua cannot provide written-description support for the '294 patent's claimed partial-deployment method, unless the valve to be deployed is made by folding—even though Paniagua also expressly discloses sutured valves. Medtronic.Br.30-40. This Court has rejected that argument as a "false premise." *Revolution Eyewear*, 563 F.3d at 1367. Where a patent discloses two inventions, a "claim addressing only one" of those inventions is not thereby "invalid for lack of sufficient written description." *Id.*

For that reason, Medtronic's reliance on *Tronzo v. Biomet, Inc.*, 156 F.3d 1154 (Fed. Cir. 1998), is mistaken. In *Tronzo*, the patentee's later-filed application included claims covering cup implants with a generic shape. But the specification only discussed conical cups; characterized the conical shape as an "extremely important aspect of the [invention]"; and disparaged other shapes. *Id.* at 1159. The Court held that the specification was insufficient to support broader amended claims directed to generically shaped cups. *Id.*

As this Court has explained, *Tronzo* does not govern where, as here, the parent application discloses multiple "inventive components." *Cordis*, 188 F. App'x at 989-90; *Crown Packaging Tech., Inc. v. Ball Metal Beverage Container Corp.*, 635 F.3d 1373, 1380-83 (Fed. Cir. 2011). "Inventors can frame their claims to address one problem or several, and the written description requirement will be satisfied as to each claim so long as the description conveys that the inventor was in possession of the invention ***recited in the claim***." *Revolution Eyewear*, 563 F.3d at 1367 (emphasis added). That is the case here: Paniagua provides written-description support for every limitation in the '294 patent's claimed partial-deployment method. *See* pp. 23-25, *supra*. The fact that Paniagua ***also*** discloses, but does not claim, the novel folding method for making valves does not change that.

2. Medtronic tries to evade *Revolution Eyewear*, *Crown Packaging*, and *Cordis* by arguing that "Paniagua's specification discloses only one (arguably) in-

ventive concept—single uncut leaflets." Medtronic.Br.38. But in rejecting Medtronic's written-description challenge, the jury credited Dr. Dasi's testimony that skilled artisans would understand "[t]here were two" inventions disclosed in Paniagua, one of which was "the idea of repositionability and recapturability" of the valve during a TAVR procedure. Appx22273 (1381:20-24). The district court agreed that Paniagua discloses two inventions: "transcatheter techniques for replacing human heart valves; and a technique for making valves by folding." Appx82.

Medtronic fails to show that every reasonable juror would be compelled to accept its contrary view as clear-and-convincing proof. Medtronic cites testimony from Dr. Fish that the "lightbulb went off" when he saw a "paper model" of a heart valve with folded leaflets, Appx21068-69 (306:21-307:11), and that he considered a valve with folded leaflets to be less likely to "fail" than sutured valves, Appx21163-64 (401:15-402:4); Medtronic.Br.39. But that testimony attests only to the novelty of the folded-valve invention, which addresses valve durability ***after*** implantation. It does not somehow erase Paniagua's clear disclosure of the novel partial-deployment technique for valve implantation, which solves a different problem arising ***during*** TAVR procedures.

Medtronic urges that Paniagua's partial-deployment method "was no distinct 'invention' at all," because aspects of TAVR procedures discussed in Paniagua had been performed before, and some of the specification is copied from Bessler, a prior-

art patent. Medtronic.Br.39-40. That argument—which concerns whether what Paniagua disclosed and claimed is inventive over prior art—is irrelevant to the written-description issue on appeal. Written description asks only "whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor ***had possession of the claimed subject matter***." *Ariad*, 598 F.3d at 1351 (emphasis added). While *Cordis* described the specification's multiple disclosures as "inventive components" in the course of distinguishing *Tronzo*, 188 F. App'x at 989-90, the Court nowhere suggested it was fundamentally altering written-description law to incorporate an obviousness-type analysis.

Medtronic's argument is a transparently improper effort to smuggle its failed obviousness challenge into a written-description argument. The issue of whether the '294 patent's partial-deployment method was obvious in view of Bessler was squarely before the jury. The jury found Medtronic failed to carry its burden of proof, and the district court found the evidence supported the jury's verdict. *See* Appx6. Medtronic does not challenge that finding on appeal. And with good reason: Unrebutted evidence showed the '294 patent's partial-deployment method was "fundamentally different" than what Bessler disclosed. Appx22280(1388:5-19); *see* Appx22278-305(1386:14-1413:24).

Medtronic, moreover, ignores inventive disclosures in the '294 patent found nowhere in Bessler—even though it was the focus of extensive testimony. Dr. Dasi

explained that skilled artisans would understand the patent, particularly viewing its Figure 8 in contrast to Bessler's Figure 14, to disclose a significant advance in delivery implantation. *See* Appx22278-305 (1386:14-1413:24).

FIG.8




FIG.14




Appx19405. Dr. Dasi testified that, in the '294 patent, the pusher member (420) goes "all the way through the valve" and stent member (100), with the valve "collapsed onto" the pusher member and compressed by "the moveable sheath over it." Appx22298 (1406:5-8); *see* Appx22282 (1390:9-23). That configuration "makes it possible to very securely deploy the valve partially and then bring it back ***into the moveable sheath***" for repositioning. Appx22298 (1406:8-10) (emphasis

added). This is what allows doctors a second attempt to stick the landing using the patent's claimed partial-deployment method. Figure 8's arrows show skilled artisans that the pusher member can be both pushed out from and retracted within the moveable sheath. Appx149 ('294 patent); Appx22683 (Paniagua). The claims thus call for "recovering the distal portion of the replacement heart valve device within the moveable sheath." Appx159 (14:31-33).

Bessler, by contrast, does not allow for recapturing and repositioning the valve within the sheath for a second attempt to stick the landing. In Bessler, improper positioning requires complete removal of the device from the patient followed by a new attempt. Dr. Dasi explained that Bessler "use[s] threads and sutures to tether [the] valve to the pusher member." Appx22287 (1395:4-11); *see* Appx22294 (1402:13-19). Dr. Dasi testified skilled artisans would understand that "the thread and the suture will break" if, during deployment, doctors "tried to recover the Bessler valve device" by trying to pull the partially expanded portion "back into the sheath." Appx22301-02 (1409:25-1410:3). The only option for repositioning with Bessler is "a total bailout" that involves "retracting [the] ***entire catheter delivery system*** . . . ***out of the patient***" and starting over. Appx22299-301 (1407:23-1409:9) (emphasis added). A Medtronic witness agreed that removal of the device from the patient, as Bessler discloses, is "fundamentally different" from recapturing the device within

the sheath, Appx21895-900 (1095:15-1100:16), which is what Paniagua discloses and the '294 patent claims.

As the district court found, that evidence was sufficient to support the jury's verdict that Bessler did not render the asserted claims obvious. Appx6. Medtronic cannot rebadge its failed obviousness argument under the rubric of written description while ignoring everything—the patent's illustrations, text, and undisputed trial testimony about how skilled artisans would understand them—showing Paniagua possessed the advance over Bessler.

3. Finally, Medtronic says this case is like *Tronzo* because Paniagua "disparages other methods of forming leaflets." Medtronic.Br.35, 39. Not so. Paniagua discloses that "[m]ost" valves are made by suturing. Appx22688 (¶ [0017]). It nowhere suggests that the claimed method should not be performed with such valves. Paniagua's criticisms of sutured valves—that they "lack . . . durability," Appx22687 (¶ [0011]), and are not "anatomically accurate," Appx22688 (¶ [0022])—concern only how they function ***after*** being implanted in a patient. That has nothing to do with the claimed method for ***performing*** the implantation. There is no basis for concluding Paniagua did not "possess" performing the partial-deployment method with the sutured valves it expressly discloses.

This case is like *Cordis*: "[N]othing in the patent suggests that the benefits of" the partial-deployment method "are tied in any way" to folded valves. 188 F.

App'x at 990. "The problems" the two inventions address are distinct, "and solving one does not necessarily require solving the other." *Crown Packaging*, 635 F.3d at 1382. Paniagua thus "supports the asserted claims" for partially deploying a replacement valve, regardless of whether the valve is folded or sutured. *Id.* at 1381.

## II. THE INFRINGEMENT VERDICT SHOULD BE SUSTAINED

Ample evidence supports the jury's verdict that Medtronic induced doctors to infringe the '294 patent when using Medtronic's Evolut.

Standard of review. "Infringement is a question of fact, reviewed for substantial evidence . . . ." *GlaxoSmithKline LLC v. Teva Pharms. USA, Inc.*, 7 F.4th 1320, 1326-27 (Fed. Cir. 2021). This Court considers the "evidence . . . in the light most favorable to [the non-movant], drawing all reasonable inferences in its favor, without disturbing the jury's credibility determinations or substituting [its] resolutions of conflicting evidence for those of the jury." *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 147 F.3d 1374, 1377 (Fed. Cir. 1998).

### A. Colibri Proved Direct Infringement Under the Doctrine of Equivalents

Claim 1 recites "partially deploying a distal portion of the replacement heart valve device within the patient by ***pushing out the pusher member from the moveable sheath to expose the distal portion*** of the replacement heart valve device." Appx159 (14:22-26) (emphasis added). The court construed "pushing out the pusher member from the moveable sheath" to mean "pressing against the pusher member

with a force that moves the pusher member outward from the moveable sheath." Appx2321.

The only difference between that literal description and the equivalents theory Colibri presented at trial involved the ***amount*** of pressure applied to the pusher member. Colibri urged that "applying a pushing force on the Evolut device's pusher member," such that it emerges from the moveable sheath when that sheath "simultaneously retract[s]," Appx19562, is equivalent to "pressing against the pusher member with a force that moves the pusher member outward from the moveable sheath" while the sheath is held stationery, Appx2321. The only difference is that ***more*** pressure may need to be applied to the pusher member when an opposite force retracts the sheath than when the sheath is stationary. But in both instances, ***some*** amount of pressure ***must*** be applied to the pusher member.

The Evolut and the "pushing out the pusher member" limitation thus operate in substantially the same way—by applying a pushing force on the pusher member and an opposite force on the sheath. They operate using the same principles—the application of opposite forces ensures that the member changes position relative to the sheath. And they produce the same result—the pusher member and valve device emerge from the sheath. The jury agreed. Appx20.

That is classic doctrine of equivalents. Even if a "process . . . does not literally infringe upon the express terms of a patent claim," it "may nonetheless be found to

infringe if there is ‘equivalence’ between the elements of the accused . . . process and the claimed elements of the patented invention.” *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 21, 29 (1997).

Medtronic does not contend that the jury’s verdict is unsupported by substantial evidence—because it cannot. Instead, Medtronic invokes claim vitiation and prosecution-history estoppel. Both arguments fail.

1. *Medtronic’s Claim-Vitiation Argument Is Forfeited*

Medtronic forfeited its claim-vitiation argument. Medtronic argued claim vitiation on summary judgment, Appx11182, which was referred to a special master under Rule 53, Appx11160. The report and recommendation (“R&R”) concluded that Medtronic failed to show that the claim limitation as construed by the Court “[redacted] quote from sealed filing.” Appx11200. The district court noted that Medtronic had an opportunity to object to the R&R’s “rejection of Medtronic’s . . . claim vitiation” arguments, but did not do so. Appx85 n.1. The court thus determined Medtronic was “no longer asserting th[at] argument[ ]” and adopted the R&R’s rejection of it. *Id.*

The law is clear: Medtronic’s “failure to raise [an] objection” in district court to the special master’s rejection of its claim-vitiation argument “results in waiver of the argument on appeal.” *Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1131 (Fed. Cir. 2011).

### 2. *Medtronic's Claim-Vitiation Argument Fails on the Merits*

Claim vitiation prevents reliance on "the doctrine of equivalents 'where the accused device contain[s] the antithesis of the claimed structure'"; in such a case, "application of the doctrine of equivalents would 'vitiate' a claim element." *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1356 (Fed. Cir. 2012). Application is foreclosed only where it would "vitiate [an] element in its entirety." *Warner-Jenkinson*, 520 U.S. at 29.

Medtronic argues that, by "equating pushing out and pulling back, the jury verdict vitiated the 'pushing out' limitation." Medtronic.Br.46. That mischaracterizes Colibri's theory, which nowhere ***equates*** pushing with pulling. Colibri's theory was that doctors "apply[] a pushing force on the Evolut device's pusher member," while "simultaneously retracting the sheath." Appx19562. Pushing in one direction while pulling in the other is not the "antithesis" of pushing, *Deere*, 703 F.3d at 1356—it does not "vitiate" the pushing "element in its entirety," *Warner-Jenkinson*, 520 U.S. at 29.

Medtronic, moreover, cannot overturn the jury's verdict simply by "***[c]haracterizing*** an element of an accused product as the 'antithesis' of a claimed element." *Cadence Pharms. Inc. v. Exela PharmSci Inc.*, 780 F.3d 1364, 1372 (Fed. Cir. 2015) (emphasis added). Claim vitiation requires a determination that the "evidence is

such that no reasonable jury could determine two elements to be equivalent.” *Deere*, 703 F.3d at 1356. Medtronic makes no such showing.

The district court found that Colibri’s experts “provided sufficient evidence upon which the jury could find equivalence.” Appx4. Medtronic does not even ***try*** to show that no reasonable juror could have credited Colibri’s expert’s testimony that the function-way-result and insubstantial-differences tests for equivalence are met. *See Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 493 F.3d 1368, 1377 (Fed. Cir. 2007); Appx21293 (531:4-23); Appx21295-96 (533:24-534:7). For that reason, Medtronic’s argument that the pushing-out-the-pusher-member “limitation is vitiated by the district court’s application of the doctrine of equivalents is both incorrect and inapt.” *Cadence*, 780 F.3d at 1372.

3. *Medtronic’s “Physically Impossible” Theory Is Foreclosed by the Verdict and Record Evidence*

Medtronic barely tarries with the district court’s finding that Colibri’s “**quote from sealed filing** [redacted]” the “pushing out the pusher member” limitation as construed by the Court. Appx11200; Appx85 n.1. Medtronic instead argues that it is not “‘physically possible’” to perform Colibri’s pushing-while-retracting theory using the Evolut. Medtronic.Br.43 (quoting Appx21758 (958:16-24)). It insists the Evolut “can deploy a replacement heart valve ‘only’ by retracting—pulling back—the moveable sheath.” Medtronic.Br.43 (quoting Appx21780 (980:8-11)). That, however, is a question of ***infringement***—*i.e.*, wheth-

er doctors ***actually*** apply a pushing force on the pusher member while also pulling back on the sheath. Medtronic made that argument at trial, *e.g.*, Appx21926-27(1126:24-1126:5); Appx21802-03(1002:17-1003:3), and the jury rejected it. Medtronic cannot re-litigate that question under the guise of "claim vitiation."

Regardless, the testimony of Colibri's witnesses destroyed Medtronic's "impossibility" theory. Drs. Fish and Gallegos—cardiologists who themselves use the Evolut—explained that, as a matter of simple physics, doctors ***must*** apply a pushing force on the Evolut's pusher member for the valve to emerge from the moveable sheath. Absent that force, retracting the sheath would simply retract the pusher member and valve as well, preventing the valve from emerging. *See* pp. 11-13, *supra*.

Dr. Fish explained why. The Evolut's stent is "built" to be self-expanding, "so that it will open up on its own after you compress it." Appx21072(310:21-22). The Evolut's moveable sheath is a "hollow tube in which you put the [replacement heart valve] device." Appx21073(311:5-12). The "first thing you do is collapse [the stent] and then put it inside the movable sheath." Appx21073(310:20-22). Once inside the sheath, the stent is "going to expand. As it does, it's going to be pushing against the inside of the moveable sheath." Appx21075(313:20-22). At that point, in the claim's words, the stent "is restrained in the collapsed configuration by the moveable sheath." Appx159(14:15-16). The radial force that the expanding

stent exerts on the sheath causes it to be "stuck" "inside of the sheath." Appx21076(314:2-3).

Dr. Fish demonstrated the radial force the expanding stent exerts against the inside of the sheath using a poster and a shipping tube. He rolled up the poster to a diameter smaller than that of the tube and inserted it into the tube. When he "let go of" the poster, it "expand[ed]" and "push[ed] against the inside of the tube," causing it "to be stuck in there." Appx21077(315:3-11). Moving the tube without applying force to the poster caused them both to move, together. Appx21077(315:3-11). Dr. Fish explained that the Evolut is similar: "[I]f all you did was pull back the sheath" when trying to deploy the stent, "the stent is just going to move [back] with it" as a unit. Appx21075-76(313:23-314:5). "So in order to get [the stent] out, you'd have to apply some kind of force to move it out of the sheath," Appx21074(312:1-3)—"you have to actually have something that's going to push it," Appx21077(315:14-16).

Dr. Gallegos agreed that "once [the Evolut's stent is] inside of a movable sheath," it "will want to expand," exerting a "radial force . . . pushing outward against the . . . moveable sheath." Appx21281(519:20-25). As a result, if a user "simply move[s] the movable sheath without applying [an oppositional] force, the movable sheath will move but the distal portion of the valve will not come out." Appx21426(648:16-19); *see also* Appx21282(520:5-8). Dr. Gallegos testified there

is "[a]bsolutely" no way to deploy the replacement heart valve without "applying opposing forces." Appx21292(530:20-24).

Medtronic's refrain that "'it's just physically impossible'" for doctors to "'push out' the inner member," Medtronic.Br.43 (quoting Appx21926-27(1126:24-1127:5)), does not merely defy physics. Drs. Fish and Gallegos also showed that Medtronic's training materials ***prove*** that the Evolut's pusher member pushes out from its moveable sheath.

*First*, Medtronic's own videos showed that physicians ***do*** "push out" the stent, moving it physically forward in the patient's anatomy as it emerges from the sheath. Medtronic's lawyers showed the jury screenshots from a Medtronic training video depicting fluoroscopic images of an actual TAVR procedure. The screenshot on the left is before the stent was deployed, the second is after deployment had begun:



Appx19453 (Medtronic slide, cropped). Medtronic argued that the video showed the sheath being retracted while the stent remained stationary. *See* Appx21007-10 (265:5-268:11).

Dr. Fish testified that the video showed the opposite—that the stent was pushed out from the sheath and moved forward in the patient as the sheath retracted in the opposite direction. Dr. Fish showed this by identifying something Medtronic ignored: In a TAVR procedure, doctors use a "pigtail catheter" "to serve as a marker for where the cusp of the valve is" in the patient's body. Appx21110 (348:9-22). The pigtail catheter serves as a ***fixed*** reference point during the procedure; it "rest[s] against the cusp [of the patient's natural valve], which is in the anatomy not moving in relation to the body." Appx21115 (353:1-13). Thus, to assess the movement of the Evolut's components during the procedure, Medtronic's two screenshots had to be aligned so the pigtail catheter's position within the frames remained constant. Dr. Fish explained that with the pigtail catheter serving as a fixed reference point, it is clear that the Evolut's stent and valve device moved forward (*i.e.*, pushed out) as the sheath was pulled back. Colibri's counsel illustrated this during closing argument:




Appx19482.

This demonstrative illustrated Dr. Fish's testimony that, in the first frame, the bottom of the stent—which is fully within the sheath—aligns with a "marker" that appears as a horizontal "black line on the sheath." Appx21109(347:6-22). Both the bottom of the stent and the marker on the sheath are positioned in the middle of the pigtail catheter. The second frame shows that, when doctors deploy the valve, the moveable sheath retracts—the marker line moved up from "the middle of the pigtail catheter to above the pigtail catheter." Appx21118-19(356:14-357:10). But that frame ***also*** shows that the bottom of the stent (and the pusher device's nose-cone tip) "moved down relative to this stationary point" marked by the pigtail catheter—from the middle of the pigtail catheter to its bottom tip—proving it had been "pushed down," rather than remaining stationary while the sheath retracted. Appx21117-18(355:5-356:13). Dr. Gallegos reached the same conclusion, testifying that Med-

tronic's video shows that "the entire pusher mechanism moves" outward from the sheath, relative to the pigtail catheter, which remains stationary during the procedure. Appx21440 (662:9-12). The jury saw that unrebutted evidence with its own eyes. Medtronic cannot prevail by pretending it does not exist.

*Second*, Dr. Gallegos explained that Medtronic's instructions for using the Evolut confirm that the pusher member pushes out from the moveable sheath. Appx21283 (521:10-18). Medtronic instructs doctors that, in the "initial deployment," they should "[a]pproach target depth . . . from a supra-annular starting position [*i.e.*, above the target location] to allow [the] ***valve*** to ***descend*** to target depth":



Appx28761 (highlighting and emphasis added); *see* Appx21284(522:5-8). As Dr. Gallegos explained, Medtronic "instruct[s] doctors to start higher up above the aorta when deploying the replacement heart valve device," because Medtronic "recognize[s] that . . . the valve, the pusher assembly all move. And if we started . . . at the location we desired, the valve actually would end up lower than the desired point in the ventricle." Appx21285(523:14-21). Thus, he testified, in "every case that I've ever been involved with . . . we begin to see the pusher move [down] into the ventricle as we begin the partial deployment phase." Appx21285(523:3-5).

Medtronic addresses none of that. It asserts that Drs. Fish and Gallegos "repeatedly agreed" that the Evolut's pusher member cannot move outward from the moveable sheath. Medtronic.Br.43. The testimony Medtronic cites, however, reflects Medtronic's counsel's ***failure*** to obtain such a concession. *See* Appx21139-40(377:25-378:8); Appx21400-02(622:9-624:11). Nowhere did Colibri's witnesses retreat from their testimony that the Evolut's pusher member ***pushes out*** from the moveable sheath.

4. *Medtronic's Prosecution-History-Estoppel Defense Is Waived and Meritless*

Medtronic's contention that Colibri's doctrine-of-equivalents theory is barred by prosecution-history estoppel, Medtronic.Br.46, is waived and legally incorrect.

Standard of review: Whether prosecution-history estoppel forecloses infringement under the doctrine of equivalents is a question of law, reviewed *de novo*.

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 344 F.3d 1359, 1367-68 (Fed. Cir. 2003) (en banc).

Medtronic affirmatively waived its prosecution-history-estoppel argument. Medtronic's pretrial memorandum included a heading titled "***Abandonment*** of Issues." Appx13659 (emphasis added). It stated: "Medtronic ***is not pursuing*** the Fifth Affirmative Defense of Prosecution History Estoppel as pleaded in its Answer." *Id.* (emphasis added). Medtronic later had misgivings, arguing it had not "[w]aive[d]" its "right to appeal" the district court's rejection of its prosecution-history-estoppel argument at summary judgment. Appx18581-82. But "abandonment" means abandonment. The statement that a party "is not pursuing" a defense does not mean it will pursue it on appeal.

Medtronic's argument fails anyway. Prosecution-history estoppel applies where the "patentee originally claimed the subject matter alleged to infringe but then ***narrowed the claim*** in response to a rejection." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co*., 535 U.S. 722, 733 (2002) (emphasis added). Having overcome rejection by narrowing their claims, patentees cannot reclaim "the surrendered territory" as "equivalent to the literal claims of the issued patent." *Id.* at 733-34. Nothing of the sort occurred here.

During prosecution, Colibri presented two independent claims—claims 34 and 39—that differed. Claim 34 recited "partially deploying the replacement heart

valve within the patient ***by pushing out the pusher member from the moveable sheath*** to expose a portion of the replacement heart valve device," and "recovering the portion of the replacement heart valve device within the movable sheath." Appx23140 (emphasis added). Claim 39 did not include the partial-deployment-by-pushing limitation. And claim 39 recited "partially deploying the replacement heart valve device within the patient ***by retracting the movable sheath*** to expose a portion of the replacement heart valve device," Appx23141 (emphasis added), not found in claim 34.

The examiner rejected claim 39, stating that the combination of "retracting the movable sheath to expose a portion of the valve device ***AND*** recovering the portion of the valve within the movable sheath" lacked written-description support. Appx26116. In the examiner's view, the specification disclosed a "method where the sheath is retracted fully," and in that method, "***no recovering is disclosed***." Appx26116-17. Colibri disagreed, but canceled claim 39. Appx26225. Claim 34, which contained the separate "pushing" limitation (absent from claim 39), later became claim 1 of the '294 patent. *See* Appx159(13:38-14:37).

Prosecution-history estoppel has no application in such circumstances. Prosecution-history estoppel requires that the "amendment" have "narrowed the literal scope of the claim" based on "a substantial reason relating to patentability." *Festo*, 344 F.3d at 1366. "Claims that do not recite the amended term are not subject

to an estoppel." *Glaxo Wellcome, Inc. v. Impax Labs., Inc.*, 356 F.3d 1348, 1356 (Fed. Cir. 2004). Here, there was no "narrowing": The two independent claims had different requirements. Claim 34 required "pushing," while claim 39 did not. Infringers that practice all the limitations of claim 34—applying a pushing force to the pusher member—"cannot defeat infringement" simply by adding steps (like retraction) that claim 34 never required. *Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1372 (Fed. Cir. 2005). And because the claims here recited distinct limitations—each with requirements not found in the other—cancelling claim 39 did not in any way relate to, much less narrow, the literal scope of claim 34. Nor was claim 39's cancellation relevant to, much less necessary for, claim 34's patentability. Not one of Medtronic's cases holds that the cancellation of one independent claim can have an estoppel effect on a separate, independent claim that recites a different limitation. *See* Medtronic.Br.46-50.

Medtronic nevertheless urges that Colibri's doctrine-of-equivalents theory "is precisely what was recited in [canceled] claim 39." Medtronic.Br.47. That is not true. The argument here is that "applying ***a pushing force*** on the Evolut device's member ***while*** simultaneously retracting the sheath" to expose the member, Appx19562, is equivalent to claim 1's "***pushing out the pusher member*** from the moveable sheath," Appx159(14:24-25) (emphasis added). Pushing while retracting is not "precisely what was recited in claim 39." Pushing appears nowhere in claim

39. And the addition of that requirement, if anything, renders it not merely different from but ***narrower*** than what claim 39 might have covered. Claim 39, moreover, was rejected for lack of written description. If Medtronic truly thought Colibri's doctrine-of-equivalents theory was "precisely" what claim 39 surrendered, Medtronic would have challenged the doctrine-of-equivalents theory for lack of written description too. That it never did so speaks volumes.

Medtronic seeks to escape that conclusion by urging that "the preamble of claim 39 recited the open-ended '***comprising***' transition." Medtronic.Br.47 (emphasis added). According to Medtronic, Colibri's cancellation of claim 39 therefore "forfeited all claims reciting methods of partial deployment by retracting a moveable sheath, including . . . methods where a force is applied to hold the pusher member stationary during the retraction." Medtronic.Br.47. But as Medtronic acknowledges, the preamble's "comprising" term is a "transition," Medtronic.Br.47, not a claim limitation. Prosecution-history estoppel focuses on "the territory between the original claim ***limitation*** and the amended claim ***limitation***." *Festo*, 344 F.3d at 1367 (emphasis added). Use of "comprising" merely indicates that "[t]he addition of elements not recited in the claim cannot defeat infringement." *Gillette*, 405 F.3d at 1371-72. Because the "comprising" transition is not a claim limitation, Medtronic cannot leverage that word—which "appears in the vast majority of patent claims,"

*Smith & Nephew, Inc. v. Ethicon*, Inc., 276 F.3d 1304, 1311 (Fed. Cir. 2001)—to infinitely expand the scope of cancelled claim 39.

### B. Substantial Evidence Supports the Jury's Finding that the Evolut's Valve Is "Entirely Within" the Stent Member

Medtronic invokes (Br.51) the limitation that the "valve resid[e] entirely within an inner channel of the stent member." Appx159(14:1-4). But ample evidence shows that limitation was met. Medtronic's contrary view rests on a misreading of testimony from Colibri's expert that no juror was required to accept.

Construing the limitation that the "valve resid[e] entirely within an inner channel of the stent member," Appx159(14:1-4), the district court held that the "portions of the replacement heart valve device ***that allow the one-way flow of blood***" must be "entirely within the inner channel of the stent member." Appx2320 (emphasis added). Colibri's expert, Dr. Gallegos, testified that the ***leaflets*** are the portion of the valve that allows the one-way flow of blood, and that the leaflets reside entirely within the stent. Appx21251-52(489:25-490:9).

Dr. Gallegos explained that the phrase "allow the one-way flow of blood" means the leaflets "allow blood to flow through the valve, but not come back." Appx21252(490:19-21). He testified that the leaflets "open and close in response to the blood as the heart squeezes, rejects and relaxes." Appx21252(490:24-25). The leaflets open when the heart's left ventricle squeezes, increasing the blood pressure, and causing the blood to rush towards the valve. Appx21253(491:2-4);

Appx21254 (492:9-11). When the heart relaxes, the blood pressure in the left ventricle decreases and the "blood flow reverses," "push[ing] the leaflets closed." Appx21253 (491:5-7). Dr. Gallegos testified that the leaflets "are the ***only*** portions of the valve that allow the one-way flow of blood." Appx21255 (493:6-7) (emphasis added). And those leaflets are, undisputedly, entirely within the stent member's metal frame. Appx21254-55 (492:25-493:2).

Medtronic's own evidence supported that the leaflets are the claimed valve. A Medtronic witness agreed that the leaflets open and close to allow the one-way flow of blood. Appx21866 (1066:22-1067:3). And Medtronic documents describing the Evolut explain that the leaflets "control the flow of blood." Appx26676. That evidence is more than sufficient to support the jury's finding that the leaflets are the claimed "valve" and reside entirely within the inner channel of the stent member.

Medtronic argues that the Evolut's "inner skirt is part of the 'valve,'" and that small portions of that skirt reside outside the metal stent, Medtronic.Br.51:



Medtronic.Br.17.

But Dr. Gallegos explained why that is incorrect. He testified that the inner skirt is not what allows the "one-way flow of blood." Appx21263 (501:7-12). The inner skirt performs a "sealing function," Appx21263 (501:7-12), "to prevent leak[s] around the valve," Appx21362 (584:14). Dr. Gallegos explained that a "seal, by definition, means that it stops flow." Appx21263 (501:14-16). He testified that "something that stops flow cannot" be what "allow[s] flow." Appx21263 (501:14-16). The jury credited Dr. Gallegos's testimony.

Medtronic's ***entire*** argument is that Dr. Gallegos supposedly ***admitted*** that the inner skirt "'allows one-way flow of blood.'" Medtronic.Br.51 (quoting Appx21367 (589:19)). But, as the district court explained, Medtronic takes Dr. Gallegos's "testimony out of context"—he made no such "admission." Appx5.

Medtronic emphasized a line in Dr. Gallegos's expert report acknowledging that, "when an inner skirt malfunctions, perivalvular leak occurs and blood flows back and forth in multiple directions," so that "a malfunction[ing] inner skirt does not allow the one-way flow of blood." Appx21366-67 (588:14-589:14). But Dr. Gallegos merely recognized that when the inner skirt is ***malfunctioning***, and fails to "seal" as intended, there may be a "leak," in which case blood may flow back and forth. Appx21363-64 (585:14-586:6). When Dr. Gallegos said the inner skirt "allows one-way flow of blood," Appx21367 (589:19), he meant simply that blood

"***travels through***" the inner skirt on the way to the ***leaflets***, which are ultimately what allow the one-way flow of blood. Appx21362 (584:2-8) (emphasis added). Dr. Gallegos clarified that the inner skirt does ***not*** allow the one-way flow of blood, testifying that "[i]n a functioning valve with a functioning [inner] skirt," "[t]he primary purpose of that component is to seal" and that "sealing would be blocking flow" in any direction. Appx21432-33 (654:20-655:2).

Medtronic points to no evidence so compelling that every reasonable juror would have to find—contrary to Dr. Gallegos's testimony and Medtronic's own evidence—that the inner skirt meets the court's construction of the valve.

## III. SUBSTANTIAL EVIDENCE SUPPORTS THE JURY'S FINDING THAT MEDTRONIC ACTIVELY INDUCED INFRINGEMENT

Liability under 35 U.S.C. § 271(b) requires proof the defendant "induced th[e] infringing acts" and "knew the acts it induced constituted infringement." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 843 F.3d 1315, 1332 (Fed. Cir. 2016). Medtronic does not deny that it actively induced doctors' infringing acts when instructing them to use its Evolut. Medtronic challenges only the proof that it "acted with knowing, specific intent to induce that infringement." Medtronic.Br.53. But substantial evidence supports the jury's verdict. Medtronic's effort to manufacture a novel intent requirement for doctrine-of-equivalents cases, Medtronic.Br.54, lacks legal basis.

Standard of review: Induced infringement "is a question of fact, reviewed for substantial evidence." *GlaxoSmithKline*, 7 F.4th at 1326-27. "Intent is a factual determination" that is "particularly within the province of" the jury. *Allen Organ Co. v. Kimball Int'l, Inc.*, 839 F.2d 1556, 1567 (Fed. Cir. 1988).

### A. Overwhelming Evidence Showed Inducement

The defendant has the requisite knowledge of inducement if it "knew" the induced conduct was infringing, *Power Integrations*, 843 F.3d at 1332, or was "willfully blind"—*i.e.*, it understood there was "a high probability" the induced acts constituted infringement and took "deliberate actions to avoid learning of that fact," *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011). "[D]irect evidence is not required"; "circumstantial evidence may suffice." *GlaxoSmithKline*, 7 F.4th at 1327. Juries may "infer[ ]" the "requisite intent . . . from all of the circumstances." *Warsaw Orthopedic, Inc. v. NuVasive, Inc.*, 824 F.3d 1344, 1347 (Fed. Cir. 2016). Under those standards, Medtronic's sufficiency-of-the-evidence challenge falls woefully short.

Medtronic concedes it "knew of the '294 patent" from its business discussions with Colibri. Medtronic.Br.57; *see* p. 9, *supra*. It knew more than that: Colibri ***indicated to Medtronic*** that Medtronic was infringing. Appx21477(699:10-22). Colibri had "detailed conversation[s] on the ['294] patent application" with Medtronic's executives and lawyers, including discussions about "specific claims re-

garding recapturing and repositioning a heart valve that were in the '294 application." Appx21455-78 (677:3-700:3); Appx21462 (684:20-23). Colibri was "very clear" about "the value that [the '294] patent has in the transcatheter heart valve space." Appx21477 (699:18-22). Eric Schauble, a former Colibri VP, testified Colibri conveyed its belief that "***Medtronic was infringing***." Appx21477 (699:10-22) (emphasis added).

Medtronic argues that "Colibri actively worked to make sure Medtronic had no inkling of Colibri's belief" that Medtronic was infringing. Medtronic.Br.57. But the testimony Medtronic cites shows the contrary. In that testimony, Mr. Schauble states that Colibri avoided an "aggressive" tone given the attempt "to partner with Medtronic." Appx21477 (699:15-22). But he explained that, while Colibri "never used [the] specific word[]" "infringement," it plainly "insinuated" that doctors' using the Evolut infringed the '294 patent. Appx21477 (699:10-13). Medtronic offered no contrary evidence. The jury was entitled to infer that Medtronic got Colibri's message, and chose to infringe regardless. *See Warsaw Orthopedic*, 824 F.3d at 1347.

Medtronic's assertion that "Colibri's intentional silence . . . reinforced Medtronic's belief of non-infringement," Medtronic.Br.57, overlooks that Colibri was ***not*** silent. And the testimony Medtronic invokes does not discuss Colibri at all. Medtronic witnesses, who were not part of the Colibri-Medtronic meetings, simply

answered "no" when asked if they "ever believed that doctors using the Evolut R have been infringing Colibri's patent." Appx21721(921:15-21); Appx21794 (994:9-17). And the jurors, who saw the witnesses' demeanors, were entitled to find those denials unpersuasive. As the district court held, the evidence was such that "the jury could find that Medtronic, after evaluating . . . Colibri's intellectual property portfolio, decided to use Colibri's patented technology rather than purchase Colibri or obtain a license." Appx5.[1]

Consistent with FDA requirements, Medtronic provided "Instructions for Use" with the Evolut. Appx26398-470; Appx26471-575; Appx26576-671. Dr. Gallegos walked the jury through those instructions, explaining that they "instruct . . . physicians to use the product" following "exactly what the steps in the patent describe." Appx21241-49(479:4-487:3); *see also* Appx21223-25(461:3-463:15). Medtronic's "[p]roviding instructions" to doctors "to use" its "product in an infringing manner" is further "evidence of the required mental state for inducing infringement." *Microsoft Corp. v. DataTern, Inc.*, 755 F.3d 899, 905 (Fed. Cir. 2014); *see also Barry v. Medtronic, Inc.*, 914 F.3d 1310, 1334-36 (Fed. Cir. 2019).

---

[1] Medtronic argues that the district court "never addressed Medtronic's inducement arguments in any detail." Medtronic.Br.56. Not so. The court considered Medtronic's arguments and rejected them as "unpersuasive" in light of the trial evidence. Appx5.

Medtronic also gave doctors "lecture presentations and slide presentations" "training" them to use the Evolut. *See* Appx21103 (341:10-15); Appx28761-67; Appx21120-24 (358:19-362:4); Appx21222 (460:11-17). Medtronic instructed doctors to perform the same loading, advancing, partial-deployment, restraining and positioning, and recapture steps recited in the claimed method. *E.g.*, Appx28761-67; Appx21121 (359:18-22); Appx21241 (479:4-14). Medtronic followed that with live instruction in the operating room. Medtronic employees "participate[d]" in virtually every TAVR procedure, giving instructions "on each part of the procedure" while "standing next to" the cardiologist. Appx21121-23 (359:23-361:2); Appx21222 (460:7); Appx21227 (465:5-22). That instruction also tracks the patented method. *See* Appx21122-23 (360:23-361:2); Appx21241 (479:1-14).

Medtronic does not dispute that its instructions cover every claim limitation, save one: It urges that "Medtronic only instructs users in methods of deploying by retracting—never pushing." Medtronic.Br.55. As explained above (at 11-13), basic physics require pushing. Medtronic's own video of a TAVR procedure showed the valve ***pushing out*** from the sheath further into the patient. Medtronic's instruction that doctors "[a]pproach" from a "starting position" that will "allow [the] valve to descend to target depth," Appx28761, shows Medtronic "***recognize[s]***" that doctors must ***push*** the valve outward from the moveable sheath during "the partial deployment phase," Appx21285 (523:3-21) (emphasis added). The valve would not "de-

scend to the target depth" if the moveable sheath merely retracted after the device was in the "starting position"—and Medtronic knew it.

Having heard that evidence—and evaluated witness credibility—reasonable jurors could find Medtronic acted with "knowledge that the induced acts constitute patent infringement." *Power Integrations*, 843 F.3d at 1332. Medtronic was, at the very least, "willfully blind" to the facts shown by its training materials. *Global-Tech*, 563 U.S. at 769. The Court thus "must uphold the jury's verdict" on the "quintessential fact question" of intent. *GlaxoSmithKline*, 7 F.4th at 1326-28.

### B. The Jury's Doctrine-of-Equivalents Determination Is Consistent With Inducement

Medtronic urges that, because Colibri asserted the doctrine of equivalents, Medtronic could not have had the requisite mental state unless it "accurately predict[ed] Colibri's equivalents theory." Medtronic.Br.54. Not so. This Court routinely upholds induced-infringement verdicts involving the doctrine of equivalents without requiring such a finding. *E.g.*, *WCM Indus., Inc. v. IPS Corp.*, 721 F. App'x 959, 964-65 (Fed. Cir. 2018); *SEB S.A. v. Montgomery Ward & Co.*, 594 F.3d 1360, 1367 (Fed. Cir. 2010); *Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 686-87 (Fed. Cir. 2008). Medtronic sought no jury instruction requiring such a finding. And it cites no case espousing its would-be legal rule.

Medtronic's argument boils down to the notion that it cannot have known the induced acts would infringe under the doctrine of equivalents because the doctrine

is "complicated" and there may be difficulties determining "what is, or is not, an equivalent to a particular element." Medtronic.Br.54 (quotation marks omitted). But the jury found—based on overwhelming evidence—that Medtronic knew the acts it induced cardiologists to perform were infringing. *See* pp. 53-57, *supra*. The law requires only that Medtronic "knew the acts it induced constituted infringement," *Power Integrations*, 843 F.3d at 1332; the precise legal theory describing that infringement is beside the point. Otherwise, defendants could induce acts they know to be infringing with impunity, so long as they can later argue that they were not proved to have anticipated the actual claim constructions, or precise infringement theory (literal or doctrine of equivalents), used at trial.

Moreover, even if equivalence can sometimes be a difficult concept, it was not here. Medtronic protests that there was "no evidence that Medtronic thought . . . that its instruction to 'retract' was equivalent to the claimed 'pushing.'" Medtronic.Br.55. But that mischaracterizes Colibri's theory. The doctrine of equivalents applies here because physicians apply a ***pushing force*** to the pusher member: The "pushing out the pusher member" limitation is met because applying that pushing force causes the member to emerge from the sheath when the sheath is also subjected to force in the opposite direction. *See* pp. 33-35, *supra*. Medtronic's instructions, moreover, provide clear evidence that Medtronic ***actually did know*** that the pusher

member pushes the "valve" out so it may "descend to target depth" when the sheath is retracted. Appx28761; *see* pp. 43-44, *supra*.

Colibri's experts also explained that Medtronic's "no push, only retract" theory defies physics. They showed, using a rolled-up poster, a tube, and concepts a high-school student would understand, that, because of the radial force the stent exerts on the inside of the sheath, there's "[a]bsolutely" no way to deploy the replacement heart valve without "applying opposing forces," Appx21292(530:20-24)—pushing and retracting, *see* pp. 38-40, *supra*. The jury was entitled to "infer[ ] from all of the circumstances," *Warsaw Orthopedic*, 824 F.3d at 1347, that the equivalence would be obvious to anyone with experience with the Evolut.

Colibri's decision not to pursue willful infringement hardly shows "absence of evidence of specific intent." Medtronic.Br.57. That voluntary decision to simplify the case is irrelevant to induced infringement. Appx6. Nothing in *Roche Diagnostics Corp. v. Meso Scale Diagnostics, LLC*, 30 F.4th 1109 (Fed. Cir. 2022), is to the contrary. The observation that "the intent standard for inducement is akin to the one for willfulness" in "some respects"—because both relate to the infringer's "subjective intent"—does not suggest that plaintiffs alleging induced infringement cannot prevail unless they also pursue willful infringement.

## IV. THE DAMAGES AWARD IS AMPLY SUPPORTED

Jury damages awards " 'must be upheld unless the amount is grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork.' " *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1310 (Fed. Cir. 2009). The award here suffers no such defects.

Medtronic sold more than ***$3.5 billion*** worth of accused devices during the relevant period. Appx21547(769:7-11). Colibri's damages expert, Dr. Vellturo, estimated a royalty on those sales using the "bottom of the range" from the most-representative licensing agreement—the Medtronic-Edwards agreement—in which Medtronic licensed "comparable" rights from another patentee for use in the exact products at issue here. Appx21591(821:12-25); Appx21588(810:8-13); Appx21589(811:1-7). The jury's verdict was well "within"—it was half of—"the amount[] proposed" by Dr. Vellturo. *Amgen Inc. v. Hospira, Inc.*, 944 F.3d 1327, 1342 (Fed. Cir. 2019). Medtronic offered ***no*** damages case of its own to rebut Dr. Vellturo. The district court did not abuse its discretion in admitting Dr. Vellturo's opinions. And the jury's award was eminently reasonable.

<u>Standard of review</u>. This Court "review[s] the district court's decision to admit expert testimony for abuse of discretion." *Amgen*, 944 F.3d at 1342. "The jury's determination of the amount of damages is an issue of fact," which is "re-view[ed] for substantial evidence." *Id.*

### A. The Court Properly Admitted the Medtronic-Edwards Agreement

#### 1. *The Medtronic-Edwards Agreement Was Sufficiently Comparable*

Medtronic accuses Colibri's expert, Dr. Vellturo, of relying on a license agreement between Medtronic and Edwards that was not " 'sufficiently comparable' to the hypothetical Medtronic-Colibri negotiation." Medtronic.Br.60. This Court has repeatedly held that disputes over the "degree of comparability" of prior license agreements ordinarily present "factual issues best addressed by cross examination and not by exclusion." *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012); *see also Bio-Rad Labs., Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1372-73 (Fed. Cir. 2020); *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014). The district court here carefully considered "Medtronic's arguments as to Dr. Vellturo's reliance on the Edwards Settlement Agreement," and concluded they "go to the weight of those opinions, not admissibility." Appx102; *see also* Appx8.

That ruling was correct. So long as "baseline comparability" is satisfied, *Bio-Rad*, 967 F.3d at 1374, the jury is "entitled to hear the expert testimony and decide for itself what to accept or reject," *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 856 (Fed. Cir. 2010). Determining whether that baseline is met requires "consideration of whether the license at issue involves comparable technology, is economically comparable, and arises under comparable circumstances as the hypothetical

negotiation." *Bio-Rad*, 967 F.3d at 1373. The Medtronic-Edwards agreement checks each box.

The products covered by the Medtronic-Edwards license and the hypothetical negotiation with Colibri were the same. Appx21587 (809:1-2); Appx21583-88 (805:1-810:13). The Medtronic-Edwards agreement included Medtronic's "Evolut and Evolut R" and would have captured "the Evolut PRO and PRO+" as well. Appx21588 (810:4-13).

Colibri's experts testified that the "patents licensed under [the Medtronic-Edwards agreement] are technologically comparable to the patents that Colibri is asserting in the present case." Appx100. The Medtronic-Edwards agreement concerned TAVR "methods used to deploy . . . transcatheter heart valves into the patient's heart." Appx21504 (726:13-18). The Edwards patents disclosed "collapsible and expandable" stents, "leaflets . . . within the stent . . . [to] allow for one-way flow of blood," and "techniques to bring the stent into the heart." Appx21505 (727:14-20); Appx21506-07 (728:23-729:02). The '294 patent "compare[d] extremely well" with the Edwards patents, because it represented a "new idea[]" in TAVR—"reposition and recapture"—that enabled treatment for "a much larger group of patients." Appx21507 (729:7-19). The rights Medtronic licensed from Edwards thus were, "from a technical and capability standpoint, . . . comparable in terms of significance" with "the '294 patent." Appx21588-89 (810:23-811:7).

**CONFIDENTIAL MATERIAL OMITTED ON THIS PAGE**

The remaining circumstances are comparable, too. The Medtronic-Edwards agreement was similar in **aspect** (**term**) to the hypothetical Medtronic-Colibri license (**term**). Appx97. And it was executed in "a time period very close to" June 2015, when the hypothetical Medtronic-Colibri negotiation would have occurred. Appx21585 (807:9-11).

Such a contemporaneous agreement by the same licensee, incorporated into the same products, for comparable technology, easily clears the bar of admissibility. *See Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1299-1300 (Fed. Cir. 2015); *Bio-Rad*, 967 F.3d at 1373.

2. *Medtronic's Quibbles Do Not Establish an Abuse of Discretion*

Medtronic urges that differences render the Medtronic-Edwards agreement "not comparable." Medtronic.Br.61. Prior licenses, however, "are almost never perfectly analogous." *Ericsson*, 773 F.3d at 1227. So long as the expert "account[s] for . . . distinguishing facts when invoking [a comparable license] to value the patented invention," those differences "go[ ] to the weight of the evidence, not its admissibility." *Id.* As the district court explained, Dr. Vellturo "consider[ed] the differences between the Edwards License and the hypothetical negotiation." Appx17871; Appx100. Medtronic identifies no difference inadequately addressed by his testimony.

Medtronic complains that "the Edwards-Medtronic agreement is a "type of agreement." Medtronic.Br.60. But the law recognizes "that settlement agreements can be pertinent to the issue of reasonable royalties," *In re MTSG, Inc.*, 675 F.3d 1337, 1348 (Fed. Cir. 2012)—particularly where "the most reliable license in th[e] record arose out of litigation," *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 872 (Fed. Cir. 2010). As Dr. Vellturo testified, that was the case here. Appx21594 (824:14-18). The district court agreed, noting "the Edwards Settlement Agreement appears to be 'the most reliable license in the record.'" Appx99. Indeed, Medtronic failed to "present any alternative reliable license." Appx98-99. The fact that the Medtronic-Edwards agreement arose from litigation does not compel its exclusion.

Medtronic argues that "the Edwards-Medtronic agreement involved 'head-to-head competitors,'" while "Colibri 'is a startup that does not have any products on the market.'" Medtronic.Br.61 (quoting Appx21601 (833:7-10); Appx21595 (825:19-21)). But Dr. Vellturo "made . . . adjustments" to account for that. Appx21601-03 (833:7-835:9). Medtronic concedes the point, noting that "Dr. Vellturo repeatedly testified that he chose a rate from the bottom of the range because Edwards and Medtronic were direct competitors, whereas Colibri was only a competitor to some degree." Medtronic.Br.63; *see* Appx21644 (819:7-21); Appx21591 (821:8-25); Appx21603 (835:4-12). The district court properly held that

was sufficient to "account[] for 'the . . . economic differences.'" Appx100; Appx17871.

Medtronic also argues that the Medtronic-Edwards agreement concerns [redacted] patent families containing [redacted] patents. Medtronic.Br.62. But "comparable licenses may cover more patents than are at issue in the action." *Ericsson*, 773 F.3d at 1227. And, the district court held, Colibri's experts accounted for that as well. Appx8; Appx126. Dr. Vellturo factored into his analysis Dr. Dasi's opinion that "the inventions that are covered by these three sets of [Edwards] patents are comparable in terms of significance to . . . how the '294 patent is incorporated into the [Evolut] products." Appx21589 (811:1-7); *see also* Appx21504-07 (726:7-729:19).

Finally, Medtronic contends that the Medtronic-Edwards agreement included "apparatus patents," whereas Colibri's is a "method" patent. Medtronic.Br.62. Medtronic cites no authority holding that such a difference renders the Medtronic-Edwards agreement inadmissible. Regardless, Colibri's experts explained that Edwards's method claims—as opposed to its device claims—provided the proper basis for comparing the patents' value. Appx21504 (726:20-24); Appx21589 (811:12-24). They testified that the method claims generated the value of the licensed patents because "without the method, [the] device patents can't be . . . used." Appx21509 (731:21-25); Appx21605 (837:5-14). The jury thus understood how the patents in each agreement compared.

In a throwaway paragraph, Medtronic asserts that Dr. Vellturo's testimony was "conclusory." Medtronic.Br.65. As explained above, Dr. Vellturo's testimony, which filled more than 100 transcript pages, was anything but. His opinions—***unrebutted*** by Medtronic—more than suffice to support the jury's award. *Summit 6*, 802 F.3d at 1296 (expert testimony and single comparable license sufficient to uphold damages). Medtronic does not come close to showing that no reasonable jury could have reached the award here.

### B. Colibri's Damages Theory Properly Included the Option Value of the Patented Method

Finally, Medtronic urges that, because the infringing method is practiced in "30-40% of procedures," Dr. Vellturo should have been precluded from presenting a royalty model "that included 100% of Medtronic's Evolut sales." Medtronic.Br.66. This Court, however, has rejected the notion that royalties for method claims must be confined to "specific instances of infringement," because doing so "could create a hypothetical negotiation far-removed from what parties regularly do during real-world licensing negotiations." *Lucent*, 580 F.3d at 1334. This Court explained that, "with some inventions, say for example a method of detecting fires, value is added ***simply by having the patented invention available for use***." *Id.* (emphasis added). "Thus, potential licensors and licensees routinely agree to royalty payments regardless of whether the invention is used frequently or infrequently by the consumer." *Id.*

For example, in *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075 (Fed. Cir. 1983), the patent covered "a method and apparatus for making snow used in winter sports." *Id.* at 1076. This Court accepted that the parties would not reach a "royalty based upon actual use," because that "would have been inconsistent with the function snowmaking equipment serves at a ski resort." *Id.* at 1080. The "resort hopes that 'natural snow will always be sufficient.'" *Id.* But having the ability to perform the snow-making method when needed still has value—like "'an insurance policy.'" *Id.* This Court thus held it was proper to award a royalty reflecting the value of having the ***option*** to use the method as needed. *Id.*

The same is true here: The value of the patented partial-deployment method related to its ***availability*** in every procedure, regardless of whether it had to be used in any particular procedure. Dr. Vellturo testified that "the capability to be repositioned and recaptured" was the Evolut's "key competitive advantage." Appx21560 (782:14-18). Drs. Fish and Gallegos affirmed that that option was "absolutely" important to cardiologists, enabling them to avoid "complications" that carried "severe risks" for patients. Appx21096 (334:4-25); Appx21302-06 (540:5-544:18); *see also* Appx21096 (334:8-25).

Medtronic's own marketing materials confirmed the value of having the option to use the patented method with the Evolut, whether utilized or not: It told doctors the "***option***" of "[r]ecapturability and [r]epositionability" will "give you

confidence with ***every procedure***." Appx27614 (emphasis added); *see also* Appx21559-60 (781:16-782:13); Appx21563 (785:17-24); Appx21800 (1000:8-12). Because that ***option*** drove sales, Dr. Vellturo testified, the hypothetical royalty would "be based on the initial sale of the unit, not on whether [the method is] ultimately used." Appx21567 (789:12-20).

Medtronic never disputes that "the value of the invention is inherent in every sale whether or not that invention ultimately get[s] used." Medtronic.Br.67 (quoting Appx21567 (789:12-20)). It does not challenge Dr. Vellturo's conclusion that "practical[ ]" concerns would preclude a use-based royalty because "neither side would want" to track how each product was used. Appx21565 (787:18-22). Nor does Medtronic disagree that, in a hypothetical negotiation, the parties ***actually*** would have agreed to a royalty based on "total Evolut sales." Appx21568 (790:4-6).

Instead, Medtronic posits a categorical rule that royalties for method claims must be limited to instances where the method is used. Medtronic.Br.67. That is precisely the "rigid requirement" this Court has rejected. *Lucent*, 580 F.3d at 1334. Medtronic's invocation of *Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339 (Fed. Cir. 2022), proves the point. *Niazi* confirms that this Court has "never laid down any rigid requirement that damages in all circumstances be limited to specific instances of infringement." *Id.* at 1358 (quoting *Lucent*, 580 F.3d at 1334).

The problem in *Niazi* was that the patented method involved use of different "components," including "an outer catheter, an inner catheter, a guide wire, and a lead," to place an electrical lead into a vein to facilitate heart treatment. 30 F.4th at 1356-57. This Court affirmed exclusion of expert testimony seeking to establish "all sales of" those "components," for whatever purpose, as the royalty base. *Id.* at 1357. Among other defects, the patentee's expert offered ***no*** "evidence relating to the value of the claimed method" itself, and made ***no*** effort "to account for noninfringing uses" of the components. *Id.* at 1356-57. There was thus no basis to claim every sale of standard medical components as damages for infringement, regardless of whether they were "actually used to perform the claimed method." *Id.* at 1357. Here, by contrast, Dr. Vellturo explained precisely why all Evolut sales would be the proper royalty base, including that the Evolut's value came from providing the ***option*** of recapturing and repositioning the valve device using Colibri's claimed method in any procedure, even if it is ultimately not needed in every procedure. *See* pp. 15-16, *supra.*

Medtronic's other cases are inapposite. As the district court held, *Enplas Display Device Corp. v. Seoul Semiconductor Co., Ltd.*, 909 F.3d 398 (Fed. Cir. 2018), does "not involve anything resembling the 'option value' opinion at issue in the present case." Appx129. There, the Court held that it was improper to award damages on a "volume of sales of ***potentially infringing*** products ***beyond the ones***

***[accused]***," simply because "future" products might be "similar in nature." 909 F.3d at 409-11 (emphasis in original). Here, the royalty base was limited to sales of Medtronic products actually "at issue in this case." *Id.* at 409.

Nor does *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324 (Fed. Cir. 2015), support Medtronic. The Court stated that the "royalty base for reasonable royalty damages cannot include activities that do not constitute patent infringement" to prohibit a damages award that "would extend beyond the expiration date of the patent." *Id.* at 1343. That says nothing about whether the reasonable royalty for method patents can reflect the value from being available for use. *Id.*

## CONCLUSION

The district court's judgment should be affirmed.

March 8, 2024

Respectfully submitted,

/s/ Jeffrey A. Lamken
Jeffrey A. Lamken
Michael G. Pattillo, Jr.
Walter H Hawes IV
MOLOLAMKEN LLP
The Watergate, Suite 500
600 New Hampshire Avenue, N.W.
Washington, D.C. 20037
(202) 556-2000
jlamken@mololamken.com

Catherine Martinez
MOLOLAMKEN LLP
430 Park Avenue
New York, NY 10022
(212) 607-8160

John M. Hughes
Meg E. Fasulo
Taylor J. Kelson
BARTLIT BECK LLP
1801 Wewatta Street, Suite 1200
Denver, CO 80202
(303) 592-3100
john.hughes@bartlitbeck.com

Steven E. Derringer
Matthew R. Ford
Katherine E. Rhoades
BARTLIT BECK LLP
Courthouse Place
54 West Hubbard Street
Chicago, IL 60654
(312) 494-4400

*Counsel for Appellee Colibri Heart Valve LLC*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF CONFIDENTIAL MATERIAL

**Case Number:** 2023-2153

**Short Case Caption:** Colibri Heart Valve LLC v. Medtronic CoreValve, LLC

**Instructions:** When computing a confidential word count, Fed. Cir. R. 25.1(d)(1)(C) applies the following exclusions:

- Only count each unique word or number once (repeated uses of the same word do not count more than once).
- For a responsive filing, do not count words marked confidential for the first time in the preceding filing.

The limitations of Fed. Cir. R. 25.1(d)(1) do not apply to appendices; attachments; exhibits; and addenda. *See* Fed. Cir. R. 25.1(d)(1)(D).

The foregoing document contains 13 number of unique words (including numbers) marked confidential.

☑ This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

☐ This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

☐ This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date: 03/08/2024 Signature: /s/ Jeffrey A. Lamken

Name: Jeffrey A. Lamken

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2023-2153

**Short Case Caption:** Colibri Heart Valve LLC v. Medtronic CoreValve, LLC

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- [x] the filing has been prepared using a proportionally-spaced typeface and includes 13,985 words.
- [ ] the filing has been prepared using a monospaced typeface and includes ________ lines of text.
- [ ] the filing contains ________ pages / ________ words / ________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. ________).

Date: 03/08/2024

Signature: /s/ Jeffrey A. Lamken

Name: Jeffrey A. Lamken