**Appeal No. 2023-2153**

# United States Court of Appeals for the Federal Circuit

COLIBRI HEART VALVE LLC,

*Plaintiff-Appellee*,

*v.*

MEDTRONIC COREVALVE, LLC,

*Defendant-Appellant.*

Appeal from the District Court for the Central District of California,
Case No. 8:20-cv-00847-DOC-JDE, Judge David O. Carter

**NONCONFIDENTIAL REPLY BRIEF OF APPELLANT MEDTRONIC COREVALVE, LLC**

Mark D. Fowler
DLA PIPER LLP (US)
3203 Hanover Street
Suite 100
Palo Alto, CA 94304
(650) 833-2000
mark.fowler@us.dlapiper.com

Stanley J. Panikowski
DLA PIPER LLP (US)
4365 Executive Drive
Suite 1100
San Diego, CA 92121

Gregory A. Castanias
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
(202) 879-3939
gcastanias@jonesday.com

Joseph D. Farley
JONES DAY
325 John H. McConnell Blvd.
Suite 600
Columbus, OH 43125

Kelly Holt
JONES DAY
250 Vesey Street
New York, NY 10281-1047

*Counsel for Appellant Medtronic CoreValve, LLC*

# CERTIFICATE OF INTEREST

Case No. 2023-2153

*Colibri Heart Valve LLC v. Medtronic CoreValve, LLC*

Filing Party/Entity: Medtronic CoreValve, LLC

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: April 29, 2024 Signature: */s/ Gregory A. Castanias*

Name: Gregory A. Castanias

**1. Represented Entities** (Fed. Cir. R. 47.4(a)(1)) – Provide the full names of all entities represented by undersigned counsel in this case.

Medtronic CoreValve, LLC

**2. Real Party in Interest** (Fed. Cir. R. 47.4(a)(2)) – Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.

Not Applicable

**3. Parent Corporations and Stockholders** (Fed. Cir. R. 47.4(a)(3)) – Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

Medtronic plc

**4. Legal Representatives** – List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

- **DLA Piper LLP (US):**
    - Martin M. Ellison

- Kathryn Riley Grasso
- Safraz Ishmael
- James M. Heintz
- Catherine Huang
- Matthew Ganas

**5. Related Cases** – Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5); *see also* Fed. Cir. R. 47.5(b).

Not Applicable

**6. Organizational Victims and Bankruptcy Cases** – Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

Not Applicable

## TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ..... i
TABLE OF ABBREVIATIONS ..... vii
INTRODUCTION ..... 1
ARGUMENT ..... 1
I. THE DISTRICT COURT SHOULD HAVE GRANTED JUDGMENT OF INVALIDITY ..... 1
A. The Specification Does Not Disclose Two Distinct Inventions ..... 2
B. The Paniagua Application Does Not Provide Written-Description Support For Sutured Leaflets ..... 5
II. THE DISTRICT COURT SHOULD HAVE GRANTED JUDGMENT OF NONINFRINGEMENT ..... 9
A. Colibri Continues To Conflate General Movement Of The Inner Member With Movement "Outward From The Moveable Sheath" As Required By The Asserted Claims ..... 11
B. Medtronic Neither Forfeited Its Claim-Vitiation Argument Nor Waived Its Prosecution History Argument ..... 17
C. Colibri's Claim-Vitiation Argument Ignores The Plain Language Of The Asserted Claims ..... 19
D. Colibri's Prosecution-History-Estoppel Argument Would Recapture Subject Matter Canceled During Prosecution ..... 22
E. Colibri's "Entirely Within" Argument Confirms Medtronic's Evolut Does Not Infringe The Asserted Claims ..... 25
III. THE DISTRICT COURT SHOULD HAVE GRANTED JUDGMENT OF NO ACTIVE INDUCEMENT ..... 27
IV. THE DISTRICT COURT SHOULD NOT HAVE ALLOWED COLIBRI'S DAMAGES THEORY AT TRIAL ..... 31
CONCLUSION ..... 34

*CONFIDENTIAL MATERIAL OMITTED*

The material omitted on page 32 describes details of a previous agreement between Medtronic and Edwards Lifesciences Corporation.

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Anascape, Ltd. v. Nintendo of Am. Inc.*,
601 F.3d 1333 (Fed. Cir. 2010) ....................8

*AstraZeneca AB v. Apotex Corp.*,
782 F.3d 1324 (Fed. Cir. 2015) ....................34

*Bio-Rad Laboratories., Inc. v. 10X Genomics Inc.*,
967 F.3d 1353 (Fed. Cir. 2020) ....................31

*Broadcom Corp. v. Qualcomm Inc.*,
543 F.3d 683 (Fed. Cir. 2008) ....................30

*Commil USA, LLC v. Cisco Sys., Inc.*,
575 U.S. 632 (2015)....................30

*Cordis Corp. v. Boston Scientific Corp.*,
188 F. App'x 984 (Fed. Cir. 2006) ....................8

*DSU Med. Corp. v. JMS Co.*,
471 F.3d 1293 (Fed. Cir. 2006) ....................28

*Edgewell Pers. Care Brands, LLC v. Munchkin, Inc.*,
998 F.3d 917 (Fed. Cir. 2021) ....................17

*Energy Transp. Grp., Inc. v. William Demant Holding A/S*,
697 F.3d 1342 (Fed. Cir. 2012) ....................24

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
344 F.3d 1359 (Fed. Cir. 2003) (en banc) ....................18

*Global-Tech Appliances, Inc. v. SEB S.A.*,
563 U.S. 754 (2011)....................30

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*GS Cleantech Corp. v. Adkins Energy LLC*,
951 F.3d 1310 (Fed. Cir. 2020) ....................17

*Hanson v. Alpine Valley Ski Area, Inc.*,
718 F.2d 1075 (Fed. Cir. 1983) ....................33

*Honeywell Inc. v. Victor Co. of Japan, Ltd.*,
298 F.3d 1317 (Fed. Cir. 2002) ....................8

*Honeywell International, Inc. v. ITT Industries., Inc.*,
452 F.3d 1312 (Fed. Cir. 2006) ....................7, 8

*In re Clement*,
131 F.3d 1464 (Fed. Cir. 1997) ....................24

*J&M Corp. v. Harley-Davidson, Inc.*,
269 F.3d 1360 (Fed. Cir. 2001) ....................24

*LaserDynamics, Inc. v. Quanta Comput. USA, Inc.*,
694 F.3d 51 (Fed. Cir. 2012) ....................31

*Lockwood v. Am. Airlines, Inc.*,
107 F.3d 1565 (Fed. Cir. 1997) ....................8

*Lucent Technologies, Inc. v. Gateway, Inc.*,
580 F.3d 1301 (Fed. Cir. 2009) ....................33

*Maxwell v. J. Baker, Inc.*,
86 F.3d 1098 (Fed. Cir. 1996) ....................24

*Mycogen Plant Sci., Inc. v. Monsanto Co.*,
91 F. App'x 666 (Fed. Cir. 2004) ....................24

*Norwood v. Vance*,
591 F.3d 1062 (9th Cir. 2010) ....................19

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Nystrom v. Trex Co.*,
580 F.3d 1281 (Fed. Cir. 2009) ....................17

*Pacific Coast Marine Windshields Ltd. v. Malibu Boats, LLC*,
739 F.3d 694 (Fed. Cir. 2014) ....................24

*Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*,
786 F.3d 960 (Fed. Cir. 2015) ....................29

*Purdue Pharma L.P. v. Faulding Inc.*,
230 F.3d 1320 (Fed. Cir. 2000) ....................7, 8

*Resonate Inc. v. Alteon Websystems, Inc.*,
338 F.3d 1360 (Fed. Cir. 2003) ....................8

*RF Delaware, Inc. v. Pac. Keystone Techs., Inc.*,
326 F.3d 1255 (Fed. Cir. 2003) ....................34

*Robbins v. Carey*,
481 F.3d 1143 (9th Cir. 2007) ....................17

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
242 F.3d 1337 (Fed. Cir. 2001) ....................19

*SEB S.A. v. Montgomery Ward & Co.*,
594 F.3d 1360 (Fed. Cir. 2010) ....................30

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*,
520 U.S. 17 (1997)....................19

*WCM Industries, Inc. v. IPS Corp.*,
721 F. App'x 959 (Fed. Cir. 2018) ....................30

# TABLE OF ABBREVIATIONS

***Parties***

| Abbreviation | Term |
|---|---|
| Medtronic | Medtronic CoreValve, LLC |
| Colibri | Colibri Heart Valve LLC |

***Terms***

| Abbreviation | Term |
|---|---|
| the ’294 patent | U.S. Patent No. 8,900,294 (Appx134-159) |
| asserted claims | claims 1-3 of the ’294 patent |
| court or district court | United States District Court for the Central District of California |
| JMOL | judgment as a matter of law |
| MBr. | Medtronic’s Confidential Opening Brief (Dkt. No. 22) |
| the Paniagua application | U.S. Patent Pub. No. 2005/0113910 (Appx22673-22695) |
| POSA | person of ordinary skill in the art at the time of the invention |
| PTO | U.S. Patent and Trademark Office |
| CBr. | Colibri’s Confidential Response Brief (Dkt. No. 32) |

All emphasis is added throughout this brief, and all internal citations and alterations omitted, unless otherwise indicated.

## INTRODUCTION

Colibri's brief is about the patent it wishes it had, not the patent it actually has. The patent it wishes it had would not be limited to a valve with folded, uncut leaflets; it would not require pushing out the pusher member from the moveable sheath; and its valve would not have to "reside entirely within an inner channel of the stent member." The patent it has requires each of these things. And these requirements were legal impediments to its infringement claim against Medtronic's Evolut device. For these reasons, and more, the judgment should be reversed as a matter of law.

## ARGUMENT

### I. THE DISTRICT COURT SHOULD HAVE GRANTED JUDGMENT OF INVALIDITY

Medtronic showed the Paniagua application does not provide written-description support for the asserted claims and thus, anticipates them. MBr.30-40. Specifically, Medtronic showed the Paniagua application requires the leaflets of its "invention" to be *folded*, *uncut* leaflets, and so does not support the asserted claims, which broadly encompass valves having leaflets of *all types*, including sutured, multi-part leaflets. Colibri responds by reimagining the shared specification of the Paniagua application and the '294 patent as disclosing "two inventions"—even "expressly disclos[ing] sutured valves." CBr.22-33. This is a straw man: The *number* of alleged inventions is irrelevant to whether sutured

leaflets are part of any one of them. The specification makes clear that the "present invention" *requires* folded, uncut leaflets—and makes equally clear that sutured leaflets are *not* part of that invention.

**A. The Specification Does Not Disclose Two Distinct Inventions**

Colibri seeks to rewrite the shared specification into a disclosure of "multiple inventions—including the partial-deployment method claimed in the '294 patent and the method of making folded leaflets claimed in another patent." CBr.22. As Medtronic showed, these ideas are not distinct. MBr.38-39. Colibri's own—undisputed—evidence shows that *every* partial-deployment method in the Paniagua application uses valves with folded, uncut leaflets. That same evidence shows that the partial-deployment methods disclosed in the specification (inventive or not) are possible *only* with a valve having folded, uncut leaflets.

Dr. Fish—the other named inventor—testified that before conception, he had "been thinking about different ways to replace an aortic valve" through smaller arteries; he "was doing a lot of … stent procedures in the *larger* arteries of the body, and in doing that it just seemed to [him] there had to be some way to do it." Appx21068 (306:11-17). Dr. Fish said he envisioned an "approach … where you go through the femoral artery." Appx21170-21171 (408:24-409:3). But there were "problems," including "that somehow th[e] device had to be *small enough* to somehow get into the circulation and thread all the way up to the aortic valve."

Appx21068 (306:1-5); *see also* Appx21171 (409:15-16) (explaining that his "approach requires that the device you put into the artery is of a *smaller* diameter"). He testified that prior-art devices, including those using valves with sutured, multi-part leaflets, "were just *too big*." Appx21068 (306:6). But after seeing Dr. Paniagua's "folded" leaflets, which allowed for a smaller valve, "the lightbulb went off." Appx21068-21069 (306:24-307-5). Dr. Fish said, "The great thing about it was that it was readily collapsed into a catheter, and [he] became really excited with that idea." Appx21069 (307:5-7).

Colibri's counsel told the same story in opening:

> Early on in his fellowship, Dr. Paniagua came up to Dr. Fish with a folded paper model, said it was a valve. And Dr. Fish will tell you that it looked like origami. And it was at this point Dr. Fish thought, *We might be on to something here. We might be able to compress that replacement heart valve device down small enough to get it up … to the heart*.

Appx20945 (203:10-17) (emphasis in original).

And in closing:

> [T]hat got [Dr. Fish] thinking… What if there was a way to develop a replacement heart valve that was capable of being compressed so tightly that it could fit into a metal stent? … So when Dr. Paniagua showed Dr. Fish a paper model of a heart valve that could be folded like an elegant piece of origami, so small that it could fit into a stent, something clicked for Dr. Fish. At that moment he realized, *We can do this*.

Appx22401-22402 (1509:15-1510:4) (emphasis in original).

So, the folded, uncut leaflet was part and parcel of the partial-deployment method. The specification confirms this at every turn. Per "the inventors," "the leaflet portion of the valve" must be "formed from a single piece of biocompatible valve material"; otherwise, you "los[e] the novel and improved qualities of *the present invention*." Appx22691 (¶[0047]) (emphasis added to underscore the singularity of "the present invention"); *see also* Appx22691 (¶[0047]) ("The leaflet … *is* a single, continuous, uncut layer."). Colibri's brief says nothing whatsoever about this disclosure. Nor can Colibri dispute that *every* embodiment in the shared specification—even "alternate" ones—utilizes folded, uncut leaflets. Appx22674 (Abstract); Appx22689 ("Summary of the Invention") (¶¶[0024], [0026]); Appx22690 ("Description of a Preferred Embodiment") (¶[0037]); Appx22691 (¶[0047]).

Colibri also never disputes that the shared specification describes the "present invention"—again, singular—only as "a replacement heart valve device and method of making [the] same." Appx22689 ("Summary of the Invention") (¶[0024]); *see also, e.g.*, Appx22690 ("Description of a Preferred Embodiment") (¶[0037]). In fact, "invention" appears more than three dozen times throughout the specification, and *never* to describe any of the partial-deployment methods. Consistent with Dr. Fish's invention story, each such method is disclosed as using only "[t]he replacement heart valve device of the present invention"—never a

sutured valve. Appx22692 ("Implantation of Replacement Heart Valve Device") (¶¶[0056]-[0057]); *see also* Appx22692-22693 (¶¶[0058]-[0059], [0061]).

Yet Colibri offers the bold, absolute claims that "*[n]othing* in the patent suggests that the benefits of the partial-deployment method are tied in any way to folded valves," CBr.32-33; "Paniagua *never* suggests that a valve's method of manufacture is critical to the partial-deployment method claimed in the '294 patent," CBr.23; and "Paniagua's criticisms of sutured valves … has *nothing* to do with the claimed method for performing the implantation." CBr.32. As just shown above, the Paniagua application says plenty on this subject, and proves Colibri's pronouncements incorrect at every turn. And that is to say nothing about Colibri's witness testimony, and its counsel's arguments, each of which—consistent with the Paniagua application itself—confirms that folded, uncut leaflets are inextricably intertwined with the partial-deployment methods.

### B. The Paniagua Application Does Not Provide Written-Description Support For Sutured Leaflets

Colibri incorrectly argues that the Paniagua application actually includes valves with sutured leaflets within the disclosure of its invention. Here, too, Colibri blinkers the record, seeking to treat sutured leaflets as the specification's primary disclosure and folded, uncut leaflets as mere "[a]dditional [d]isclosure." CBr.25. Colibri goes so far as to claim that the Paniagua application "discloses

that most valves are made by suturing," and the application—again, with the negative absolute—"*nowhere* suggests that the claimed method should not be performed with such valves." CBr.32. Again, the Paniagua application itself refutes Colibri's argument.

To start, Colibri conflates the Paniagua application's mere mention of sutured leaflets with an express disclosure of the Paniagua application's invention. *See, e.g.*, CBr.18 ("Paniagua … ***expressly*** discloses valves with sutured leaflets" (emphasis in original)). The context of this "express disclosure" makes Medtronic's case, not Colibri's.

Medtronic showed that the Paniagua application's *only* reference to sutured leaflets disparages such valves as prone to "failure," inferior, and "disadvantage[d]" compared to the invention's folded, uncut leaflets. MBr.10-11, 33-34; *see also* Appx22688-22689 (¶¶[0022]-[0024], [0026]); Appx22691 (¶[0047]). Further, every disclosed embodiment includes folded, uncut leaflets—and each is *expressly* described as excluding sutured leaflets altogether. Appx22689 (¶[0024]) ("without … suturing"); Appx22689 (¶[0026]) ("rather than … by suturing"); Appx22691 (¶[0049]) (same); Appx22691 (¶[0047]) ("unlike prior efforts that have involved suturing"; "no … sutures"). Dr. Fish went so far as to tout this exclusive use of folded, uncut leaflets as a matter of life and death. Appx21163-21164 (401:3-402:8). So, yes, the Paniagua application

*mentions* valves with sutured leaflets, *but only to describe what the invention was not.*

A written description must show that the inventors "possessed" the full scope of the invention—here, that means including valves with sutured, multi-part leaflets—with sufficient "blaze marks" to guide the artisan to the claimed embodiment. *Purdue Pharma L.P. v. Faulding Inc.*, 230 F.3d 1320, 1326-27 (Fed. Cir. 2000) ("[O]ne cannot disclose a forest in the original application, and then later pick a tree out of the forest and say here is my invention."). Here, the Paniagua application does not suffer from being merely generic; it *denies* possession of valves having sutured, multi-part leaflets altogether, and any "blaze marks" it possesses lead artisans off the path of such sutured, multi-part valves. As in *Honeywell International, Inc. v. ITT Industries., Inc.*, 452 F.3d 1312 (Fed. Cir. 2006), where the Court asked what, "[i]f the written description could talk, it would say," *id.* at 1320, here, the written description practically shouts: *Do not use valves with sutured, multi-part leaflets*, lest you "los[e] the novel and improved qualities of *the present invention*." Appx22691 (¶[0047]).

Colibri tries to sidestep this precedent with its "two inventions" argument. CBr.26. That argument fails, as shown above, for the specification's disparagement of sutured leaflets makes the *number* of inventions irrelevant. But even were there "two inventions," the cases Colibri cites are factually and legally

distinct. None of the patents in *Cordis Corp. v. Boston Scientific Corp.*, 188 F. App'x 984 (Fed. Cir. 2006), *Resonate Inc. v. Alteon Websystems, Inc.*, 338 F.3d 1360 (Fed. Cir. 2003), or *Honeywell Inc. v. Victor Co. of Japan, Ltd.*, 298 F.3d 1317 (Fed. Cir. 2002), disparaged one of the alleged inventions at all, let alone to the extent contained in the Paniagua application, where the inventors told the world what their invention was—and, more importantly, what it was not. Moreover, *Resonate* and *Honeywell*—the only precedential cases Colibri cites—concerned claim construction, not written description. *Resonate*; 338 F.3d at 1364 ("The single issue … is the correctness of the district court's claim construction."); *Honeywell*, 298 F.3d at 1322 ("Honeywell's infringement claim turns on the construction of claim 1.").

Nor is Colibri saved by testimony that "skilled artisans would already know how to make valves by sewing leaflets on a stent." CBr.25. Of course they would: That was in the prior art, and the Paniagua application cited, distinguished, and disparaged it. The question is not whether a POSA would "know how to make" sutured valves, but whether a POSA, upon reading the Paniagua application, would have "considered [sutured valves] to be part of [Colibri's] invention," *Purdue Pharma*, 230 F.3d at 1328, or, put another way, would "'clearly conclude that the inventor[s] invented the claimed invention.'" *Anascape, Ltd. v. Nintendo of Am. Inc.*, 601 F.3d 1333, 1335 (Fed. Cir. 2010) (quoting *Lockwood v. Am. Airlines,*

*Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997)). As Medtronic showed, no ordinary artisan would pick up the Paniagua application and conclude that a valve with sutured leaflets was part of that invention. MBr.32-37.

Finally, Colibri says that "how valves are 'formed' is irrelevant," because "[t]he claims 'have no process limitations' for the valves." CBr.24-25. But the issue is not one of claim-construction; rather, it is of written description. And the specification makes clear that sutured leaflets are not within that description. Moreover, in teaching (repeatedly) that the leaflets are "formed by folding … rather than … by suturing," *e.g.*, Appx22689 (¶[0026]), the Paniagua application is not merely (or even primarily) describing a manufacturing process. It is describing their structure—specifically, valves with folded, uncut leaflets having "long-term durability" and the ability to "simulate the exact anatomy of a native heart valve," Appx22688 (¶¶[0022]-[0023])—*unlike* potentially lethal valves with sutured leaflets.

The Paniagua application lacks written-description support for the full scope of the asserted claims. It anticipates as a matter of law.

## II. THE DISTRICT COURT SHOULD HAVE GRANTED JUDGMENT OF NONINFRINGEMENT

Medtronic showed that the district court should have granted JMOL of noninfringement for any or all of three distinct reasons:

*One*, Colibri's equivalents theory with respect to the "pushing out the pusher member from the moveable sheath" limitation of the asserted claims would entirely vitiate that limitation, for the allegedly equivalent movement is not "pushing out" anything, but the polar opposite of pushing—*pulling* back the moveable sheath.

*Two*, Colibri's equivalents theory is estopped by the prosecution history of the '294 patent, during which Colibri canceled application claim 39, which purported to claim the exact deployment method Colibri now says infringes its patent by equivalents. To countenance this equivalents theory would allow Colibri to recapture subject matter that it explicitly canceled during prosecution.

And *three*, having claimed "a valve residing entirely within an inner channel of the stent member," and under an unchallenged claim construction that defines the term "valve" as all "portions of the replacement heart valve device that allows the one-way flow of blood," Colibri failed to show the presence of this essential claim element because the evidence is uniform and undisputed that the "inner skirt"—a part of the valve that resides outside of the inner channel of the stent member—"allows the one-way flow of blood."

Colibri's attempts to answer these showings are unavailing. Its equivalents arguments rely on a selective and inconsistent invocation of "basic physics." And its response to Medtronic's not-entirely-within-the-inner-channel showing reverts

to arguing the same claim construction it offered—unsuccessfully—at trial and does not challenge as reversible error on appeal.

If the patent is not invalidated, it should be held noninfringed.

### A. Colibri Continues To Conflate General Movement Of The Inner Member With Movement "Outward From The Moveable Sheath" As Required By The Asserted Claims

Colibri claimed, as an essential step of the claimed method, "pushing out the pusher member from the moveable sheath." Appx159. The district court construed this limitation to require "pressing against the pusher member with a force that moves the pusher member outward from the moveable sheath." Appx2321. The court held "that 'pushing out' refers not just to an application of force but rather to *actual movement*," Appx2146-2147, and "expressly rejected" Colibri's "argument that the 'pushing out' limitation could be satisfied by pressing on the pusher member with a force that 'merely prevents the replacement heart valve from being retracted together with the sheath,'" Appx11184, as in Medtronic's Evolut.

Even so, Colibri argues that Evolut, which all agree can deploy a replacement heart valve "only" by retracting the moveable sheath, Appx21780 (980:8-11); Appx21940 (1140:11-18); *see also* Appx21134-21135 (372:2-373:7); Appx21747 (947:16-23), nonetheless infringes by equivalents as a matter of "basic physics." CBr.56. According to Colibri, "as a matter of simple physics, doctors

*must* apply a pushing force on the Evolut's pusher member for the valve to emerge from the moveable sheath," otherwise "retracting the sheath would simply retract the pusher member and valve as well." CBr.38.

Colibri misses the point. There is no dispute that force is applied to Evolut's inner member as the moveable sheath is retracted—Colibri's characterization of Medtronic's argument as a "'no push, only retract' theory [that] defies physics," is factually incorrect. CBr.59. The parties' actual dispute is whether retracting Evolut's moveable sheath while applying a restraining force to the inner member, which is incapable of "mov[ing] … outward from the moveable sheath," Appx2321, is equivalent to the claimed "pushing force." It cannot be for two reasons: (1) claim vitiation; and (2) prosecution-history estoppel.

As Medtronic showed, the force acting on the inner member as the sheath is retracted merely maintains the position of the replacement heart valve. MBr.43-45. All the evidence shows that Evolut's inner member is "rigidly connected" (or "anchored") to the handle of the device. Appx21398 (620:5-11); Appx21144-21145 (382:13-383:3). The inner member thus cannot "move[] … outward from the moveable sheath." Appx2140-2152; Appx1082. "It's just physically impossible." Appx21926-21927 (1126:24-1127:5); *see also* Appx21802-21803 (1002:17-1003:3). Colibri's witnesses agreed: "It's anchored there so it can't come out of the [moveable sheath], yes." Appx21398 (620:9-11) (Dr. Gallegos);

*see also* Appx21139-21140 (377:25-378:8) (Dr. Fish); Appx21397-21402 (619:17-624:11) (Dr. Gallegos).

Colibri confuses the issue by presenting images purportedly showing movement of the inner member. CBr.40, 42. These images, taken from a video, do show movement of the inner member—but not "outward from the moveable sheath," as the claims require. Appx2140-2152; Appx1082. What they show instead is movement of the *entire* device within the patient. This would have been apparent from the position of the spindle, an integral part of Evolut's inner member, had Colibri not cropped the spindle out of the first image.




CBr.42 (annotated to show the missing spindle).

As Dr. Fish testified, the "spindle," to which the replacement heart valve device is attached, "is glued [to] the inner member" and thus "can't move relative to the inner member." Appx21144 (382:3-8). He testified that both the spindle and inner member are "anchored" to the handle, such that movement of either requires movement of "the *whole catheter*." Appx21144-21145 (382:9-383:3). Dr. Gallegos agreed that "the spindle remains glued in place throughout the operation. It doesn't move." Appx21403 (625:7-12); *see also* Appx21404 (626:12-19) (Dr. Gallegos) ("They couldn't move out of the handle because they're all affixed together.").

Dr. Fish was shown the video from which Colibri's images are taken, and testified that because Colibri's counsel had "zoomed in on what's happening" elsewhere, the spindle was outside "the frame." Appx21145 (383:4-24). He then admitted that if Colibri's counsel had not shown a cropped version of the video, "what we [would] see here is that the *whole end of the catheter has moved together as one unit* including the tip, the inner member, and the spindle," "because they're all tied together." Appx21145-21146 (383:19-384:2). Dr. Gallegos admitted the same: Agreeing that the video Colibri's counsel "chose to show … did not include the spindle at the top," he testified that had the video not been cropped, "what you [would] see … is that the whole end of the device is moving down including the tip, the inner member, the spindle, and the rest of the inner member behind it.

They're *all descending together* downward." Appx21447 (669:5-20). This undisputed testimony from Colibri's witnesses confirms that its cropped images show movement of the *entire device*; nothing more.

Colibri's focus on the pigtail catheter injects further confusion. CBr.41-43. Undisputed evidence shows that the pigtail catheter is a "separate" device, Appx21439-21440 (Dr. Gallegos) (661:24-662:2), not part of Evolut—the two are even shown as being physically separated in Colibri's images. So, movement of the inner member *relative to the pigtail catheter*—which is all Colibri's images show—says nothing about movement of the inner member *relative to the moveable sheath*—which is what the asserted claims require.

Colibri's earlier, *uncropped* screenshots (CBr.40) show that when Evolut's moveable sheath is retracted—as evidenced by movement of the marker band—the spindle and stent maintain their positions, because the inner member never moves "outward from the moveable sheath." Appx2140-2152; Appx1082. (In fact, the inner member cannot move *in any direction* relative to the moveable sheath.) But Colibri cropped these images, removing the spindle as a reference point, instead seeking to use the separate pigtail catheter as a reference point.




CBr.40.

What is more, the district court considered Colibri's same arguments at summary judgment, *see, e.g.*, Appx11180, and rejected this literal infringement theory as a matter of law. Appx11182-11187; Appx86. According to the special master, whose recommendation the court adopted, "[e]vidence of movement of the *entire delivery system* does not amount to 'pressing against the pusher member with a force that moves the pusher member outward from the moveable sheath.'" Appx11186; Appx86. Colibri repackaged this argument as its equivalents theory. But the fact remains: "Evidence of movement of the *entire delivery system* does not amount to 'pressing against the pusher member with a force that moves the pusher member outward from the moveable sheath.'" Appx11186; Appx86.

### B. Medtronic Neither Forfeited Its Claim-Vitiation Argument Nor Waived Its Prosecution History Argument

Apparently seeking to sidestep these problems with its merits arguments, Colibri suggests that Medtronic "forfeited its claim-vitiation argument," CBr.35, and "waived its prosecution-history-estoppel argument." CBr.45. Both arguments lack merit.

Colibri first argues that Medtronic forfeited its claim-vitiation argument by not raising it in its objections to the special master's report and recommendation on summary judgment. CBr.35. But the special master simply denied Medtronic's summary-judgment motion, finding issues of fact to be resolved at trial; he did not reject Medtronic's argument entirely. Appx11200-11201. So, there was nothing Medtronic needed to do to preserve its argument. Moreover, "the failure to object to a [special master's] conclusions of law does not automatically waive [an issue]." *Robbins v. Carey*, 481 F.3d 1143, 1146-47 (9th Cir. 2007); *see also GS Cleantech Corp. v. Adkins Energy LLC*, 951 F.3d 1310, 1326 (Fed. Cir. 2020) ("[W]e apply the law of the regional circuit as to procedural matters," including waiver.). And "[c]laim vitiation is a legal determination," *Edgewell Pers. Care Brands, LLC v. Munchkin, Inc.*, 998 F.3d 917, 923 (Fed. Cir. 2021), "subsumed within the test for equivalents itself." *Nystrom v. Trex Co.*, 580 F.3d 1281, 1287 (Fed. Cir. 2009). Medtronic certainly preserved that defense. Appx13650-13654.

Colibri's argument that Medtronic waived its prosecution-history-estoppel argument fares equally poorly. CBr.45. Medtronic raised this legal argument at summary judgment, Appx3164, which the Court denied. Appx84-85. Medtronic's statement about "not pursuing" prosecution-history estoppel *at trial* was a recognition that this "question[] of law," which had been decided already, was "for the court, not a jury, to decide." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 344 F.3d 1359, 1368 (Fed. Cir. 2003) (en banc). In the same document, not "later" as Colibri says, CBr.45, Medtronic stated that its contentions were made "in light of the" the court's summary-judgment rulings, did "not constitute a waiver or concession of any aspect of Medtronic's objections or arguments made in connection with" those rulings, "nor does it constitute a waiver of Medtronic's right to appeal the same." Appx13637. Medtronic reaffirmed all this in its subsequent trial brief, stating that it would not present prosecution-history estoppel "[a]t trial," and that this position "does not constitute a waiver or concession of any aspect of Medtronic's objections or arguments made in connection with those [same] orders." Appx18581-18582.

Moreover, Medtronic explicitly "raise[d]" its prosecution-history-estoppel argument in its Rule 50(a) motion "for preservation purposes." Appx18727. Colibri's opposition thereto expressly acknowledged that Medtronic was "rerais[ing]" its prosecution-history-estoppel arguments, and Colibri responded

*only on the merits*—never claiming waiver or abandonment. Appx18751. Where a party fails to timely raise waiver, that argument itself is forfeited. *Norwood v. Vance*, 591 F.3d 1062, 1068 (9th Cir. 2010) ("It is well-established that a party can waive waiver … by failing to assert it."). Colibri thus waived the waiver argument it raises on appeal. And when Colibri argued waiver too late, in opposition to Medtronic's Rule 50(b) motion, Appx19567, the district court did not find waiver but instead addressed Medtronic's prosecution-history-estoppel argument strictly on the merits. Appx4.

### C. Colibri's Claim-Vitiation Argument Ignores The Plain Language Of The Asserted Claims

An equivalents theory cannot be so broad as to "vitiate" a claim element; *i.e.*, "effectively eliminate that element in its entirety" by stripping it of any meaning whatsoever. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997); *see also SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1346-47 (Fed. Cir. 2001) (Equivalents "cannot be employed in a manner that wholly vitiates a claim limitation.").

The element in question requires deploying the replacement valve by "pushing out the pusher member from the moveable sheath." Colibri knew of other deployment methods (having discussed several in the Paniagua application, and initially claiming methods of deployment by retraction in the '294 patent, *see*

Section II(D), below), but *chose* to claim only pushing the pushing member out from the moveable sheath. Appx159. The district court construed this language narrowly, as requiring "a force that moves the pusher member outward from the moveable sheath." Appx2321. That is, the "pushing" force must cause "actual movement" of "the pusher member outward from the moveable sheath." Appx2146-2147; Appx2152.

Colibri's equivalents theory takes an eraser to this limitation. The inner member of Medtronic's Evolut cannot move "out of the [moveable sheath]," Appx21398 (620:9-11) (Dr. Gallegos), not in *any* direction. Appx21139-21140 (377:25-378:8) (Dr. Fish); Appx21398-21402 (619:17-624:11) (Dr. Gallegos). Evolut can "only" operate by *pulling* back the moveable sheath from the valve. *See, e.g.*, Appx21780 (980:8-11); Appx21940 (1140:11-18). No other method of deployment is "physically possible." Appx21758 (958:16-24). (Even it were, Colibri dropped its literal-infringement theory at trial and was left only with its theory that Evolut's retraction method was equivalent to "pushing out the pusher member.") So, where the claims require pushing a pusher member out of the moveable sheath, Colibri's theory is that Evolut's method is somehow a viable equivalent because the inner member is held still while the moveable sheath is retracted.

Throughout its response, Colibri says that as matter of "basic physics," retracting Evolut's moveable sheath requires this "pushing" force be exerted on the inner member. CBr.56. But as Colibri's response makes plain, "simple physics" demands that whether deploying by pushing, pulling, or any other method, there will *always* be an opposite force acting on the device—there is no escaping Newton's Third Law. CBr.11. And so, Colibri can *always* find some "pushing" force acting during deployment, whether that force is the one that "moves the pusher member outward from the moveable sheath" as in the asserted claims, or is merely a result of retracting the moveable sheath as in Evolut. Effectively, any method that "produce[s] the same result—the pusher member and valve device emerge from the sheath," CBr.34—which is to say *every* method of deployment, falls within the scope of the asserted claims under Colibri's equivalents theory.

Colibri sheds light on the sweep of its argument when it says Evolut and the "pushing out the pusher member" limitation "operate using the same principles—the application of *opposite forces* ensures that the member changes position relative to the sheath." CBr.34. *Any* deployment method will have "opposite forces" available to be accused of infringement. But "opposite forces" is not the claim limitation—a particular force, operating in a particular direction, is—"*pushing out* the pusher member from the moveable sheath." Appx159. That limitation is entirely vitiated by Colibri's equivalents theory.

### D. Colibri's Prosecution-History-Estoppel Argument Would Recapture Subject Matter Canceled During Prosecution

Colibri trumpets laws of "basic physics" in arguing that Evolut, which only deploys by retracting, necessarily requires "pushing." CBr.56. Elsewhere, Colibri abandons physics entirely. It argues, for example, that canceled claim 39, which recited the very method of "retracting" and "recovering" practiced by Evolut users, *does not* require pushing because "[p]ushing appears nowhere in claim 39." CBr.47. (Colibri changes its tune when discussing Evolut's instructions, which also "nowhere" say "pushing," only retracting; more on that soon.) But if Evolut's retracting requires pushing as a matter of "simple physics," CBr.11, so too does the device of canceled claim 39. To use Colibri's words, its "'no push, only retract' theory defies physics." CBr.59. Either retracting necessarily requires pushing, or it does not—Colibri cannot have it both ways.

But that is exactly what Colibri is trying to do. Canceled claim 39 recited the exact deployment method Colibri now accuses of infringement:

> 39. (New) A method of controlled release of a percutaneous replacement heart valve in a patient where a bioprosthetic heart valve is indicated, comprising:

> after the advancing step, partially deploying the replacement heart valve device within the patient by retracting the moveable sheath to expose a portion of the replacement heart valve device; and
>
> after the partially deploying step, recovering the portion of the replacement heart valve device within the moveable sheath that was exposed in order to address a problem with the position of the replacement heart valve device within the patient.

Appx23140-23141.

Colibri's contention that canceled claim 39 is somehow different than Evolut's method of operation because the claim "nowhere" recites "pushing" denies the "basic physics" necessary for Colibri's equivalents theory. CBr.37-44; *see also, e.g.*, CBr.11 ("[T]he equivalence is simple physics."). Apart from this, Colibri offers no other distinction between canceled claim 39 and the accused Evolut method.

To avoid the consequences of its decision to cancel claim 39, Colibri argues that prosecution-history estoppel cannot apply because canceling claim 39 had no effect on pending claim 34, which issued as asserted claim 1. CBr.46-47. According to Colibri, the cancellation of one independent claim cannot "have an estoppel effect on a separate, independent claim that recites a different limitation." CBr.47. But Medtronic showed that this Court's precedent holds otherwise: No particular claim relationship is required for prosecution-history estoppel to apply.

MBr.48-50 (citing *Energy Transp. Grp., Inc. v. William Demant Holding A/S*, 697 F.3d 1342, 1359 (Fed. Cir. 2012); *J&M Corp. v. Harley-Davidson, Inc.*, 269 F.3d 1360, 1368 (Fed. Cir. 2001); *Pacific Coast Marine Windshields Ltd. v. Malibu Boats, LLC*, 739 F.3d 694, 703 (Fed. Cir. 2014); and *Mycogen Plant Sci., Inc. v. Monsanto Co.*, 91 F. App'x 666, 668 (Fed. Cir. 2004)). Colibri addresses none of these cases in its brief.

Colibri amended claim 39 in the most narrowing way possible: cancelling it entirely. By so doing, it "deprived" the PTO "of the opportunity to consider whether [the subject matter of claim 39]," *which stood rejected*, "w[as] patentable." *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1108 (Fed. Cir. 1996). Having avoided the PTO's scrutiny to gain issuance of the '294 patent, Colibri now seeks to use equivalents to assert infringement of subject matter it could not obtain during prosecution. And here, Colibri seeks to avoid PTO scrutiny yet again, by using equivalents to enlarge claim scope post-issuance in ways that it could not through proper means, such as reissuance. *See In re Clement*, 131 F.3d 1464, 1469 (Fed. Cir. 1997) ("If the scope of the reissue claim is … *broader than that of the canceled claim, then the patentee is clearly attempting to recapture surrendered subject matter* and the reissue claim is, therefore, unallowable.").

Because Colibri canceled claims covering the very same deploying-by-retracting method used in Evolut, Medtronic cannot infringe the asserted claims as a matter of law.

**E. Colibri's "Entirely Within" Argument Confirms Medtronic's Evolut Does Not Infringe The Asserted Claims**

Boxed in by its decision to claim "a valve residing *entirely within* an inner channel of the stent member," Appx159, Colibri now urges a narrow definition of the term "valve." It defines "valve" as the leaflets alone because only they "open and close." CBr.50. Colibri proposed this same definition below, Appx1341, but the district court rejected it. Appx2099-2109; Appx2320. The court instead defined the term broadly to include all "portions" (*plural*) of the device "that allow the one-way flow of blood." Appx2320. As Dr. Gallegos's undisputed testimony confirms, the inner skirt is such a portion because it seals against the natural anatomy of the aorta to channel blood through the valve, Appx21361-21363 (583:19-585:1), and prevents backflow in the opposite direction. Appx21363-21364 (585:2-586:1).

As Medtronic showed, Dr. Gallegos testified that "one-way" blood flow requires (i) allowing blood to flow from the heart to the aorta *and* (ii) preventing flow in the opposite direction. MBr.51-52 (citing Appx21361 (583:3-18);

Appx5484 (¶151)). Based on his own definition, Dr. Gallegos admitted that the inner skirt "allows one-way flow of blood." Appx21367 (589:19).

Like the district court, Colibri says that Dr. Gallegos's admission is taken "out of context," CBr.51, but never explains in what context his admission should be understood. MBr.51-53. As Colibri confirms, Dr. Gallegos testified that without a functioning inner skirt, blood would flow in "multiple directions." CBr.51. He said this at trial, Appx21366-21367 (588:14-589:14), and in his opening expert report. Appx5493 (¶167 n.16). The statement from his expert report is the "this" in the question leading up to his admission:

Q. Okay. So when we look at this, when the inner skirt like an inner skirt in the Evolut valves is not malfunctioning and it's doing its job, then it allows the one-way flow of blood, right?

A. It allows one-way flow of blood, yes.

Appx21367 (589:15-19).

Even without Dr. Gallegos's admission, his other testimony proves that the inner skirt is part of the "valve" because without it, blood would flow in "multiple directions." Appx21366-21367 (588:14-589:14); Appx5493 (¶167 n.16). Medtronic's witnesses agree. Appx21689-21690 (889:4-890:13); Appx22018-22023 (1185:22-1190:13). Colibri does too. CBr.51. So, there is no dispute that

"one-way" blood flow can be achieved only with the inner skirt—and that makes it part of the "valve," by definition.

Because Evolut's inner skirt is undisputedly necessary to "allow the one-way flow of blood," it is part of the "valve." And portions of that skirt undisputedly reside outside of the stent member. Appx21355 (577:4-8). No reasonable jury could find that the accused products meet the "valve residing entirely within" limitation.

## III. THE DISTRICT COURT SHOULD HAVE GRANTED JUDGMENT OF NO ACTIVE INDUCEMENT

Medtronic showed Colibri failed to prove Medtronic acted with knowing, specific intent to induce infringement. MBr.53-58. Specifically, Medtronic showed that it only instructs users to deploy by retracting—never pushing. Appx22867 (Step 22); Appx26432 (Step 22); Appx26514 (Step 5); Appx26609 (Step 5); Appx21762-21763 (962:23-963:5). There is no evidence anyone at Medtronic knew, or even believed, that Evolut users were infringing under Colibri's equivalents theory. Colibri says "overwhelming evidence showed inducement," CBr.52-57, but points to none of this supposedly overwhelming proof. Colibri also says (repeatedly) that "Medtronic does not deny that it actively induced doctors' infringing acts when instructing them to use its Evolut," CBr.52, but this is *exactly* what Medtronic disputes. Colibri only makes this claim by

conflating Medtronic's knowledge of Evolut's instructions with knowledge of active inducement.

Colibri has the legal test wrong. It is not enough that Medtronic knew it was instructing users to act in a way *later* found to be infringing. Rather, it "must be shown … to have *knowingly* induced infringement, not merely knowingly induced the *acts* that constitute direct infringement." *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006) (emphasis in original). There is no evidence of knowing inducement of infringement.

Colibri disagrees, but points only to this statement: "Approach target depth (3 mm) from a supra-annular starting position to allow valve to descend to target depth." CBr.43-44 (quoting Appx28761). No mention of "pushing" whatsoever. Unlike Colibri's canceled claim 39 argument, however, here the absence of the term "pushing" is no matter, because according to Colibri, its "experts … explained that Medtronic's 'no push, only retract' theory defies physics." CBr.59. But that explanation was provided *at trial*, not contemporaneous with the alleged infringement. All the evidence shows that Medtronic had no knowledge that it was inducing infringement. MBr.53-58.

Colibri's response is that "there was ample evidence Medtronic knew it was infringing—Colibri had so indicated in discussions." CBr.14. Colibri says it did so "clearly." CBr.9; *see also* CBr.20 ("Colibri conveyed to Medtronic that it was

infringing"). But the only evidence Colibri points to is this testimony from its witness, Mr. Schauble:

> Q. Did it ever come up in these conversations that Colibri believed Medtronic was infringing the '294 patent?
>
> A. We never used those specific words, but we insinuated it.

Appx21477 (699:10-14).

No reasonable jury "would accept [this testimony] as adequate to support [the] conclusion" that Colibri told Medtronic of its equivalents theory. *Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*, 786 F.3d 960, 964 (Fed. Cir. 2015). What is more, although Colibri clings to "context" in other instances, it ignores context here: Mr. Schauble testified that Colibri intentionally avoided even mentioning infringement in discussions with Medtronic because Colibri was "trying to partner with Medtronic" and "wanted … to engage" Medtronic, so "[t]he last thing that [Colibri] wanted to do was to be aggressive and scare [Medtronic] away." Appx21477 (699:14-22). Such intentionally cloaked "insinuat[ions]" are the polar opposite of "clearly" telling Medtronic anything.

Finally, Colibri says that "[t]his Court routinely upholds induced-infringement verdicts involving the doctrine of equivalents without requiring … a finding" of knowledge of inducing infringement. CBr.57. But its three cited cases

are inapposite. *WCM Industries, Inc. v. IPS Corp.* is non-precedential and does not address the inducement standard at all; Colibri cites only the opinion's "background" section. 721 F. App'x 959, 964-65 (Fed. Cir. 2018). The others predate *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011) (abandoning the "should have known standard" in favor of "actual knowledge" or "willful blindness"); *see also Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 639 (2015) ("[I]nducing infringement attaches only if the defendant knew … the induced acts constitute patent infringement."), and are factually distinct. The defendant in *Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683 (Fed. Cir. 2008), "was on notice of [the patentee's] patents *and infringement contentions*." *Id.* at 700. Here, Mr. Schauble himself said Colibri intentionally and strategically withheld its infringement charge. Appx21477 (699:14-22). (This fact alone scuttles Colibri's "willfu[l] blind[ness]" argument, made in a single throwaway sentence, CBr.57, and which it never argued to the jury.) And *SEB S.A. v. Montgomery Ward & Co.*, 594 F.3d 1360 (Fed. Cir. 2010), concerned "deliberate indifference" to the existence of a *patent*, not actual knowledge of the patentee's infringement contentions, and involved a defendant who purchased and "copied all but the cosmetics" of the patented device. *Id.* at 1377. Nothing of the sort happened here.

No reasonable jury could find Medtronic actively induced infringement of the '294 patent.

## IV. THE DISTRICT COURT SHOULD NOT HAVE ALLOWED COLIBRI'S DAMAGES THEORY AT TRIAL

Medtronic showed that the district court erred in ruling that Dr. Vellturo's reliance on the Edwards-Medtronic agreement was permissible. MBr.59-66. Medtronic also showed that Dr. Vellturo's royalty base impermissibly included products that are used in an infringing manner 30-40% of the time at most. MBr.66-70. Colibri responds by arguing that the Edwards-Medtronic agreement was sufficiently comparable. CBr.61-66. But Colibri bases its argument on a showing of "baseline comparability" discussed in *Bio-Rad Laboratories., Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1374 (Fed. Cir. 2020), involving negotiated licenses, not settlement agreements, which this Court treats *very* differently. *Id.* at 1373 ("The propriety of using prior settlement agreements to prove the amount of a reasonable royalty *is questionable*."); *LaserDynamics, Inc. v. Quanta Comput. USA, Inc.*, 694 F.3d 51, 77 (Fed. Cir. 2012) (expressing "*longstanding disapproval* of relying on settlement agreements to establish reasonable royalty damages").

Colibri says Dr. Vellturo "factored into his analysis" a number of factors in considering an appropriate royalty rate, CBr.65, but as Medtronic showed, Dr. Vellturo acknowledged only one difference: the parties' competitive

relationship. MBr.62 (citing Appx21646 (821:13-16)). Colibri tries to excuse this by saying (repeatedly) that "Dr. Vellturo … chose a rate from the bottom of the range" of royalty rates from the Edwards-Medtronic agreement. CBr.64. But as Medtronic showed, even choosing a rate at the bottom of the so-called "range" cannot excuse Dr. Vellturo's failures. MBr.63-64. And Colibri cites no case justifying such a stratagem. The #% rate Dr. Vellturo chose corresponds to rights to # patents (the Spenser family), including apparatus claims, owned by Medtronic's direct commercial competitor, and "type of patent applications and patents as well." Appx21599-21600 (829:24-830:4). Dr. Vellturo never accounted for these differences.

Colibri's response highlights another problem: Dr. Vellturo never accounted for the fact that the hypothetical Colibri-Medtronic license is based primarily—between 60-70%—on "the option value of the patented method." CBr.66. The Edwards-Medtronic type of agreement included numerous patents with *apparatus* claims, all of which were allegedly infringed 100% of the time Medtronic used its devices. Here, the hypothetical negotiation concerns a single patent with three *method* claims, used in an infringing manner 30-40% of the time at most. No evidence—from Dr. Vellturo or otherwise—shows Medtronic would have paid the same royalty rate for # patents, including apparatus claims that

were infringed 100% of the time, as for infringement of one patent it does not infringe (if at all) most of the time.

In any event, Medtronic showed that Dr. Vellturo's royalty base impermissibly included products never used to infringe. MBr.66-70. Colibri disagrees, citing *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075 (Fed. Cir. 1983), and *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009), as support. CBr.66-70. Medtronic showed why *Hanson* is inapposite, MBr.69-70, and Colibri never grapples with that in response. As for *Lucent*, which concerned infringing *products*, not *methods*, Colibri relies on dicta in which this Court discussed a hypothetical invention "for … a method of detecting fires," where "value is added simply by having the patented invention available for use." 580 F.3d at 1334. The non-binding nature of this hypothetical aside, it is irrelevant that "value is added" if the patent's claims do not cover that "value." Although this Court's *Lucent* hypothetical did not describe any claims, if there had been claims, as analogous here, to require *actually* detecting fires, the mere availability of the option would not infringe them.

The asserted claims recite the affirmative step of "recovering the distal portion of the replacement heart valve device within the moveable sheath that was exposed in order to address a problem with the position of the replacement heart valve device within the patient." MBr.66 (quoting Appx159 (14:32-37)). The

claims do not recite the mere "option" or capability of such recovery—only *actual recovery* infringes. So, while there may be "value [in] having the option to use the patented method," CBr.67, that is irrelevant—the asserted claims are "directly infringed only by … practicing the patented method." *RF Delaware, Inc. v. Pac. Keystone Techs., Inc.*, 326 F.3d 1255, 1267 (Fed. Cir. 2003). As it stands, the overwhelming majority of Colibri's damages award "include[s] activities that do not constitute patent infringement." *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1343 (Fed. Cir. 2015).

## CONCLUSION

For these reasons and those in Medtronic's opening brief, this Court should reverse the judgment of infringement and no invalidity. Alternatively, this Court should reverse the damages award. At minimum, a new trial should be ordered.

Dated: April 29, 2024

Respectfully submitted,

/s/ Gregory A. Castanias

Gregory A. Castanias
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
(202) 879-3939
gcastanias@jonesday.com

Joseph D. Farley
JONES DAY
325 John H. McConnell Blvd.
Suite 600
Columbus, OH 43125

Kelly Holt
JONES DAY
250 Vesey Street
New York, NY 10281-1047

Mark D. Fowler
DLA PIPER LLP (US)
3203 Hanover Street
Suite 100
Palo Alto, CA 94304
(650) 833-2000
mark.fowler@us.dlapiper.com

Stanley J. Panikowski
DLA PIPER LLP (US)
4365 Executive Drive
Suite 1100
San Diego, CA 92121

*Counsel for Appellant Medtronic CoreValve, LLC*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) and Federal Circuit Rule 32(b)(1) because it contains 7,000 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in Times New Roman 14-point font.

Dated: April 29, 2024

*/s/ Gregory A. Castanias*
Gregory A. Castanias
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
(202) 879-3939
gcastanias@jonesday.com

*Counsel for Appellant Medtronic CoreValve, LLC*

## CERTIFICATE OF COMPLIANCE WITH RULE 25.1(e)(2)

I certify that the foregoing brief complies with the limitations set forth in Federal Circuit Rule 25.1(d)(1)(A) and contains four unique words (including numbers) marked as confidential.

Dated: April 29, 2024

*/s/ Gregory A. Castanias*
Gregory A. Castanias
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
(202) 879-3939
gcastanias@jonesday.com

*Counsel for Appellant Medtronic CoreValve, LLC*